UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

CEDAR PETROCHEMICALS, INC.,

        Plaintiff,

-v-                                    No. 06 Civ. 3972 (LTS)(JCF)

DONGBU HANNONG CHEMICAL CO., LTD.,

        Defendant.

------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2 8 SEP 2011

## MEMORANDUM ORDER

In this breach of contract action, Cedar Petrochemicals, Inc. ("Cedar") asserts that Defendant Dongbu Hannong Chemical Co., Ltd. ("Dongbu") delivered non-conforming liquid phenol in violation of written and oral contracts and in contravention of its obligations under the Convention on Contracts for the International Sale of Goods, Apr. 11, 1980, S. Treaty Doc. No. 98-9 (1983), 19 I.L.M. 671 (1980), reprinted at 15 U.S.C. App. (1998) ("CISG" or "Convention"). The parties now cross-move for summary judgment. Dongbu's motion for summary judgment is based on the legal contention that the contract displaced the provisions of the CISG under which Cedar brings its action. Cedar's cross-motion is premised on the factual contention that the phenol was corrupted prior to its delivery, which was governed by a "Free on Board" ("F.O.B.") clause. The Court has diversity jurisdiction of this action pursuant to 28 U.S.C. § 1332. The Court has considered carefully the parties' submissions and, for the following reasons, denies both motions.

BACKGROUND

The following material facts are undisputed unless otherwise indicated.[1] On May 17, 2005, Cedar, a New York-based petrochemicals trader, entered into a contract with Dongbu, a South Korean corporation specializing in the same, whereby the latter agreed to deliver a certain quantity of "Pure Phenol as per attached Kumho's Standard Guaranteed Sales Specs"[2] to a ship called the Bow Flora in the port of Ulsan, South Korea, at which point Cedar would take possession. (Contract, attached as Ex. 1 to Third Amended Complaint ("TAC")). The terms and conditions of the Contract provided that "Intercoms 2000 as amended to date" would govern and contained the delivery term "FOB Ulsan Anchorage, Korea"; it further provided that the phenol was to be inspected "[b]y a mutually acceptable independent surveyor whose finding as to quantity/quality as per shoretank figures at load port are final and binding on both parties." The Contract expressly stated that it represented "the entire agreement of the parties."

The parties concur that the final agreement called for phenol that met a color specification of 10 Hazen units maximum ("10 max") on the Platinum-Cobalt Scale ("Pt/Co Scale"). However, the parties offer divergent accounts as to how and when they arrived at that number. Cedar has now advanced two contradictory narratives. In its complaint, Cedar claimed that <u>prior</u> to memorializing the contract, it informed Dongbu of its intention to re-sell the phenol

---

[1] Facts characterized as undisputed are identified as such in the parties' statements pursuant to Local Civil Rule 56.1 or drawn from evidence as to which there is no non-conclusory, contrary factual proffer. Citations to the parties' respective S.D.N.Y. Local Civil Rule 56.1 statements ("___ 56.1 Stmt") and responses thereto ("___ 56.1 Resp. Stmt") incorporate by reference citations to the underlying evidentiary submissions.

[2] Kumho is a South Korean corporation that manufactured the phenol; it was named as a defendant in the TAC, but the action was dismissed as against Kumho for lack of personal jurisdiction. See Order of March 3, 2009.

to Erista, a Spanish corporation and prominent end-user of petrochemicals. (TAC ¶¶ 18-19). According to this account, "Kumho's Standard Guaranteed Sales Specs" called for a color maximum of 20 Hazen units, which was ten units over Erista's requirement; when the parties memorialized the May 17, 2005, agreement, it was understood that Dongbu would deliver phenol that conformed to Erista's more stringent color specification of 10 Hazen units. (Id. ¶ 20; Declaration of Charlene Silva, ¶¶ 15-18, attached as Ex. 3 to TAC). Plaintiff's summary judgment materials tell a different story. Here, Cedar asserts that it informed Dongbu of its intention to re-sell the phenol to Erista <u>after</u> the contract was memorialized and that, based on these discussions, the contract was subsequently modified to incorporate Erista's "10 max" color specification, which was 5 Hazen units <u>greater</u> that Kumho's. (Cedar 56.1 Stmt ¶¶ 11, 17-18). Dongbu disputes both accounts and claims that Kumho's color specification was always "10 max," and that the Erista specifications were never incorporated into the Contract, prior or subsequent to May 17, 2005. (Dongbu 56.1 Resp. Stmt ¶¶ 17-22).

On or about May 21, 2005, the phenol was loaded from the manufacturer's shore tanks onto the Green Pioneer, a ship chartered by the manufacturer, in the port of Yosu, South Korea. (Dongbu 56.1 Stmt ¶ 16). The phenol was then shipped to Ulsan, South Korea and transferred to Cedar's vessel, the Bow Flora. In accordance with an internationally recognized inspection regime, independent surveyors took samples at several points during the loading and transport of the phenol. (Declaration of Martin East ¶¶ 14-26, docket number 81). The first such test was conducted on the phenol in the shore tanks as per the inspection clause. During each test, multiple samples were drawn: one for contemporaneous testing, and two – retained by the Bow Flora's crew and the surveyor in Ulsan, respectively – for later testing should quality issues arise. (Id.). Each contemporaneous test indicated that the phenol was on-specification.

After the Bow Flora was fully loaded in Ulsan, the independent surveyors took a final sample from its tanks and determined that the phenol was on-specification with a color of 4 Hazen units. (Cedar 56.1 Stmt ¶ 40). Shortly thereafter, Cedar tendered payment to Dongbu. (Id. ¶ 43).

When the phenol arrived in Rotterdam, the Netherlands, on July 20, 2005, tests revealed that its color had degenerated to over 500 Hazen units. (TAC ¶¶ 47-48). Subsequent tests of the samples retained on the Bow Flora (the "Rotterdam Samples") showed that all samples were well above the specified maximum color value. (TAC ¶ 52). After Cedar informed Dongbu of the phenol's degradation, the parties agreed to jointly test the samples retained in Ulsan. These tests showed that the first and last samples ("Samples D" and "Sample A") – drawn from the shore tanks and from the Bow Flora's fully loaded tank, respectively – were on-specification. (Cedar 56.1 Stmt ¶ 57). The middle two samples ("Sample C" and "Sample B") – drawn from the Green Pioneer and from the Bow Flora's tank after one foot of phenol had been loaded – were off-specification. (Id.). The tests revealed that the sample drawn from the Green Pioneer contained particulate matter, which was not found in any of the other samples. (Deposition of Martin East at 207:8-13, attached as Ex. 12 to Aff. of Carolyn Traister Schiff).

On May 24, 2006, Cedar commenced the instant action, which alleges that Dongbu breached two provisions of the CISG: first, Article 35, which requires that the goods be fit for ordinary usage or any particular purpose that is "expressly or impliedly made known to the seller," and second, Article 36, which provides that a seller is liable for defects present before risk transfers to the buyer "even though the lack of conformity becomes apparent only after that time." Dongbu moves for summary judgment on the grounds that the contract displaced the provisions of the CISG on which Cedar relies and that, under the express terms of

the contract, Dongbu was only obligated to provide phenol that conformed to the agreed-upon specifications at the time of delivery. Cedar maintains that the CISG applies in full and cross-moves for summary judgment on the grounds that the evidence, including two expert reports,[3] conclusively establishes that the phenol was damaged prior to its delivery to the Bow Flora.

## DISCUSSION

Summary judgment is to be granted in favor of a moving party if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (the moving party bears the burden of establishing that there is no genuine issue of material fact). A fact is considered material "if it might affect the outcome of the suit under the governing law," and an issue of fact is a genuine one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson, 477 U.S. at 248). When cross-motions for summary judgment are filed, "the standard is the same as that for individual motions for summary judgment." Natural Res. Def. Council v. Evans, 254 F. Supp. 2d 434, 438 (S.D.N.Y. 2003). "The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." Id. (citing Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001)).

---

[3] Dongbu's motion to strike the Reports of Martin East and John Minton was denied by Magistrate Judge Francis on January 14, 2011. By an order entered contemporaneously herewith, Dongbu's objections to Judge Francis' order denying the motion to strike are overruled.

*Dongbu's Motion for Summary Judgment*

Dongbu identifies three contractual terms that purportedly evidence the parties' intent to derogate from the CISG: (1) the delivery term, "F.O.B. Ulsan, Anchorage"; (2) the term providing that inspection "[b]y a mutually acceptable independent surveyor whose finding as to quantity/quality as per shoretank figures at load port are final and binding on both parties"; and (3) the clause providing that the contract reflects "the entire agreement of the parties."

The CISG is an international convention that governs the formation of international sales contracts, as well as the rights and obligations of the parties. The Convention "automatically applies to international sales contracts between parties from different contracting states unless the parties agree to exclude [its] application." Zhejiang Shaoxing Yongli Printing & Dyeing Co., Ltd. v. Microflock Textile Group Corp., No. 06-CV-22608(JJO), 2008 WL 2098062, at *2 (S.D. Fla. May 19, 2008); CISG Art. 6. Where parties wish to exercise their right to derogate from the CISG, they must do so explicitly. See BP Oil Int'l, Ltd., v. Empresa Estatal Petroleos de Ecuador, 332 F.3d 333, 337 (5th Cir. 2003) (holding that "if the parties decide to exclude the [CISG], it should be expressly excluded by language which states that it does not apply"); Asante Techs., Inc. v. PMC-Sierra, Inc., 164 F. Supp. 2d 1142, 1150 (N.D. Cal. 2001) (holding that a choice of law provision selecting British Columbia law did not "envince a clear intent to opt out of the CISG"). None of the terms Dongbu cites explicitly exclude or otherwise express a clear intent to displace the CISG.

Dongbu's contention that the "F.O.B." term displaces Article 36 liability for hidden defects that only manifest after delivery is plainly incorrect. As provided in the contract, the definition of "F.O.B." is furnished by Incoterms (International Commercial Terms) 2000, a

widely used glossary of trade terms published by the International Chamber of Commerce. According to Incoterms 2000:

> "Free on Board" means that the seller delivers when the goods pass the ship's rail at the named port of shipment. This means that the buyer has to bear all costs and risks of loss or damage to the goods from that point.

It is worth noting at the outset that the entire body of Incoterms – "F.O.B" included – is incorporated into the CISG through Article 9(2) thereof. See St. Paul Guardian Ins. Co. v. Neuromed Medical Systems & Support, GmbH, No. 00-CIV-9344(SHS), 2002 WL 465312, *3-4 (S.D.N.Y. Mar. 26, 2002). Dongbu makes no attempt to explain how a term that is made part of the CISG could also derogate from it. More to the point, because the contract does not explicitly displace any provision of the CISG, Dongbu's argument depends on the errant assumption that Free on Board is so fundamentally incompatible with Article 36 that the choice of the former necessarily implies a decision to exclude the latter. Free on Board means that, if the goods are injured before risk[4] has passed to the buyer, the seller is liable; if the injury occurs afterward, the buyer is liable. Id. Article 36 is wholly compatible with that division of risk; it merely affirms that the decisive question when assigning liability is who bore the risk of loss at the time the injury occurred, not when the injury manifested. See Joseph Lookofsky, Article 36: Time of Conformity Determation in International Encyclopedia of Laws – Contracts, Suppl. 29 (J. Herbots, et. al., eds., 2000), available at http://www.cisg.law.pace.edu/cisg/biblio/loo36.html ("Article 36(1) makes it clear that the seller remains liable for any non-conformity existing at that particular point in time, i.e., even if the non-conformity in question first becomes

---

[4] "Risk" refers to "accidental injury to the goods." P.M. Roth, The Passing of Risk, 27 American Journal of Comparative Law 291 (1979), available at http://www.cisg.law.pace.edu/cisg/biblio/roth.html.

discoverable by the buyer at a later point in time.") (emphasis in original). If Cedar succeeds in showing that the phenol was damaged prior to delivery to the Bow Flora, the FOB term will not shield Dongbu from liability.

Dongbu also vaguely intimates that the inspection clause extinguishes any liability under Article 36, but it offers no explanation as to how. The inspection clause only mentions the tests conducted on the phenol in the shore tank, the first of many tests conducted over the course of delivery. Dongbu nonetheless appears to construe this clause to mean that it fulfilled its contractual obligations concerning the phenol's quality when the independent surveyors drew samples from the shore tanks and certified that it was on-specification. This construction would render the "F.O.B." term and the elaborate, mutually agreed-upon inspection regime a nullity. If, hypothetically, the surveyors had tested the phenol moments after its loading onto the Green Pioneer and found it wildly off-specification, Dongbu would be free of liability. Risk of injury would effectively pass to Cedar upon extracting the phenol from the shore tanks in Yosu. Were that the case, there would be little use in conducting periodic tests of the phenol after the shore tank figures were ascertained. "There is no surer way to find out what parties meant, than to see what they have done," Brooklyn Life Ins. Co. v. Dutcher, 95 U.S. (5 Otto) 269, 273 (1877), and the parties' conduct here clearly demonstrates that they did not intend the inspection term to operate as Dongbu suggests.

Dongbu's last ground for asserting that the agreement derogated from the CISG is the contract's "entire agreement" language. According to Dongbu, this merger clause precludes Cedar from relying on extrinsic evidence regarding the ordinary usage of phenol or Cedar's intent to re-sell the shipment to Erista. The problems with this argument are manifold. First, the CISG does not merely lack a parol-evidence rule, it commands courts to consider

extrinsic evidence that illuminates the parties' intent. CISG Art. 8; MCC-Marble Ceramic Center, Inc., v. Ceramica Nuova d'Agostino, S.p.A., 144 F.3d 1384, 1387 (11th Cir. 1998); accord Guang Dong Light Headgear Factory Co. v. ACI Int'l, Inc., 521 F. Supp. 2d 1153, 1166 (D. Kan. 2007); Claudia v. Olivieri Footwear Ltd., No. 96 Civ. 8052(HB)(THK), 1998 WL 164824, at *4-5 (S.D.N.Y. Apr. 7, 1998). CISG Advisory Council opinions[5] and the one U.S. court to explicitly consider this issue have held that "'extrinsic evidence . . . should not be excluded, unless the parties actually intend the Merger Clause to have this effect'" and that "'Article 8 requires an examination of all relevant facts and circumstances when deciding whether the Merger Clause represents the parties' intent.'" See TeeVee Toons, Inc. v. Gerhard Schubert GmbH, No. 00 Civ. 5189(RCC), 2006 WL 2463537, *8 (S.D.N.Y. Aug. 23, 2006) (quoting CISG-AC Opinion no. 3 ¶ 4.5 (Oct. 23, 2004)). Viewed in the light most favorable to Cedar, there is clearly a genuine dispute as to whether the parties intended the merger clause to exclude all extrinsic evidence. Second, even if the merger clause were to effectively re-animate the parol-evidence rule, such a rule would only "bar[] evidence of an earlier oral contract that contradicts or varies the terms of a subsequent or contemporaneous written contract." MCC-Marble Ceramic Center, 144 F.3d at 1388. Here, there is a genuine dispute as to whether the parties' negotiations concerning the re-sale to Erista occurred before or after the contract was memorialized. Finally, even if the merger clause displaced Article 8's dictate that courts consider extrinsic evidence regarding the parties' negotiations, such clauses do not apply to

---

[5]     Given the relative dearth of domestic authority interpreting the CISG, U.S. courts have relied heavily on the Advisory Council opinions. See e.g., TeeVee Toons, Inc. v. Gerhard Schubert GmbH, No. 00-CIV-5189(RCC), 2006 WL 2463537, *8 (S.D.N.Y. Aug. 23, 2006) (citing Delchi Carrier SpA v. Rotorex Corp., 71 F.3d 1024, 1027-29 (2d Cir 1995)).

CISG Article 9, which allows parties to introduce evidence of common international trade practices. CISG Advisory Council Opinion No. 3 ¶ 4.7. Thus, even if Dongbu showed that the parties intended the merger clause to exclude Article 8 and that Cedar informed Dongbu of its intent to re-sell the phenol prior to the contract's memorialization, Cedar could still introduce evidence of petrochemical trade practices to bolster the inference that Dongbu knew or should have known that the phenol would be unfit for ordinary usage if it degraded prior to reaching its final destination.

*Cedar's Motion for Summary Judgment*

Cedar's cross-motion for summary judgment is likewise unavailing. Cedar contends that the tests, "coupled with simple deductive reasoning," irrefutably establish that the phenol was damaged prior to delivery to the Bow Flora. In the alternative, Cedar argues that the particulate matter found in the sample drawn from the Green Pioneer ("Sample C") proves that Dongbu breached its obligation to provide "pure Phenol." Cedar notes that each of the samples taken from the Green Pioneer tested off-specification and, from this, concludes that the phenol must have been corrupted either during loading or transport aboard the Green Pioneer – in either case, <u>before</u> delivery to the Bow Flora. The glitch in Cedar's "deductive reasoning" is that it fails to account conclusively for the fact that the Uslan sample taken from the Bow Flora ("Sample A") was still on-specification.

Dongbu has advanced its own theory which, consistent with the tests, explains how the phenol might have degraded after delivery to the Bow Flora. According to this theory, the Rotterdam tests cannot be relied upon because too little is known about the phenol sample's storage conditions aboard the Bow Flora to eliminate the possibility that the phenol degraded

due to some other cause. (Def. Resp. at 23-24 (quoting Deposition of Martin East at 442:13-25)). As for the Ulsan tests, Dongbu notes that the particulate matter in Sample C was not found in any other sample and hypothesizes that the sample itself was contaminated. The availability of this potential explanation means that Sample C's non-conformity does not definitively prove that the entire cargo was defective. Dongbu accounts for Samples B and A by postulating that the Bow Flora's containers were overheated, which singed the first foot of phenol and caused Sample B to degrade; once the remainder of the phenol was loaded, the temperature declined and the color returned to normal. Only then was Sample A drawn.

During depositions, Dongbu floated this theory to Cedar's expert, Martin East, who acknowledged that many of the tests necessary to evaluate Dongbu and Cedar's competing theories were never conducted. (Def. Resp. at 17, n.4 (citing East Dep. 226:11-24)). When asked whether Dongbu's theory was possible, Mr. East conceded "[t]here is no absolute support for one version or another . . . . Either is possible." (Id. at 17 (quoting East Dep. 225:23-226:5)). That statement is fatal to Cedar's cross-motion for summary judgment. Neither party has presented evidence that conclusively establishes when or how the phenol was damaged. There are genuine disputes of material fact as to both timing and causation. Accordingly, Cedar's cross-motion for summary judgment is denied.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment dismissing Plaintiff's complaint is denied in its entirety. Plaintiff's cross-motion for summary judgment is also denied in its entirety. This Memorandum Order resolves docket entry nos. 68 and 80.

The final pre-trial conference in this case will be held on January 13, 2012 at 3:30pm. The parties must confer and make submissions in advance of the conference in accordance with the Pretrial Scheduling Order (docket entry no. 17). The parties must also meet with Magistrate Judge Francis for settlement purposes in advance of the final pre-trial conference.

SO ORDERED.

Dated: New York, New York
September 28, 2011

_____
LAURA TAYLOR SWAIN
United States District Judge