UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

|  |  |  |
|---|---|---|
| CEDAR PETROCHEMICALS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | 06 Civ. 3972 (AJN) |
| | ) | |
| | ) | **ECF CASE** |
| v. | ) | |
| | ) | |
| DONGBU HANNONG CHEMICAL CO., LTD. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
_____ )


**DEFENDANT'S PROPOSED FINDINGS
OF FACT AND CONCLUSIONS OF LAW**


McDermott Will & Emery LLP
340 Madison Ave
New York, NY  10173
Tel: (212) 547-5400
Fax: (212) 547-5444

*Attorneys for Defendant Dongbu Hannong Chemical Co., Ltd.*

Defendant Dongbu Hannong Chemical Co., Ltd. ("Dongbu" or "Defendant") respectfully submits the following Proposed Findings Of Fact and Conclusions Of Law in advance of the upcoming bench trial in this matter. Dongbu also incorporates by reference all facts already stipulated to by Dongbu and Plaintiff Cedar Petrochemicals, Inc. ("Cedar") in the parties' Joint Pre-Trial Statement filed with this Court on July 8, 2013.

## SUMMARY

1.      On May 17, 2005, Cedar entered into a contract ("Contract") with Dongbu in which Dongbu agreed to deliver a certain quantity of "Pure Phenol as per attached Kumho's Standard Guaranteed Sales Specs"[1] to a vessel called the BOW FLORA in the port of Ulsan, South Korea, at which point Cedar would take possession.

2.      In the Contract, which the parties agreed was their "entire agreement," the parties expressly agreed to price, quality, quantity, delivery and payment terms. Dongbu delivered the liquid phenol to Cedar pursuant to the express terms of the Contract. Cedar accepted delivery and paid the Contract price.

3.      After the Phenol was in Cedar's possession, it continued on its journey from Korea to Rotterdam, The Netherlands. Upon arrival, the Phenol was tested to determine whether it stayed on-specification, particularly with respect to its color. Despite being delivered to Cedar on specification in Ulsan, the test in Rotterdam suggested that the Phenol, at arrival, was off-specification for color.

4.      As a result, Cedar requested that samples of the Phenol collected at various stages of the Phenol's transshipment be tested to determine the cause of the Phenol's discoloration.

5.      The samples were tested during a "joint analysis" in August 8, 2005. Dongbu asserts that this analysis demonstrates that (i) the Phenol did not have an inherent defect and (ii) the Phenol was damaged after it was loaded upon the BOW FLORA, i.e., after the risk of loss was passed to Cedar.

6.      Although Cedar has proffered two alleged "expert" witnesses to interpret the test results, there are multiple possible – and equally plausible – explanations as to the timing and cause of the Phenol's discoloration. In fact, neither proposed expert can state with greater than 50 percent certainty that the Phenol's discoloration was caused by either Cedar or Dongbu.

7.      Indeed, in its order deciding the parties' motions for summary judgment, this Court recognized the flaw in Cedar's proof. One of Cedar's proposed experts, Martin East, admitted that Dongbu's theory of the Phenol's damage is possible. The Court noted that this admission was fatal to Cedar's cross-motion for summary judgment. Respectfully, Cedar has no additional relevant, admissible evidence to present concerning the Phenol coloration and cannot

---

[1]      Kumho P&B Chemicals, Inc. ("Kumho") is a large Korean chemical manufacturing company that is in the business of trading, manufacturing, buying and selling various liquid petrochemical products. (DE 40 ¶¶ 9-10.)

meet its burden to show that its theory of the Phenol's discoloration is any more likely than that offered by Dongbu.  As a result, judgment should be entered for Dongbu.

## PROPOSED FINDINGS OF FACT

### II.    BACKGROUND

#### A.    Procedural History

8.    On or about May 24, 2006, Cedar filed its Complaint in this action.  (DE 1.)[2] Over a year later, on or about August 2, 2007, Cedar amended its Complaint (the "First Amended Complaint") (DE 22.)

9.    On or about August 13, 2007, Dongbu served its Answer and Affirmative Defenses to the First Amended Complaint.  (DE 23.)  Thereafter, on or about September 21, 2007, Dongbu moved pursuant to Fed. R. Civ. P. 12(c) to dismiss the First Amended Complaint. (DE 26.)

10.    On or about October 29, 2007, this Court granted Dongbu's motion to dismiss, but granted Cedar leave to re-plead its breach of contract claim.  (DE 35.)  The Court, however, dismissed Cedar's claim for indemnity without leave to replead.  (*Id.*)  Thereafter, on or about November 2, 2007, Cedar filed a Second Amended Complaint which purported to meet this Court's pleading requirements.  (DE 36.)

11.    On or about March 26, 2008, Cedar filed a Third Amended Complaint which sought to include non-party Kumho as a Defendant.  (DE 40.)

12.    On or about May 30, 2008, Dongbu served its Answer and Affirmative Defenses to the Third Amended Complaint and Cross Claim against Kumho.  (DE 41.)

13.    On or about July 30, 2008, Kumho moved to dismiss all claims asserted against it for lack of personal jurisdiction (DE 46).  Kumho's motion was granted on or about March 6, 2009.  (DE 59.)

14.    On or about July 30, 2010, Dongbu moved for summary judgment to dismiss the action, in its entirety, as a matter of law.  (DE 68-70)  Dongbu also moved to strike the expert reports of Cedar's designated experts Martin East ("East") and John Minton ("Minton"). (DE 66, 67.)  Further, Dongbu moved for sanctions against Cedar for spoliating evidence. (DE 71, 72.)  On or about September 13, 2010, Cedar cross-moved for summary judgment in its favor.  (DE 80-83.)

15.    On January 14, 2011, Magistrate Judge Francis denied Dongbu's motion to strike the expert reports of East and Minton as well as Dongbu's motion for sanctions ("January 14 Order").  (DE 113.)

---

[2]    "DE" refers to the entry on the Court's docket.

16.     On September 28, 2011, the Court denied the parties' cross motions for summary judgment ("Summary Judgment Order").  (DE 118.)  Also on September 28, 2011, the Court entered an order overruling Dongbu's objections to Judge Francis' January 14 Order.  (DE 117.)

### B.     The Parties

17.     Defendant Dongbu is a Korean corporation engaged in the business of manufacturing and selling petrochemical products.  (Pre-Trial Statement at ¶¶ 3, 4.)

18.     Plaintiff Cedar is a New York corporation engaged in the business of buying and selling liquid petrochemical products.  (*Id.* at ¶¶ 1, 2.)

19.     As noted above, non-party Kumho is a large Korean chemical manufacturing company that is in the business of trading, manufacturing, buying and selling various liquid petrochemical products.  (DE 40 ¶¶ 9-10.)

## III.    DONGBU DID NOT BREACH THE CONTRACT

### A.     The Contract

20.     As part of its petrochemical sales business, Dongbu frequently served as a "middleman" or "export agent" in connection with the sale of certain petrochemical products manufactured by Kumho to Kumho's customers in China.  (Chu Decl. ¶ 2.)

21.     Kumho had been selling liquid petrochemical products to Cedar for many years.  (*Id.* ¶ 3.)  Despite this longstanding relationship, in mid-April 2005 Kumho and Cedar, through its Korean agent H.V. Co., requested that Dongbu serve as a middleman/export agent in connection with the sale of 2,000 metric tons of phenol from Kumho to Cedar.  (*Id.* ¶ 3.)

22.     In May 2005, Kumho, H.V. Co., and Dongbu met at the Great Shanghai restaurant at the Koreana Hotel in Seoul.  (Pre-Trial Stmt. at ¶ 8.)

23.     At this meeting, the H.V. Co. and Kumho representatives explained to the Dongbu representatives the terms of the agreement between Cedar and Kumho.  (Chu Decl. at ¶ 4.)  The H.V. Co. and Kumho representatives informed the Dongbu representatives that Cedar and Kumho agreed that Kumho would sell to Cedar 2,000 tons (plus or minus 5%) of liquid phenol at a price of US$950 per metric ton (the "Phenol").  (*Id.* at ¶ 5.)  In addition, the Phenol was to meet the manufacturer's (e.g., Kumho's) standard specifications.  (Def. Ex. A.)

24.     Kumho's representatives also explained that Kumho wanted Dongbu to serve as a middleman/export agent for the deal by purchasing the Phenol from Kumho at a price of US$935 per metric ton and then reselling the Phenol to Cedar at the US$950 per metric ton price agreed to by Kumho and Cedar.  (Chu Decl. ¶ 6.)

25.     As compensation for their role in the transaction, H.V. Co. would receive approximately US$20,000 commission and Dongbu would receive a fee of approximately US$10,000.  (*Id.* ¶ 7.)

- 3 -

26.     Kumho and Dongbu agreed that Dongbu would merely participate "on paper" and that Kumho would arrange for all aspects of the sale and delivery including the provision, transportation and inspection of the Phenol.  (*Id*.)

27.     Thus, at all times Dongbu was simply a middleman/export agent.  (*Id*. ¶ 6.)  In reality, Cedar was purchasing the Phenol from and dealing with Kumho.  (*Id*. ¶¶ 4-7)

28.     On May 17, 2005, Cedar and Dongbu entered into the Contract for the sale of the Phenol at issue.  (Pre-Trial Stmt. at ¶ 19; Def. Ex. A.)

29.     The Contract, which was drafted by Cedar in the form of a memorandum from Cedar to Dongbu and which bore Cedar's letterhead, provided, *inter alia*:

- Cedar was the "buyer" and Dongbu was the "seller" of approximately 2,000 MTS of phenol (the "Phenol") at a price of 950.00 USD/MT;

- The Phenol was to be "Pure Phenol as per attached Kumho's Standard Guaranteed Sales Specs";

- The Phenol was to be delivered pursuant to the "Incoterm: F.O.B. Ulsan Anchorage, Korea";

- Cedar was to make payment for the Phenol by an "Irrevocable Documentary L/C at sight;"

- The Phenol was to be inspected "By mutually acceptable independent surveyor *whose findings as to quantity/quality as per shore tank figures at load port are final and binding on both parties*";

- The Contract was to be governed by "Incoterms 2000 as amended to date . . . ."

(Pre-Trial Statement at ¶¶ 19-25; Def. Ex. A.)

30.     The Contract also provided that "[t]his agreement is subject to our standard terms and conditions, a copy of which is attached hereto and is incorporated by reference.  In the event of a conflict between the terms of this agreement and our standard terms and conditions, the terms of this agreement shall control."  (*Id*.)  Finally, the Contract expressly states that it represents "the entire agreement of the parties."  (*Id*.)

31.     Pursuant to the terms and conditions of the Contract, the Phenol was to meet certain specifications with regard to color.  (*Id*.)

32.     The determination as to whether Dongbu met the contractual specification for color was to be made by SGS Korea Co Ltd. ("SGS") and Global Surveyors & Inspectors Ltd.

("GSI") ("collectively, the "Independent Surveyors"), two "mutually/acceptable independent surveyor[s]," as set forth in the Contract, that were selected by Kumho and Cedar.  (Def. Ex. A.)

33.     Dongbu signed and stamped the Contract.  (*Id.*)

34.     On 17 May 2005, Cedar applied for a letter of credit for the Phenol's purchase price.  (Pl. Ex. 6.)

35.     Cedar's application for a letter of credit incorporated Kumho's Guaranteed Phenol Sales Specifications, including but not limited to, color of "Max. 5."  (*Id.*)

36.     Dongbu signed and stamped Cedar's Letter of Credit Application.  (*Id.*)

37.     On 19 May 2005, Cedar procured a Documentary Letter of Credit from Korea Exchange Bank ("Letter of Credit") to cover the purchase price.  (Def. Ex. B.)

38.     On 24 May 2005, Dongbu signed, stamped, and issued to Cedar Signed Commercial Invoice No. EC50550401V00.  (Pl. Ex. 19.)

39.     The Signed Commercial Invoice indicated that the Phenol's color specification was to be "Max. 10."  (*Id.*)  This is the final, agreed upon, color specification for the shipment of Phenol at issue.

40.     Dongbu was never informed that Ertisa was the end user of the Phenol or that Cedar intended to resell the Phenol to Ertisa.

**B.     The Transshipment and Delivery of the Phenol**

41.     On or about May 21, 2005, the No. 3 GREEN PIONEER, a ship chartered by Kumho for the purpose of delivering the Phenol to Cedar, was loaded with the Phenol in Yosu, Korea.  (Pre-Trial Stmt. at 27, 30.)  At that time, the Independent Surveyors determined that the Phenol met the color quality specification of "10 max."  (Pre-Trial Stmt. at 31.)  Dongbu had no involvement in this process.  (Chu Decl. at ¶ 11.)

42.     Thereafter, on or about May 24, 2005, Kumho transferred the Phenol from the M/T No. 3 GREEN PIONEER to the M/T BOW FLORA, at Ulsan Anchorage, Korea.  (Pre-Trial Stmt. at ¶ 41.)  The Phenol was to then be shipped to Rotterdam, The Netherlands on board the BOW FLORA.  (*Id.* at ¶ 53.)

43.     Upon meeting its contractual obligations, Dongbu issued a commercial invoice to Cedar, requesting payment for the Phenol.  (Chu Decl. ¶ 13; Def. Ex. C.)

44.     Pursuant to the Cedar-Dongbu Contract, Cedar was to pay for the Phenol with an irrevocable letter of credit, which would be issued upon the receipt of certain documentation prepared by the Independent Surveyors, including a Certificate of Quality, Certificate of Quantity, Certificate of Analysis, First Foot Certificate of Analysis, and Vessel Tank Certificate of Analysis (the "Independent Surveyor Certificates").  (Def. Exs. A, B.)

45.     The Independent Surveyor Certificates, which, *inter alia*, affirmed that the Phenol met the Cedar-Dongbu Contract's color quality specification of "10 max," were provided to Cedar's bank and Dongbu was paid in accordance with the Contract.  (Def. Exs. A, D, E.)

46.     At that time, in accordance with the Contract, the Phenol was tested by SGS Korea to determine whether it met the agreed-upon specifications.  (Pre-Trial Stmt. at ¶ 48-58; Def. Ex. A.)  The Phenol was on specification when it was delivered to Cedar as it tested at 4 Hazen Units, *i.e.*, less than the Contract specification of "Max 10."  (Pre-Trial Stmt. at ¶ 54.)

47.     Specifically, once the BOW FLORA was fully loaded, SGS Korea pulled and tested a postload running sample and determined that sample was on-specification for all parameters, including color at 4 Hazen units/Max 10.  (Pre-Trial Stmt. at ¶ 54.)

48.     At each stage of the transshipment process, the Independent Surveyors drew and retained samples of the Phenol in Korea.  (*Id.* at ¶¶ 47-58.)

49.     For purposes of trial, the only retained samples of consequence are: (i) a sample taken from the shoretanks in Yosu, Korea, prior to its being loaded upon the GREEN PIONEER; (ii) a sample taken from the GREEN PIONEER prior to its being loaded upon the BOW FLORA; (iii) a sample taken from the BOW FLORA after one foot of liquid Phenol was loaded into the BOW FLORA's tanks; and (iv) a sample taken from the fully loaded BOW FLORA.

50.     Each of these samples were stored at SGS's storage facility in Ulsan, Korea. Each of these samples were stored in a solid state in clear, glass bottles at ambient temperature. (*Id.* at ¶¶ 33, 36, 38, 44, 50.)

51.     Dongbu heard nothing more about the transaction until on or about July 21, 2005, when it was informed by Kumho that Cedar was taking the position that the Phenol was off-specification for color.  (Chu Decl. ¶ 15.)

## C.     The August Analysis of the Retained Phenol Samples

52.     The retained samples were tested in Korea on or about August 8, 2005 (the "August Analysis").  The August Analysis shows that the Phenol did not suffer from an inherent defect because the retained sample drawn from the shoretanks at Yosu was on-specification at less than 5 Hazen units/Max 10.  (Def. Ex. X at 5.1.)

53.     Something else, therefore, caused the phenol to discolor.

54.     Phenol is a white, crystalline solid at room temperature.  (Def. Ex. DD.)

55.     Phenol is susceptible to discoloration under certain storage conditions.  "Phenol gradually turns pink if it contains impurities or is exposed to heat or light."  (Def. Ex. FF, Kirk Othmer, Encyclopedia of Chemical Technology, 4th Ed.)  "In storage phenol may acquire a yellow, pink, or brown discoloration which makes it unusable for some purposes."  (*Id.*)  "The discoloration is promotion by the action of water, light, air, and catalysts, eg traces or iron and copper."  (*Id.*)

56.     "When stored as a solid in the original drum or in nickel, glass-lined, or tanks lined with baked phenolic resin, phenol remains colorless for a number of weeks." (*Id.*) Thereafter, when stored as a solid at room temperate, the Phenol will naturally degrade in color after a number of weeks. (East Dep. at 173, 175, 176.)

57.     "The recommended temperature for storing and transferring phenol is 50-55 °C. At storage temperatures exceeding 55°C, colouration of the phenol can occur." (Def. Ex. DD, BP Chemicals, Technigram H107/1 at 2.) Another publication states that storage tanks "need to be fitted with a thermostatically controlled heating system capable of maintaining the product temperature at about 60°C. It is preferable for the tank to have high and low-temperature alarms; furthermore, the tank should be fitted with a gauge so that stock quantities can be safely monitored." (Def. Ex. II, Hazardous Cargo Bulletin, Chemical Tankers, "Phenol – in need of heat treatment" at 50.)

58.     Cedar's expert witnesses acknowledge that, among other causes, phenol will discolor (i) after several weeks when stored at ambient temperatures (Minton Dep. at 74, 102; Schiff Aff. Ex. 22); (ii) if it is heated over 60 degrees Celsius (East Dep. at 193; Minton Dep. at 86-87; Schiff Aff. Ex. 22); (iii) if the phenol is exposed to light, as when it is stored in clear glass bottles (East Dep. 465; Minton Dep. at 74; Schiff Aff. Ex. 22); and (iv) if the phenol includes some external particulate matter (East Dep. at 112-114, 203-204, 215-216; Minton Dep. at 169).

59.     The test results (earliest in time sampled listed first) from the August Analysis are as follows:

| Sample | Sample Description | Color (Hazen Units) |
|--------|--------------------|---------------------|
| D | Yosu, Korea Shoretanks FB-991 and FB-1993 (Composite) | 3-5 |
| C | GREEN PIONEER Before Discharge | 30-50 |
| B | BOW FLORA 'First Foot' During Loading | 20-30 |
| A | BOW FLORA Full Tank After Loading | 10 |

(Pl. Ex. 64.)

60.     In examining the results, it is important to note that the first sample (from the shoretanks) and the last sample (from a full tank of phenol on board the BOW FLORA) tested *on specification*. (*Id.*) By contrast, the two samples drawn in between tested off specification.

61.     Dongbu submits that these samples show the following:

- The first sample taken (Sample D) remained on-specification throughout the whole process. This demonstrates that the Phenol was not subject to any inherent defect.

- The first foot sample (Sample B) taken from the BOW FLORA was slightly overheated once it was loaded onto the BOW FLORA thereby causing the discoloration noted during the August Analysis.

- The final sample (Sample A) tested on specification because when the remaining, conforming phenol from the GREEN PIONEER was added to the phenol damaged on board the BOW FLORA it diluted the off-color, damaged phenol.

62.    As for the second retained phenol sample (Sample C) from the GREEN PIONEER, this sample was contaminated by the presence of "small particulate matter" and it is that particulate matter that is the likely cause of the that sample's discoloration and not anything that occurred on board the GREEN PIONEER.  (*Id.*)

63.    Cedar's own experts confirmed during their deposition testimony – and must so confirm at trial – that the above explanation for why the Phenol was damaged on board the BOW FLORA is reasonable and possible.  Cedar's expert, Martin East, testified during his deposition as follows:

Q.    But one of the things that could have caused it is the heating temperature in the BOW FLORA at the time the first foot of phenol was put into the tank; am I correct?

A.    It's possible, yes.

Q.    So that this tank is empty, but it has to be heated in order to receive the phenol; is that correct?

A.    Yes.

Q.    And it could have been at a slightly elevated temperature, because the phenol hadn't yet been added; is that right?  That's a possibility?

A.    Yes.

*      *      *

Q.    So one of the possibilities is that because it was being heated on reception of this phenol, it could have been a little warmer than optimal temperature, causing a slight elevation in color; correct?

A.    It's possible.

Q.    Okay.  And that color then goes back down to spec when the rest of the phenol is added; right?

A.    Possible.

Q.    Because what you have here is a 10 at the end.  When it's all loaded, you come in with 10; right?

A.    That's correct.

Q.    And that met the spec?

A.    Mmm.

Q.    Correct?

A.    Yes.

Q.    So one of the things that could have happened here is that the sample that you reviewed in August, or you learned about in August, which was the GREEN PIONEER sample, was no longer - was contaminated, having nothing to do with the phenol on the GREEN PIONEER but having something to do with the canister, which explains why only that canister had small particles found in it; correct?  That's a possibility?

A.    It's a possibility.

Q.    And the explanation for sample B is quite simple: the heating elements were such that they were a little warmer than usual, there was some color degradation, but that disappeared when everything else was put on and there was enough good phenol, because it was being rated at somewhere between 3 and 5, that this 20 to 30 got averaged out at a 10; correct?

A.    Right.

Q.    So if that was the case - assume that's the case - there was nothing wrong with the phenol that the GREEN PIONEER transferred to the BOW FLORA; right?

A.    On the basis that it was only that sample which was contaminated by some foreign particle, that would be the case. (East Dep. 222:12–25; 224:1–225:15.)

East then went on to acknowledge that he could not disprove the above hypothesis.  East testified as follows:

Q.    So, as you sit here today, you can't tell me whether my hypothesis is correct or your hypothesis is correct, based on the information you have available to you; is that right?

A.   *There is no absolute support for one version or another.*

Q.   *And either is possible?*

A.   *Either is possible.*  (East Dep. at 225:23-226:5) (emphasis supplied.)

Thus, East's testimony, standing alone, confirmed that Cedar does not have sufficient admissible evidence to demonstrate that Dongbu's hypothesis as to why the Phenol was damaged *is no less likely* than another hypothesis.[3]

64.   Indeed, the Court recognized, in its Summary Judgment Order, that East's statement was "fatal to Cedar's cross-motion for summary judgment."  (DE 118, Summ. J. Order at 11.)  Just as Cedar failed to carry its burden at the summary judgment stage, Cedar will again fail at trial because it has no additional admissible evidence to present at trial concerning the causation of the Phenol's discoloration than what it presented at the summary judgment stage.

**D.   Cedar Cannot Dispute Dongbu's Conclusions Regarding the August Analysis.**

65.   At trial, Cedar will be unable to show that Dongbu's above comprehensive and simple explanation for each and every sample from the August Analysis is incorrect.

66.   First, Cedar may improperly dismiss the presence of particulate matter in Sample C as the cause for that sample's discoloration, despite the fact that its expert acknowledged that it could be a potential cause of discoloration.

67.   Cedar's own expert, East acknowledged that the discoloration in Sample C may have been caused as follows:

Q.   To your knowledge – actually, at the time you wrote your report in August of 2005, *you acknowledged that it was possible that the degradation that was reflected in that particular composite could have been affected by the contamination or the particles that you noted; is that right*?

A.   *That's right.*

\*   \*   \*

---

[3]      In addition, as detailed below, East acknowledged that did not do a complete, and adequate investigation which would have aided him in reaching a more definitive conclusion. And, East further acknowledged that (1) he sought, but never received, the BOW FLORA heating records and (ii) more testing could have been done to confirm whether Dongbu's hypothesis is correct but it was not performed because it was too "specialized" and "expensive." (*See* East Dep. at 226:11–24.)

Q.     And at the time that you wrote your report, you understood that one of the reasons why there could have been this discoloration – *discolorization in this composite sample was due to – could have been due to the foreign contaminant, is that right*?

A.     I said I – but – it may have been a contributing factor,  I think – I can't remember the exact words.  But I acknowledged that that was possible.  *I think I still do say so*.  (East Dep. at 203:18-24; 216:14-22) (emphasis supplied.)

So while Cedar may attempt to dismiss the particulate matter as a possible cause of Sample C's discoloration, there can be no doubt that, as of the date of East's deposition, he believed that this particulate matter could have caused this sample's color degradation.

68.     Cedar may also argue that if the particulate matter present in Sample C did adversely affect that Sample, those particles were pulled out of the GREEN PIONEER *before* Dongbu's delivery.  Cedar may also argue that if those particles were discovered in one sample, they must have been present throughout the Phenol because it would be highly unlikely that this one sample collected all such particles.

69.     The fact of the matter, as acknowledged by East, is that of all of the samples tested (including those tested in Rotterdam), *not a single tested sample (other than Sample C) contained any particulate matter.*  (East Dep. at 207:8–13).  If there were particles throughout the Phenol, one would assume that the particles would have turned up in other of a number of retained samples and samples taken by the crew of the BOW FLORA.  None did.

70.     Cedar will also argue that it is the industry practice to always use clean, new bottles for sampling.  However, the individual who was responsible for the testing has no specific recollection of taking the sample of the Phenol during this shipment and cannot definitively say that he used a clean, new bottle for sampling or that the particulate matter got into the sampling bottle by another means.  (Pre Trial Stmt. ¶¶ 43-44.)

71.     Therefore, the more reasonable, likely and logical explanation is that some particulate matter found its way into this single sample at the time the sample was drawn, when it was stored, or when it was tested and not – as Cedar posits – when the Phenol was aboard the GREEN PIONEER.[4]  Cedar cannot adequately rebut Dongbu's explanation for why Sample C tested off specification.

72.     Second, East also admitted the importance of determining whether the Phenol was overheated while aboard the BOW FLORA.  (East Dep. at 224:1-6.)  In preparing his report, East

---

[4]     Cedar may state that Dongbu has somehow waived the right to challenge the test results of the SGS Korea analysis because it had a representative present.  This is preposterous.  Dongbu was present when the testing was conducted and the results of the testing are not being contested.  The question is what these tests *actually mean*.  No argument can be made that Dongbu waived its right to *interpret* the results simply because a representative attended the testing.

requested the heating records from the BOW FLORA but never received those documents.  (East Dep. at 191, 192, 289, 334, 345.)  Indeed, when East had completed his first "interim" report, on or about August 17, 2005, he noted that, in order to determine the cause of the Phenol's degradation, he would need the heating records of the BOW FLORA and during his deposition testified as follows:

> Q.   Okay.  And among the advice that you gave to Mr. Lillis' firm is that further documents were required, and *among those further documents were the heating records for the BOW FLORA, right*?
>
> A.   *That's correct.*
>
> Q.   And also as to the method of heating on the BOW FLORA, is that correct?
>
> A.   That's correct.
>
> Q.   And having given that advice to Mr. Lillis' firm, *has Mr. Lillis' firm ever provided to you the documents that you said you needed to see*?
>
> A.   *It was not provided to me.*  (East Dep. 345:5-16) (emphasis supplied.)

Indeed, East's admission that he never received the heating records, prevents Cedar from being able to adequately dispute Dongbu's theory of the Phenol's damage.

73.   Moreover, the "heating records" that Cedar produced after the close of fact discovery in this matter does not adequately dispute Dongbu's theory.  There are multiple issues presented by these "heating records":

- Cedar cannot demonstrate that the heating records are authentic.  During their respective testimony, both the Captain of the BOW FLORA and the First Mate confirmed that the original heating records were on board the ship for six years. (Egeland at 89, 91-92; Berg-Nielsen at 40, 60.)  Given that the Phenol was transported in 2005, the original records were kept on the BOW FLORA until 2011.  However, Cedar never obtained the original heating record during discovery.

- Unlike other official documents of the voyage and the subject cargo, the "heating record" was not signed by either the Captain or the First Mate and it does not carry the official seal of the BOW FLORA.  (Egeland at 97; Berg-Nielsen at 54.)

- Cedar's offering of the copy of this document – when the original would have been available during the discovery period – is a violation of the best evidence rule and the "heating record document" should not be admitted. Fed. R. Evid. 1002; 901.

- In addition, Cedar failed to demonstrate that the heating record in question is a business record in order to overcome the hearsay rule.

- Even assuming, *arguendo*, that the heating record is admitted into evidence – although it should not be – it still does not solve Cedar and East's problem. The heating record itself does not record or demonstrate (i) the heat of the tanks of the BOW FLORA at the time of loading; (ii) whether the heating coils were turned on prior to the Phenol being loaded on the BOW FLORA; or (iii) the temperature of the Phenol at the time the first foot sample was taken.

- In short, the heating records do not refute Dongbu's theory that the Phenol was scalded upon loading onto the BOW FLORA and that is what caused the Phenol's discoloration.

74.     The question of the heating record's authenticity is not an academic one. Prior to Cedar's late production of the "heating record" the only evidence in the record concerning the temperature of the Phenol was a single email. On August 17, 2005, prior to East issuing an "Email Report" regarding the cause of the Phenol's discoloration, Robert Sparrow of Marsh emailed his colleague Teresa Ruiz de la Parte and questioned the reason for heating the Phenol to 65 degrees on this voyage. East was copied on this email.

75.     Given that the "heating record" is simply a Microsoft Excel spreadsheet that could be replicated by anyone (Berg-Nielsen at 71), it is highly suspicious that the "heating record" does not reflect a temperature of 65 degrees Celsius.

76.     Third, Sample C's color also may have degraded because it was stored at ambient conditions in clear, glass bottles. As conceded by Cedar's expert East, these conditions also could have contributed to the color degradation of Sample C. The retained phenol samples tested during the August Analysis, upon which East and Minton based their conclusions, were stored in clear, glass containers at ambient temperature and turned solid. (East Dep. at 179, 465; Minton Dep. at 185.)

77.     East and Minton each conceded at their respective depositions that if phenol is put in clear glass containers it is likely to become discolored. Minton testified as follows:

Q.     If I was to take a sample, put it in a solid state –

A.     Yeah.

Q.     – what color would it be ten weeks later?

A.     Well it depends absolutely on the phenol and what's happened to it before.

Q.     Give me a range.

A.     Somewhere between naught and 500.

(Minton Dep. at 105-106.)

East testified as follows:

Q.      Is there any difference in storing phenol in brown glass as opposed
        to storing it in clear glass?

A.      Yes, there is. It can be affected by light.

                    *          *          *

Q.      So some samples were stored in brown glass containers and others
        in white glass containers?

A.      Yes . . . I think SGS, were drawn by – in brown glass.  But all, I
        think, of the ones from Korea were in clear glass, or white glass as
        it says here.

Q.      *So if it is drawn and put into white glass, there's likely to be more
        colored – discolorization because there's more exposure to light;
        is that right*?

A.      *That's correct*.

Q.      *But nowhere in either of your reports or in your advice did you
        point that fact out; am I correct*?

A.      *Correct*.  (East Dep. at 465-466) (emphasis supplied.)

Thus, although East and Minton knew that that phenol discolors in the presence of light, neither
person accounted for this in their expert reports or discussed its impact.  This casts further doubt
upon Cedar's theory of the damage to the Phenol.

        78.    Finally, it cannot be disputed that the final sample taken in time, *i.e.*, Sample A,
tested *on specification*.  (Pl. Ex. 67.)  Indeed, Cedar's expert, East, agreed that this final sample
of phenol delivered to Cedar tested on specification:

Q.      Because what you have here is a 10 at the end.  When it's all
        loaded, you come in with 10, right?

A.      That's correct.

Q.      *And that met the spec*.

A.      *Mmm*.

Q.      *Correct*?

A.      *Yes*.  (East Dep. at 224:10-16) (emphasis supplied.)

- 14 -

Thus, although Cedar will attempt to obfuscate the fact that the final sample of Phenol tested *on specification*, Cedar's own expert acknowledged that the Phenol supplied by Dongbu was on specification, in accordance with the parties' Contract.

79.     In short, the most reasonable and logical explanation of the August Analysis results is:  (i) the first foot of Phenol was overheated when it was introduced into the BOW FLORA's storage tanks, therefore causing it to degrade in color; (ii) after this first foot of Phenol was overheated (and the sample taken), the balance of the colorless, conforming Phenol was added to the BOW FLORA's storage tanks; (iii) adding the balance of the colorless, conforming Phenol masked the discolored Phenol because it diluted the portion of Phenol that was overheated and discolored; and (iv) as a result, the full tank of Phenol on the BOW FLORA tested on-specification at 10 Hazen Units.

80.     Cedar has provided no admissible evidence to the contrary.

**E.     Cedar's Construct of What Occurred is Flawed
        Because it is Based Upon Unproven Assumptions of Fact.**

81.     Cedar's analysis of the four samples tested in the August Analysis – and its conclusion that the Phenol was damaged on board the GREEN PIONEER – is fatally flawed because it is based upon unproven and unsupported assumptions of fact.  These assumptions of fact lead Cedar down a path of flawed logic and, ultimately, the wrong conclusions as to the cause of the Phenol's discoloration.

82.     At trial, Cedar will likely make the following assumptions concerning the cause of the Phenol's discoloration:

- Cedar will assume that the contaminants in Sample C – the GREEN PIONEER sample – can be ignored as a source of that sample's discoloration.  As demonstrated above, the contaminants in this Sample are a possible cause of that sample's discoloration and must be accounted for in explaining and interpreting the August Analysis test results.

- Cedar does not account for the degree of discoloration that was caused by the samples being kept at ambient temperatures in clear glass bottles.  (East Dep. at 111, 180-81, 224-25, 275, 76; Minton Dep. at 105-106.)

- Cedar will assume that the Rotterdam samples have any merit whatsoever.  Any reference at trial to the Rotterdam samples are an absolute **red herring**. Moreover, they are irrelevant and should not be considered.

- Indeed, Cedar's experts discounted the Rotterdam sample test results because each of the Rotterdam samples were carried on board the BOW FLORA and were not kept under the same storage conditions as the samples tested in the August Analysis.  (East Dep. at 442:13-25. ("Q.  But as you sit here today, your testimony as you recall is that you really couldn't make it apples to apples, that is the August composite GREEN PIONEER sample versus the Rotterdam

GREEN PIONEER sample, because there was a difference in the storage conditions? . . . A. You are correct. I think I said that to Mr. Lillis, that there was a difference in storage, so you couldn't make any comparison between the results obtained on the GREEN PIONEER sample in Korea and the GREEN PIONEER samples tested in Rotterdam.")

- In addition, Cedar has not produced (and Cedar's experts did not have available to them) the full Rotterdam inspection reports. (East Dep. at 150-51, 323.) Rather, he only received summaries. (*Id.*)

- Cedar may assume that Sample A – the on specification BOW FLORA full tank sample – can simply be dismissed as an "outlying test" simply because it does not fit into its overall theory.

83. Finally, Cedar's theory does not account for one of its own assumptions, *i.e.*, that when Phenol is first damaged a "seeding" effect occurs whereby the color of damaged Phenol will continue to degrade over time. (East Dep. at 334:20-24.)[5]

84. Although Cedar's (and its experts East's and Minton's) "seeding" theory is unsupported by the literature, assuming, *arguendo*, that Cedar's "seeding theory" is correct and the Phenol was first damaged on board the GREEN PIONEER, it stands to reason that all samples taken later in time after the Phenol left the GREEN PIONEER would result in equal or greater color degradation. The actual test results from the August Analysis, however, bear out **the complete opposite** of Cedar's "seeding" theory. (Pl. Ex. 67.)

85. Below are the August Analysis results listed in chronological order from top to bottom (earliest in time listed first) starting with Sample C:

| Sample | Sample Description | Color (Hazen Units) |
|---|---|---|
| C | GREEN PIONEER Before Discharge | 30-50 |
| B | BOW FLORA 'First Foot' During Loading | 20-30 |
| A | BOW FLORA Full Tank After Loading | 10 |

(*Id.*)

86. Based upon Cedar's "seeding" theory and its assertion that the Phenol was damaged on board the GREEN PIONEER, Samples B and A should show equal or greater discoloration than Sample C. They do not. Remarkably, the color of the Phenol **decreased** in each successively drawn sample; in direct contravention of Cedar's construct. If Cedar's

---

[5] Cedar's "seeding theory" does not appear in any academic literature concerning the discoloration of Phenol. (Def. Exs. DD-KK, NN.)

"seeding" theory regarding the damage to the Phenol was correct, these results could not possibly occur.

### F.    Cedar's Argument that the Phenol Was Not "Pure" Is Untenable.

87.    Cedar will also argue that the Phenol delivered by Dongbu was not "pure" as required by the Contract.

88.    First, Cedar will argue that "the presence of this substance, i.e., the particulate matter in Sample C proves that the Phenol was not free from impurities, adulterants, pollution, foreign elements, or something inappropriate or extraneous."  As described above, the presence of particulate matter in one sample shows absolutely nothing about the overall composition of the Phenol.  Indeed, because no particulate matter was discovered in any other retained sample, it is most likely that the particulate matter was introduced into Sample C during the sample collection or testing process.

89.    Second, Cedar may argue that the Phenol was not "homogenous" – which Cedar equates with "pure" – because had the Phenol been homogenous, these identically stored samples should have deteriorated in a like manner.  Cedar will rely upon the retained samples tested at Rotterdam and in Korea to "prove" this point.  This is flawed for several reasons.

90.    Cedar's own experts cannot reasonably rely upon the samples taken at Rotterdam because the samples were not stored under appropriate conditions.  (East Dep. at 443:13-25.)  Indeed, the Rotterdam samples were carried upon the BOW FLORA under conditions which render them completely unreliable, *i.e.,* in a sample locker where the heat of the sample locker was unknown and/or unregulated.  (Def. Ex. V ¶ 5.3.)

91.    Moreover, neither East nor Minton obtained the heating records of the BOW FLORA so that any determinations could be made from these Rotterdam samples.  (East Dep. at 342:9–17; Minton Dep. at 53:2–15.)

92.    In addition, Cedar's argument assumes that Phenol degrades at exactly the same rate.  Simply put, there is no **proof** underlying Cedar's assumption that Phenol degrades at the same rate or deteriorates in a like manner when stored in the same conditions.  (*Id.*)

93.    Finally, even assuming, *arguendo*, that Phenol did degrade at the same rate under the same conditions, there is no proof in the record that all of the retained samples tested in Rotterdam were actually held under the exact same conditions.

### G.    CISG Article 35(2) is Inapplicable Because
### the Phenol Did Not Suffer from a Latent Defect.

94.    Cedar will argue that Dongbu violated CISG article 35(2) by not delivering cargo "fit for its intended purpose – resale to Ertisa made known to Dongbu at the conclusion of the contract."  It cannot be contested that Dongbu delivered Phenol which conformed to the specifications of the contract and any damage to the Phenol was caused after the Phenol passed the rail of the BOW FLORA.  CISG 35(2) is a section of the CISG which protects a buyer against latent defects but, as Cedar also concedes, the Phenol did not suffer from a latent defect.

95.     Cedar will argue that the Phenol, because it apparently degraded over time, did not conform to "its intended purpose" which they alleged was to be resold to another buyer. Indeed, Cedar has argued that it is known to all parties in the international sale of phenol that many purchasers of phenol are simply in the business of acquiring and reselling phenol in an attempt exploit inefficiencies and price differences in the global market.  Cedar has yet to offer any admissible evidence of this theory and has not provided any prior to trial.  In this case, however, Dongbu and Cedar had a Contract for a discreet purpose – the sale of on-specification Phenol to be delivered in Ulsan, Korea.

96.     Moreover, Cedar has not provided any evidence (and cannot provide any evidence at trial) that it communicated to Dongbu that Ertisa was the end user of the Phenol or that Cedar intended to resell the Phenol.

**H.     East's and Minton's Investigation and Analysis was Flawed**

97.     Minton, Trehorne & Davies ("MTD") was initially retained by Marsh Ltd. (on behalf of the cargo underwriters for Ertisa S.A.) to investigate the cause of the phenol color degradation while being transported to Rotterdam on the vessel the BOW FLORA (the "Marsh Investigation").  (East p. 145.)  If MTD found that the phenol color degradation occurred prior to its delivery to the BOW FLORA, then the cargo underwriters could disclaim liability to Ertisa. (Minton p. 28.)

98.     Prior to the Phenol's shipment, Ertisa insured the cargo for any damage to the Phenol that occurred on board the BOW FLORA.

99.     After learning that the Phenol arrived at Rotterdam off specification, Ertisa made a claim against its insurance policy.

100.    After Ertisa informed its insurance broker Marsh S.A. ("Marsh") of the Phenol's discoloration upon arrival at Rotterdam, on or about  July 21, 2005, Marsh hired MTD to attend the August 8, 2005 Analysis and report on the cause of the Phenol's color degradation.

101.    East was assigned by MTD to perform the Marsh Investigation.  (East p. 148.)  In that regard, East testified at his deposition concerning what a typical investigation would entail based on his experience:

> . . . you secure what samples are available; make sure what samples are taken are taken correctly; you establish the provenance of those samples; you check the seal numbers if there is analysis to be done, then you arrange for that to be done, and to make sure it's done in the correct fashion; you interview the people involved, discuss with the – in the case of a P&I surveyor, the key personnel that might be – start with the chief officer and the master, maybe go down into the ABs at the end of the day, depending on –
>
> A. You [would] review documents; you would obtain copies of every document you could get your hand on.

Q.  Okay. You would interview key personnel and in determining on the issue, you may interview a number of people; is that correct?

A.  That's right.

Q.  And you would review the procedures and methods followed in the sample gathering; is that correct?

A.  That's right. (East Dep. at 24-25.)

102.    As was made abundantly clear during the East and Minton depositions, none of this was done in connection with the Marsh investigation.  (See e.g., East Dep. at 90-92, 110-111, 191-192, 224-225, 232, 241-256, 285-290, 295-298, 334, 337-338, 341-345, 374-375, 456-458; Minton Dep. at 10, 23, 45-46, 48, 53, 59, 88-89, 136-138, 169-170, 183-184, 189, 200, 204, 215-217, 260, 268-275, 283-285, 400.)

103.    In fact, East and Minton Reports are themselves mere reiterations of reports – upon which their trial testimony will be based – written in connection with the Marsh Investigation and with an aborted lawsuit in Korea in which Cedar sought to sue the testing company, SGS, and the operator of the vessel the GREEN PIONEER.  In that regard, the first "interim" report prepared by East was an August 17, 2005 "Email Report" to Robert Sparrow of Marsh.  (Def. Ex. X.)

104.    Prior to issuing the Email Report, on August 11, 2005, Teresa Ruize de la Parte of Marsh emailed East concerning his analysis and stated "[d]ue to the above, we do really appreciate if you can speed as much as possible the results and your report."

105.    East, therefore, was under pressure to deliver his report as soon as possible.

106.    On August 17, 2005, prior to East issuing an "Email Report" regarding the cause of the Phenol's discoloration, Robert Sparrow of Marsh emailed his colleague Teresa Ruiz de la Parte and questioned the reason for heating the Phenol to 65 degrees on this voyage.  East was copied on this email.

107.    East did not mention this email in any of his subsequent reports.

108.    At the time that his interim Email Report was prepared East only had a limited number of documents and did not have full inspection reports from Rotterdam or Korea, although he had requested them.  (East Dep. at 343.)

109.    On August 17, 2005, East sent an interim "Email Report" to Marsh.

110.    East stated "[i]t should be noted at this time that we do not have copies of the full inspection reports from any of the various inspections, either at Korea or Rotterdam and we would request these be obtained and forwarded to us, if we are required to progress this matter further."

111.    East also stated that "[i]t is possible that further laboratory analysis of all retained samples might identify some offending specie, and if this is required, then all retained samples from Korea and Rotterdam will need to be collected in one place (we would suggest the UK) and a protocol for the testing agreed with the various parties."

112.    East further stated that "[t]he greater increase in the colour of material in the ship's tank whilst the vessel was on passage against retained samples drawn at the time of transshipment would possible have occurred because phenol is normally heated on passage (to about 55C), whilst retained samples would have remained unheated in storage on board the vessel and heat is usually associated with increased chemical activity.  This would suggest the colour has deteriorated due to its normal shipping conditions.  Accordingly, it may be worth considering running simulation trials on samples from the shore tank ex load port, if this can be made available."

113.    East also stated that "[t]he particles observed in the composite sample ex the No 3 Green Pioneer before transshipment appeared to be matted material and have not been observed in any other sample related to this matter.  It is possible, bearing in mind our comments in 4.4 above, that these particles have a relevance in this matter."

114.    East further stated that "[s]hould underwriters wish us to carry out further investigative work on this matter, we would suggest two approaches.  The first would be a full review of all available documentation, and the second, the previously mentioned laboratory work."

115.    East stated that the documents he would need to consider would include the following:  "Full inspection report from GSI pertaining to the loading and discharge of the No 3 Green Pioneer"; "A full list of samples drawn by GSI, their seal numbers and current whereabouts"; "Full inspection report from SGS Korea for the transshipment of the cargo from No 3 Green Pioneer to the Bow Flora"; and "Full inspection report from SGS pertaining to the outturn at Rotterdam."

116.    In his "Email Report," East concluded, among other others things, that "the cargo originally loaded out of this shore tank was not inherently colour unstable."

117.    Without having interviewed anyone, without having the full inspection reports, without having performed his own tests, without having reviewed all of the relevant documents, and without having tested his hypothesis, he opined that "the determination in the colour of the material was due to its transport on board the No. 3 GREEN PIONEER."  (East Dep. p. 343.)

118.    Nevertheless, in the Email Report, East raised a number of questions concerning his opinion.  Among other things he noted (i) that "the conditions under which the samples were stored have adversely affected the cargo colour"; (ii) that there was an irregularity with the seal numbers on the samples retained in Korea; (iii) that further laboratory testing would shed light on how the phenol became discolored and when; (iv) that particles observed in one of the samples (Sample C) "may have relevance in this matter"; and (v) that further documentation including full inspection reports would be required for a further investigation.  (Def. Ex. Z.)

119.    East did not, however – at any time to the present – perform any further investigation, nor did he ever receive the full inspection reports.  (East Dep. pp. 191, 192, 290, 295-296; Minton pp. 46, 183-184, 200.)

120.    Not surprisingly, given the interest of his employer in a finding that the damage to the Phenol occurred prior to loading the Phenol on board the BOW FLORA at the time of his interim report, East reached exactly that the conclusion, therefore relieving the insurer of liability.

121.    East did no further investigation because he was not instructed by the insurance underwriters.  (East Dep. at 108, 209, 225.)

122.    About a year later, on or about June 21, 2006 counsel for Cedar requested that MTD serve as an expert in an action brought by Cedar against SGS and the GREEN PIONEER in Korea and requested that East prepare a "supplemental report which will be submitted to the Court in Korea in advance of your live testimony at trial."  (Def. Ex. K; East pp. 451-454.)

123.    Apparently, Cedar's Korean counsel, Suh & Co., reviewed East's prior Email Report and had questions and concerns about the methodology employed, information (or lack thereof) relied upon, and the conclusions set forth therein.  (Def. Ex. K.)

124.    Accordingly, Suh & Co., which would be the law firm submitting any expert report to the Korean Court, requested that such report address, among other things, the cause of the phenol discoloration, the temperature at which the phenol was stored during its voyage to Rotterdam, and include citations to textbooks or other literature supporting East's conclusions (*Id.*)

125.    In furtherance of that request, on or about June 28, 2006, East sent a memorandum, which he refers to as an "Advice," to counsel for Cedar.  (Def. Ex. Y.)  As East explained at his deposition, the Advice was not a formal expert report, but was an interim, informal report.  (East Dep. at 87-88.)

126.    Between the issuance of the Email Report and the "Advice," East did not conduct any further investigation.  (East Dep. pp. 90-91; Minton Dep. p. 59.)  He still had not conducted any interviews (other than to discuss with Ertisa what they planned to do with the discolored phenol), he still had not performed (nor had anyone from MTD performed) tests on samples of the phenol, and he still had not tested his hypothesis.  (East Dep. p. 90; Minton Dep. p. 59.)  As East explained:

A.    Did I refer to anything or talk to anybody? I certainly talked to Ertisa about what their intentions were with regard to the disposal of the product. I discussed with the people who I arranged to attend the joint analyses in Rotterdam and Korea the background to the problem and what they should be doing and what samples were available. Aside from that, I can't think of anything – I can't recall having talked to anybody else.

Q.    Did you interview anyone in connection –

- 21 -

A.      No.

Q.      – with this?

A.      No.

                        *       *       *

Q.      Let me finish.  In connection with the preparation of the June 28, 2006
        advice?

A.      No.

Q.      Did anyone on your behalf interview anybody?

A.      No.

Q.      Did you or anyone on your behalf conduct any tests/analyses of any of
        the hypotheses or theories that you articulated in the June 28th, 2006
        advice?

A.      There was no other testing, there was no other interviews undertaken
        (East Dep. at 90-92.)

                        *       *       *

Q.      And what did you do, if anything, to test any of the hypotheses that you
        were suggesting?

A.      Um, we didn't do anything in the way of laboratory analysis, if that's
        what you are referring to.

Q.      Well, you reviewed a bunch of facts?

A.      Yes.

Q.      And there were some anomalies in those facts?

A.      Yes.

Q.      And based upon the facts you said it could have been A, could have
        been B, could have been C, or D, or perhaps other things; right?

A.      That's correct.

Q.      So therefore, in order to satisfy yourself whether it was A, B, C, D or
        something else, did you do any kind of testing – whether laboratory or
        not – any kind of testing or further analysis to find out which is the
        hypothesis that was the right one?

A.      We did not do any other testing, no.  (East Dep. at 334.)

127.    East explained that he prepared the "Advice" based solely on his review of the results of the Rotterdam and Korea testing and the still incomplete set of documents listed in the Advice.  Perhaps most significantly, he did not address all the issues raised by Suh & Co.  (East Dep. pp. 456-458.)

128.    In other words, he did not cure the deficiencies that Suh & Co. believed needed to be cured in order for the conclusions set forth in the Email Report (and later, the Advice) to be admissible in a Korean Court.

129.    Nevertheless, he maintained his opinion that the phenol discoloration began on the GREEN PIONEER.  East stressed, however, that such opinion was a mere hypothesis:

> Before doing so, may we reiterate what was in our report on the BOW FLORA that the evidence does not show how or where the colour degradation took place.  Further, it is highly unlikely that either extensive testing or laboratory simulations will ever demonstrate the cause of this problem.  (We have made similar investigations on other shipments of discoloured  phenol in the past without success).  From the known facts, it is only possible to hypothesise how it may have occurred.  (Def. Ex. Y.)

130.    East (nor anyone at MTD) never tested that hypothesis.  (East Dep. at 334.)  This was confirmed by Minton at his deposition:

Q.      . . . And you would agree then with the first sentence of paragraph 1:  "Before doing so, may we reiterate what was in our report on the BOW FLORA that the evidence does not show how or where the color degradation took place."

A.      That's the first sentence in paragraph 2, correct.  You said 1.

Q.      Oh, I beg your pardon.  You agree with that?

A.      I do.

Q.      And the last sentence of that paragraph:  "From the known facts, it is only possible to hypothesize how it may have occurred."  Is that correct?

A.      I agree, yep.

Q.      It was simply a hypothesis?

A.      Yes.

Q.      And it would be fair to state that no testing was done to test the hypothesis, correct?

A.      Correct.  (Minton Dep. pp. 215-16.)

131.     East never testified in the Korean action, which was apparently either dismissed or withdrawn.  (East Dep. pp. 453-454.)

132.     Thereafter, counsel for Cedar requested that East serve as an expert witness in the present lawsuit.  As with the predecessor Email Report and the Advice, in preparing his expert report, East conducted no interviews, did not obtain additional documents, did not conduct any additional tests and did not test his hypothesis.  (East Dep. pp. 90-92.)

**I.      East and Minton Fail To Sufficiently Consider Phenol's Susceptibility to Discoloration**

133.     As an initial matter, it cannot be disputed that phenol has a susceptibility to change color after several weeks when stored in a solid state at ambient temperature.  (Minton Dep. pp. 74, 102.)  Indeed, this is an inherent property of phenol.  (East Dep. pp. 95, 99, 100, 102.)  When stored in a solid state phenol may also change color if stored in clear glass containers as opposed to brown glass containers.  (East Dep. p. 465; Minton Dep. p. 74.)

134.     The retained phenol samples tested in Korea, upon which East and Minton based their conclusions, were stored in clear glass containers at ambient temperature and turned solid.  (East Dep. pp. 179, 465; Minton Dep. p. 185.)  East and Minton each concede that if phenol is put in clear glass containers it is likely to become discolored.  (East Dep. at 456-66; Minton Dep. at 105-106.)

135.     Although the samples tested in Rotterdam were purportedly stored in brown glass containers, they were apparently stored at ambient temperature upon the BOW FLORA in less than ideal conditions for 8 weeks before testing; the samples tested in Korea were stored for 12 weeks at ambient temperature.  (East Dep. pp. 240, 272, 275-76, 442.)

136.     East and Minton concede that the discoloration of two of the four samples (the B Sample and the C Sample) was mild and not visible to the naked eye and could have simply been the result of the normal deterioration in color that you would expect to see in phenol when stored in clear containers in a solid state, for over 12 weeks, and not the result of any overheating or contamination on board the GREEN PIONEER.[6]  (East Dep. pp. 111, 180-181, 224-225, 275-276; Minton Dep. pp. 105-106.)

137.     East did not even consider the admitted fact that phenol turns color when stored in a solid state in clear glass containers when reaching his conclusions, which were adopted by Minton.  (East Dep. p. 469.)

---

[6] Similarly, the retained samples tested in Rotterdam could have been the result of normal deterioration coupled with overheating on the BOW FLORA, as discussed below.  (East Dep. pp. 224-225.)

**J.     East and Minton Failed to Obtain Heating Records and Rule Out Heating Conditions on the BOW FLORA as the Cause of the Discoloration**

138.    It is also undisputed that storing phenol above a temperature of 60 degrees Celsius can cause discoloration.  (East Dep. p. 193; Minton Dep. pp. 86-87.)   There is evidence that the phenol stored on the BOW FLORA was heated at above 60 degrees Celsius.  (Def. Ex. T.)

139.    On August 17, 2005, prior to East issuing his "Email Report" regarding the cause of the Phenol's discoloration, Robert Sparrow of Marsh sent an email to his colleague Teresa Ruiz de la Parte and East in which Sparrow questioned the reason for heating the Phenol to 65 degrees on this voyage.  (*Id.*)

140.    East and Minton admitted that Sample B could have been discolored as a result of overheating in the BOW FLORA storage tank on loading.

Q.      So one of the possibilities is that because it was being heated on reception of this phenol, it could have been a little warmer than optimal temperature, causing a slight elevation in color; correct?

A.      It's possible.  (East Dep. p. 224.)

141.    Although overheating is a cause of phenol discoloration, East (nor Minton) never obtained, and therefore never reviewed, the BOW FLORA heating logs to determine the temperature that the phenol, and the retained samples, was subjected to during transport to Rotterdam.  (East Dep. at 191, 192, 289, 344, 345; Minton Dep. at 45, 48, 53.)

142.    As noted above, Cedar's late produced "heating record" should not be admitted into evidence.  However, even if it is, the "heating record" does not refute Dongbu's theory of the damage to the Phenol.  The heating record itself does not record or demonstrate (i) the heat of the tanks of the BOW FLORA at the time of loading; (ii) whether the heating coils were turned on prior to the Phenol being loaded on the BOW FLORA; or (iii) the temperature of the Phenol at the time the first foot sample was taken

143.    Apparently, East and Minton have reviewed this document and its effect on their theory will be subject to and tested under cross-examination at trial.

**K.     East and Minton Failed to Investigate Possible Contamination of the Storage Canisters and Irregularities with the Shore Tank Sample Numbers**

144.    Not only did East fail to take normal color deterioration into account and fail to review the relevant heating logs, he also acknowledged that the "Sample C" sample taken from the GREEN PIONEER could have been contaminated by the sample storage canister, and not from anything on the GREEN PIONEER.  (East Dep. pp. 112-114, 203-204, 215-216; Minton Dep. p. 169.)  However, neither East nor Minton conducted any testing to determine whether the discoloration could have been caused by particles in the storage canister.  (East Dep. p. 216; Minton Dep. p. 169.)

145.    Moreover, it appears that there was an irregularity with respect to the shore tank sample (Sample D) because the seal number was not in a consecutive numerical order.  In that regard samples are usually given seal numbers in a numerical order (*e.g.*, 1, 2, 3, 4, etc.).

146.    But the shore tank sample tested on August 8, 2005 had a seal number that was out of order.  In that regard, the seal numbers were 5946, 534093, 534095, 534096.  (East Dep. p. 232.)  Therefore, it is possible, and East and Minton do not reject this possibility, that the original sample was lost or broken and a "new" sample was taken – thus the shore tank samples may not have been as old as the other samples.  (East Dep. p. 235.)

147.    This is important because East and Minton have contended that since the shore tank samples did not suffer from color degradation but the samples taken from the GREEN PIONEER did, then that indicates that something must have happened on the GREEN PIONEER that caused the color to degrade.  Neither East nor Minton investigated this irregularity in the sample seal numbering.  (Minton Dep.  p. 170; East Dep. p. 232.)

**L.    There Is No Support in the Literature for the "Seeding" Theory**

148.    In paragraph 7.2 of their respective Reports, East and Minton conclude that "Joint analysis of samples demonstrated that the discoloration of samples had commenced on the #3 GREEN PIONEER, prior to loading to the BOW FLORA.  Subsequent darkening of the colour was due to this initial seeding."

149.    This "seeding" theory espoused by East and Minton is not mentioned in any of the publications referenced in the East and Minton Reports, nor were East and Minton able to provide any support for such theory at their respective depositions.[7]  (East Dep. pp. 129-131, 140, 334-335, 458-459; Minton Dep. p. 213.)

150.    In fact, East conceded at his deposition that he did not consider himself an expert on the concept of seeding and that he "probably" was told about the concept by Minton.  (East Dep. p. 139; Minton Dep. p. 316.)  Minton, for his part, could not recall where he learned about the supposed "seeding" theory, nor could he provide a reference to any industry, or scholastic publication discussing such theory.  (Minton Dep. p. 219.)

## PROPOSED CONCLUSIONS OF LAW

**IV.    THE STANDARD**

151.    In a bench trial, such as this "it is [the Court's] job to weigh the evidence[,] assess credibility, [and] rule on the facts as they are presented."  *Johnson-McClean Techs. v. Millenium Info. Tech. Group*, No. 02 Civ. 244, 2003 U.S. Dist. LEXIS 1092, at *24 (S.D.N.Y. Jan. 27, 2003); *see also Mathie v. Fries*, 121 F.3d 808, 811-12 2d Cir. 1997).

---

[7] In paragraph 3.7 of their respective Reports, East and Minton claim that "seeding" is mentioned in the Ertisa product summary annexed as appendix 4.3 of their Reports.  At his deposition East conceded that nowhere in the Ertisa summary is the concept of seeding mentioned.  (Def. Exs. F, X.)

152.     When, as here, the evidence is, at best, equally divided as to when, where, and how the liquid phenol was discolored, "the party with the burden of proof loses." *United States v. Gigante*, 39 F.3d 42, 47 (2d Cir. 1994); *see also Fulop v. Malev Hungarian Airlines*, 244 F. Supp. 2d 217, 223 (S.D.N.Y. 2003) ("The evidence on this issue is substantially divided and, in the Court's assessment, does not tilt sufficiently to Plaintiff's case to satisfy the preponderance standard.").

153.     Cedar, as Plaintiff, has the burden of proof to demonstrate it is entitled to judgment by a preponderance of the evidence. *Milton Abeles, Inc. v. Creekstone Farms Premium Beef, LLC*, No. 06-CV-3893(JFB)(AKT), 2010 U.S. Dist. LEXIS 34017 *14 (E.D.N.Y. Feb. 1, 2010) ("[T]he burden of proof in an action for breach of contract is on the plaintiff to prove the elements of its complaint by a preponderance of the evidence.").

## V.     CEDAR'S BREACH OF CONTRACT CLAIM MUST BE DENIED

### A.     The CISG Does Not Override The Parties' Express Contractual Agreements.

154.     The CISG was ratified by the United States on December 11, 1986 and became effective on January 1, 1988. *See* 15 U.S.C. App. at 332 (1998). The CISG "applies to contracts of sale of goods between parties whose places of business are in different States when the States are contracting parties. CISG Art. 1 § 1(a). The CISG governs this dispute because the United States, where Cedar has its place of business, and Korea, where Dongbu has its place of business are both States Party to the Convention. *Id.*

155.     Among other things, "[t]he Convention strives to promote certainty among contracting parties and simplicity in judicial understanding by 1) reducing forum shopping, 2) reducing the need to resort to rules of private international law, and 3) establishing a law of sales appropriate for international transactions." *Valero Mktng. & Supply Co. v. Greeni Oy*, 373 F. Supp. 2d 475, 479 (D.N.J. 2005), *rev'd and remanded on other grounds*, Nos. 06-3390, 06-3525, 2007 U.S. App. LEXIS 17282 (3d Cir. July 19, 2007). *See also St. Paul Guardian Ins. Co. v. Neuromed Medical Sys. & Support, GmbH,* No. 00 Civ. 9344 (SHS), 2002 U.S. Dist. LEXIS 5096, at *7-8 (S.D.N.Y. Mar. 26, 2002) *aff'd*, Nos. 02-6095(L), 02-6103, 2002 U.S. App. LEXIS 26787 (2d Cir. Dec. 20, 2002).  ("The CISG aims to bring uniformity to international business transactions, using simple, non-nation specific language.  To that end, it is comprised of rules applicable to the conclusion of contracts for the sale of international goods.") (citations omitted) Accordingly, the CISG can be viewed as the international counterpart to the Uniform Commercial Code.

156.     As explained by the Second Circuit, "[b]ecause there is virtually no caselaw under the Convention, we look to its language and to the 'general principles' upon which it is based. *See* CISG art. 7(2). The Convention directs that its interpretation be informed by its 'international character and…the need to promote uniformity in its application and the observance of good faith in international trade.'" *Delchi Carrier SpA v. Rotorex Corp*., 71 F.3d 1024, 1027-1028 (2d Cir. 1995) (citations omitted).

157.     Like the UCC, the CISG does not usurp or undermine the parties own contracts. In that regard, Article 6 of the CISG provides that "The parties may exclude the application of

this Convention or, subject to article 12, *derogate from or vary the effect of any of its provisions*." (Italics supplied.) As explained in the Commentary to Article 6 of the CISG, "The non-mandatory character of the Convention is explicitly stated in article [6]. The parties may exclude its application entirely by choosing a law other than this Convention to govern their contract. They may also exclude its applications in part or derogate from or vary the effect of any of its provisions by adopting provisions in their contract providing solutions different from those in the Convention."[8]

158.    Although there is little federal caselaw interpreting and applying the CISG, United States courts have recognized the effect of Article 6. As explained by Judge Holderman in *Ajax Tool Works, Inc. v. Can-Eng Mfg*., No. 01 C 5983, 2003 U.S. Dist. LEXIS 1306, at *9 (N.D. Ill. Jan. 29, 2003):

> Although the CISG applies to the parties' contract, contrary to [plaintiff's] argument, the terms and conditions and all limitations contained in the contract are not completely superseded by the provisions of the CISG….The CISG does not preempt a private contract between parties; instead, it provides a statutory authority from which contract provisions are interpreted, fills gaps in contract language, and governs issues not addressed by the contract. In fact, Article 6 states that parties may, by contract, "derogate from or vary the effect of any of [the CISG's] provisions." CISG Art. 6. Accordingly, under the CISG, the terms of the parties' agreement controls.

*See also*, *Am. Mint LLC, v. GOSoftware, Inc*., No. 1:05-CV-650, 2006 U.S. Dist. LEXIS 1569, at *19 (M.D. Pa. Jan. 5, 2006) (citing *Ajax*, and noting that pursuant to Article 6, parties were free to agree to liquidate damages in the event of breach of contract.)

159.    Accordingly since the parties' contract will always control, commentators have referred to the CISG as a "gap-filling law", "supplying rules when the parties have not addressed issues specifically in the contract." 14-74 *Corbin on Contracts* § 74.12 (2007).

**B.    Extrinsic Evidence Concerning the Parties' Intent Is Neither Relevant Nor Admissible Because the Contract Represented the Parties "Entire Agreement"**

160.    Article 8 of the CISG instructs courts to interpret the "statements made by and other conduct of a party . . . according to his intent where the other party knew or could not have been unaware of what that intent was."[9] Although there is a dearth of caselaw on the subject, the

---

[8] This Commentary is from the Text of Secretariat Commentary on Article 5 of the 1978 Draft of the Convention, which was the draft counterpart of CISG Article 6.

[9] Article 8 provides:

> (1)    For the purposes of this Convention statements made by and other conduct of a party are to be interpreted according to his intent where the other party knew or could not have been unaware what that intent was.

(continued…)

few courts that have considered the interplay between the parol evidence rule and CISG Article 8 have found that the parol evidence rule does not apply to exclude extrinsic evidence.  *See MCC-Marble Ceramic Center v. Ceramica Nuova D'Agostino, S.P.A*., 144 F.3d 1384, 1391 (11th Cir. 1998).

161.    Here the parties have expressly chosen to "derogate from" and/or "vary the effect" of Article 8 in their Contract by stating that terms set forth in the Contract comprised the "entire agreement of the parties."

162.    As recognized by the 11th Circuit in *MCC-Marble*, "to the extent parties wish to avoid parol evidence problems they can do so by including a merger clause in their agreement that extinguishes any and all prior agreements and understandings not expressed in the writing." 144 F.3d at 1391.  *See also*, Albert H. Kritzer, Guide to Practical Applications of the United Nations Convention of Contracts for the International Sale of Goods 125 (Boston:  Kluwer Law & Taxation, 1989)(counseling the use of a merger clause to compensate for the absence of a parol evidence rule in the CISG.)  Dongbu has not discovered a single case that permits a party to avoid contractual obligations as set forth in its own form contract by contending that it did not intend for its own words to have effect.[10]

---

(2)    If the preceding paragraph is not applicable, statements made by and other conduct of a party are to be interpreted according to the understanding that a reasonable person of the same kind as the other party would have had in the same circumstances.

(3)    In determining the intent of a party or the understanding a reasonable person would have had, due consideration is to be given to all relevant circumstances of the case including the negotiations, any practices which the parties have established between themselves, usages and any subsequent conduct of the parties.

[10] The only case that Dongbu has discovered that even addresses this issue is *TeeVee Toons, Inc. v. Gerhard Schubert GmbH*, No. 00 Civ. 5189 (RCC), 2006 U.S. Dist. LEXIS 59455 (S.D.N.Y. Aug. 22, 2006).  That case concerned the first impression question of "whether, under the principles of the CISG, a prior oral agreement to disregard boilerplate language itself containing, *inter alia*, a merger clause, trumps the written merger clause itself."  *Id.* at *26.  In that case, the plaintiff asserted that there was an express oral understanding reached between the parties that certain "boilerplate language," which included a merger clause and which would have relieved the defendant – the draftsman of the "boilerplate language" – of liability, would not apply.  Judge Casey found that under the CISG any statements made between the parties indicating that the allegedly "boilerplate language" would not apply must be considered in determining the parameters of the parties' contract.  If either party intended that the merger clause would have no effect, then it would have no effect.  *Id.* at *27-30.

Here, in sharp contrast, there is no allegation of a prior oral agreement to disregard the parties' merger clause.  Indeed, there could be no such allegation because *Cedar drafted the Contract using its own forms*, and it defies logic to believe that Cedar would include language
(continued…)

- 29 -

163.    There is no ambiguity in the Contract's merger clause that the contract would comprise "the entire agreement of the parties."  (Def. Ex. A.)

164.    The Contract at issue was drafted by Cedar using its own forms.  Accordingly, the rule of *contra proferentum* applies and any ambiguity must be interpreted against Cedar.  *See e.g. Photopaint Techs., LLC v. Smartlens Corp*. 335 F.3d 152, 161 (2d Cir. 2003)("we generally interpret contractual ambiguities against the drafter"); *Westchester Resco Co v. New England Reinsurance Corp*, 818 F.2d 2, 3 (2d Cir. 1987) ("Where an ambiguity exists in a standard-form contract supplied by one of the parties, the well-established contra proferentem principle requires that the ambiguity be construed against that party"); *Broder v. Cablevision Sys. Corp*., 329 F. Supp. 2d 551, 556 (S.D.N.Y. 2004), *aff'd*, 418 F.3d 187 (2d Cir. 2005) ("Any ambiguity in a contract should be 'construed most strongly against the party who prepared it.'").

### C.    Cedar's Alleged Evidence of Petrochemical Trade Practices Should Not Be Considered

165.    In its Summary Judgment Order, the Court stated that "even if Dongbu showed that the parties intended the merger clause to exclude Article 8 *and* that Cedar informed Dongbu of its intent to re-sell the phenol prior to the contract's memorialization, Cedar could still introduce evidence or petrochemical trade practices to bolster the inference that Dongbu knew or should have known that the phenol would be unfit for ordinary usage if it degraded prior to reaching its final destination."  (Summ. J. Order at 10) (emphasis added).)

166.    Cedar has not offered any evidence that anyone from Cedar communicated to Dongbu that Ertisa was going to be the end user of the Phenol.

167.    Accordingly, any evidence of petrochemical trade practices should not be considered.

### D.    Cedar Cannot Meet Its Burden of Proving that the Phenol was Off Specification Prior to F.O.B. Delivery

168.    To show that the contract was breached, Cedar must meet its burden of proving that the phenol was off-specification for color prior to its F.O.B. delivery to Cedar.  *Milton Abeles*, 2010 U.S. Dist. LEXIS 34017 *14.  Cedar cannot meet this burden.

169.    Free on Board means that, if the goods are injured before risk (i.e., accidental injury to the goods) has passed to the buyer, the seller is liable; if the injury occurs afterward, the

---

that it did not intend to have effect.  In the *TeeVee Toons* case, the party challenging the effect of the contractual provision was not its author.

In any event, Dongbu has found no subsequent cases following Judge Casey's decision. If Judge Casey is correct then written contracts will be worthless because a party could always avoid its contractual obligations simply by claiming that it had a prior oral agreement to disregard certain provisions of its agreement.  This is certainly not what the drafters of the CISG intended.

buyer is liable.  *St. Paul Guardian Insurance Co. v. Neuromed Medical Systems & Support, GmbH*, No. 00 Civ. 9344 (SHS), 2002 WL 465312, at *3-4 (S.D.N.Y. Mar. 26, 2002).

170.    In other words, Cedar must show, by a preponderance of the evidence, that the Phenol at issue was damaged while it was being carried on board the GREEN PIONEER.

171.    For the reasons stated above, and for those that will be proven at trial, Cedar cannot demonstrate that the Phenol was damaged while on board the GREEN PIONEER.  The only logical explanation for the results at the August Analysis demonstrates that the Phenol was damaged on board the BOW FLORA.

172.    Dongbu did not guaranty – nor did it contract – that the phenol would remain on specification for color *add infinitum*.  Dongbu only agreed that the phenol would meet certain color specifications *at the time of delivery* and would not be damaged while on board the GREEN PIONEER.  Dongbu met that burden.  There was no breach of contract.

**E.    Cedar's Alleged Damages**

173.    During discovery, Cedar posited its alleged damages as being the difference between the contract price and the resale price of the damaged Phenol.

174.    Cedar has not provided a witness with respect to its alleged damages but we understand one (or more) will be offered at trial.

175.    It appears from Cedar's statement of damages as discussed in the parties' pre-trial order that it is claiming certain damages that are speculative and, simply not available to them (i.e., lost profits or loss of goodwill).

176.    Moreover, Cedar claims certain consequential damages, such as lost profits and loss of goodwill, that are highly speculative and not within the contemplation of the parties at the time of contracting.  *Kenford Company v. County of Erie*, 73 N.Y.2d 312, 320 (N.Y. 1989).

177.    Cedar also seeks the N.Y. State interest rate.  However, the federal rate should apply in this diversity case.

178.    Dongbu reserves all of its rights with respect to damages upon reviewing the direct testimony that Cedar proffered.  Dongbu will cross-examine Cedar's offered witnesses at trial and question all aspects of Cedar's alleged damages at trial and reserves all rights to do so at that time.

## CONCLUSION

177.    Dongbu respectfully requests that this Court enter judgment in favor of Dongbu because Cedar cannot prove, by a preponderance of the evidence, that Dongbu breached the Contract.

Dated: New York, New York
     July 8, 2013

McDERMOTT WILL & EMERY LLP

By:_____
    Robert A. Weiner
    Michael R. Huttenlocher
    340 Madison Ave.
    New York, New York  10173-1922
    (212) 547-5400

    *Attorneys for Defendant*
    *Dongbu Hannong Chemical Co., Ltd.*