UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

|  |  |
|---|---|
| CEDAR PETROCHEMICALS, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DONGBU HANNONG CHEMICAL CO., LTD. | ) |
| | ) |
| Defendant. | ) |
| | ) |

06 Civ. 3972 (AJN)

_____ )

**DEFENDANT DONGBU HANNONG CHEMICAL CO. LTD.'S
POST-TRIAL MEMORANDUM OF LAW**

McDermott Will & Emery LLP
340 Madison Avenue
New York, New York 10173

*Attorneys for Defendant Dongbu Hannong Chemical Co., Ltd.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

PRELIMINARY STATEMENT ...................................................................... 1

I.    CEDAR'S DAMAGES ARE NOT ATTRIBUTABLE TO ANY INJURY TO THE PHENOL CAUSED PRIOR TO LOADING ON THE BOW FLORA ................... 3

    A.    The BOW FLORA Violated Its Heating Instructions for the Phenol ................... 3

    B.    The Phenol Could Have Been Scalded on the BOW FLORA ............................ 5

    C.    The BOW FLORA's Damage to the Phenol Prevented it From Being Blended Back On Specification By Ertisa ............................................................ 6

    D.    Cedar's "Seeding" Theory Is Not Supported and Does Not Explain Why the Phenol Arrived in Rotterdam with a Color of Greater Than 500 Hazen Units ................................................................................................................ 8

    E.    The BOW FLORA's Actions Constitute A Superseding Cause Relieving Dongbu of Any Liability ..................................................................................... 10

II.    CEDAR'S BREACH OF CONTRACT CLAIM FAILS AS A MATTER OF LAW ............................................................................................................... 13

    A.    The CISG Does Not Override The Parties' Express Contractual Agreements ......................................................................................................... 13

    B.    The Parties' Contract, Not Articles 35 and 36 of the CISG, Controls This Dispute ................................................................................................................ 14

        1.    Article 8 of the CISG – Extrinsic Evidence ............................................ 15

        2.    Article 9 of the CISG – Trade Usage ....................................................... 16

        3.    Article 36 of the CISG – Latent Defect .................................................. 18

III.    IF INTEREST IS AWARDED, THE FEDERAL RATE SHOULD APPLY ................. 19

    CONCLUSION ......................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ajax Tool Works, Inc. v. Can-Eng Mfg.*,
   No. 01 C 5983, 2003 U.S. Dist. LEXIS 1306 (N.D. Ill. Jan. 29, 2003)..................................14

*Am. Mint LLC, v. GOSoftware, Inc.*,
   No. 1:05-CV-650, 2006 U.S. Dist. LEXIS 1569 (M.D. Pa. Jan. 5, 2006)...............................14

*Delchi Carrier, SpA v. Rotorex Corp.*,
   No. 88-CV-1078, 1994 U.S. Dist. LEXIS 12820 (N.D.N.Y. Sept. 9, 1994) ..........................20

*Exxon Company, U.S.A. v. Sofec, Inc.*,
   517 U.S. 830 (1996)....................................................................................3, 10, 11, 12

*Fix v. Quantum Indus. Ptnrs. LDC*,
   374 F.3d 549 (7th Cir. 2004) ....................................................................................17

*Hernandez v. Barrios-Paoli*,
   93 N.Y.2d 781 (1999) ...............................................................................................18

*IBM Credit Fin. Co. Corp. v. Mazda Motor Mfg. (USA) Corp.*,
   170 Misc. 2d 15 647 N.Y.S.2d 322 (Sup. N.Y. Co. 1996), *aff'd*, 245 A.D. 2d 78, 665
   N.Y.S.2d 645 (1st Dep't 1997) ............................................................................. 17-18

*Rexnord Holdings, Inc. v. Bidermann*,
   21 F.3d 522 (2d Cir. 1994)..........................................................................................3

*Westchester Resco Co v. New England Reinsurance Corp*,
   818 F.2d 2 (2d Cir. 1987) ...........................................................................................5

STATUTES

15 U.S.C. App. at 332 ...................................................................................... 13-18

28 U.S.C. § 1961.................................................................................................20

TREATISE

14-74 *Corbin on Contracts* § 74.12 (2007) ...............................................................14

OTHER AUTHORITIES

Restatement (Second) Torts § 440...........................................................................10

Restatement (Second) Torts § 442....................................................................... 10-11

Defendant Dongbu Hannong Chemical Co., Ltd. ("Dongbu"), by and through its attorneys McDermott Will & Emery LLP, hereby submits this Post-Trial Memorandum of Law, as requested by the Court at the conclusion of the bench trial in this matter conducted from September 30, 2013 to October 3, 2013.

## PRELIMINARY STATEMENT

At the conclusion of the bench trial in this matter, the Court asked the parties to address three legal questions while assuming, for purposes of these questions only, that the Court has hypothetically determined that the phenol at issue (the "Phenol") was injured in some manner prior to being loaded upon the BOW FLORA.[1]   The questions, as framed by the parties after discussion with the Court, are as follows:

1. Assuming that the Phenol was injured prior to being loaded on the BOW FLORA, did that injury *actually cause* the damages allegedly suffered by plaintiff Cedar Petrochemicals, Inc. ("Cedar")?

2. Assuming that the Phenol was injured prior to being loaded on the BOW FLORA, does the contractual term "F.O.B. Ulsan Anchorage" require that Dongbu be found liable or can Dongbu otherwise be found not liable?

3. Assuming that the Court determines that Dongbu is liable, what pre-judgment interest rate applies – the N.Y. State statutory rate or the U.S. Federal statutory rate?

---

[1] Familiarity with the general facts and evidence adduced at the bench trial in this matter is assumed and not repeated herein.  For a more detailed recitation of the facts and evidence to be determined from the trial, Dongbu hereby incorporates by reference its Supplemental Proposed Findings of Fact and Conclusions of Law, dated October 9, 2013 and submitted contemporaneously herewith.

First, as described herein, the evidence adduced at trial demonstrates that Cedar cannot meet its burden of proof to demonstrate that its *damages* were *caused* by any *injury* that the Phenol may have sustained prior to being loaded on board the BOW FLORA.  Indeed, Dongbu submits that the BOW FLORA's violation of the heating instructions given to it by Cedar constitutes a superseding cause of any injury suffered by the Phenol on board the GREEN PIONEER.  As a result, the BOW FLORA's actions relieve Dongbu of any liability in this matter.

Second, as described herein, the parties' contract includes an inspection clause which states that the testing conducted at transshipment in May of 2005 is "final and binding" on the parties.  The provisions of the United Nations Convention on Contracts for the International Sale of Goods ("CISG") cited by Cedar to overcome this binding inspection clause do not displace the parties' contract.  Indeed, the parties' contract includes a binding merger clause which displaces any reference Cedar makes to Articles 9, 35, or 36 of the CISG.  As a result, the May 2005 test results should control – the results in which the Phenol tested on specification – and Dongbu should be found not liable.

Finally, if the Court finds Dongbu liable, it should apply the federal interest rate found in 28 U.S.C. § 1961 when awarding pre-judgment interest.  As Cedar concedes, this case is governed by the CISG.  In such a case, a plaintiff's entitlement to pre-judgment interest flows from Article 78 of the CISG.  Courts in this exact same situation have applied the Federal rate. Should the Court need to reach the issue, it should too.

## ARGUMENT

**I.   CEDAR'S DAMAGES ARE NOT ATTRIBUTABLE TO ANY INJURY TO THE PHENOL CAUSED PRIOR TO LOADING ON THE BOW FLORA**

Cedar has failed to demonstrate a critical element of its breach of contract claim against Dongbu, *i.e.*, that Dongbu actually caused Cedar's damages.  It is black letter law for any breach of contract claim that, to hold a party liable, the plaintiff must demonstrate by a preponderance of the evidence that (i) a contract exists between the parties, (ii) the contract was breached, (iii) damages, and (iv) defendant's alleged breach caused damages of the plaintiff.  *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994).

Cedar cannot prove each element of its claim for breach of contract.  Critically, Cedar Cedar cannot prove that Dongbu's alleged breach – *i.e.*, injuring the Phenol prior to delivery to the BOW FLORA – actually caused Cedar's damages.  Rather, what caused Cedar's damages was the BOW FLORA's violation of Cedar's heating instructions and overheated the cargo.  This constitutes a superseding cause which relieves Dongbu of any liability.  *See Exxon Company, U.S.A. v. Sofec, Inc.*, 517 U.S. 830 (1996).  Indeed, had the BOW FLORA delivered the Phenol in Rotterdam in the condition that Dongbu provided it to the BOW FLORA – with a Hazen unit score of *at worst* 30-50 – the Phenol could have been blended back into specification in accord with normal industry practice and not caused Cedar any damages.

### A.   The BOW FLORA Violated Its Heating Instructions for the Phenol

As was discussed at length at the trial, at the time the Phenol was transshipped from the GREEN PIONEER to the BOW FLORA, in May 2005, it tested on specification for all parameters, including color.  (FF/CL ¶ 70.)  However, when the BOW FLORA arrived in Rotterdam, the Phenol tested off specification for color at >500 Hazen units/10 Max.  (FF/CL ¶ 40.)

- 3 -

For the voyage to Rotterdam, the BOW FLORA was provided with heating instructions – not heating "guidance" – to ensure that the Phenol would not be damaged or overheated during the voyage.  (FF/CL ¶¶ 26, 27; Ex. TT.)  The BOW FLORA, however, violated the heating instructions provided to it thereby damaging the Phenol to an un-blendable state.

First, the BOW FLORA was instructed to "keep the temperature between 50 degree C and 55 degree C throughout the loading, transit and discharge."  (Ex. TT.)  Cedar's experts explained at trial that this heating instruction was important because phenol can discolor if stored above 55°C.  (East, 59:6-14; Minton, 302:22-303:4.)  A copy of the purported heating records for Phenol from the BOW FLORA reveals that the BOW FLORA violated the heating instruction by heating the phenol to a temperature above 55°C.  (Ex. 81.)  Indeed, the BOW FLORA repeatedly violated this heating instruction during the voyage, *i.e.*, a total of 27 different occasions (more than 23% of the voyage) and the Phenol reached a temperature as high as 55.9°C.  (Ex. 81.)

Second, the BOW FLORA was instructed that "[i]n the event vessel wishes to increase temperature of cargo, such increase is not to exceed 1 degree C per 24 hours."  (Ex. TT.)  At trial, Mr. East testified that violating this heating instruction could injure the Phenol as follows:

> Q. . . . "In the event vessel wishes to increase temperature of cargo, such increase is not to exceed one degree Celsius for 24 hours." Are you familiar with that instruction?
>
> A.  That's in there, yes.
>
> Q.  That's because phenol is fairly unstable and a rapid change or lowering of temperature can cause discoloration, is that correct?
>
> A.  That's correct, it can.
>
> Q.  Within a 24-hour period?
>
> A.  Yes.
>
> Q.  Would you agree with me if it occurs within a 12-hour period, it's even more likely to have caused discoloration?

- 4 -

A.  It's possible.  I have to probably talk to someone on that one.
(East, 59:15-60:5.)

The heating records kept by the BOW FLORA reflect that the Phenol's temperature was
increased by more than 1°C in less than a 24-hour period of time.  (Ex. 81.)  Indeed, the
temperature changed by more than 1°C in a *12 hour* period of time on three separate occasions:

- The Phenol increased in temperature by 1.3 °C on June 25, 2005 (Ex. 81, D25);

- The Phenol increased in temperature by 1.1°C on June 28, 2005 (Ex. 81, D25); and

- The Phenol increased in temperature by 1.4 °C between July 2 and 3, 2005 (Ex. 81, D25)

These explicit violations of the heating instructions by the BOW FLORA demonstrate that the
Phenol was damaged while on the BOW FLORA – irrespective of the condition of the Phenol as
delivered by the GREEN PIONEER.

### B.    The Phenol Could Have Been Scalded on the BOW FLORA

In addition to this explicit, tangible damage to the Phenol, Cedar's experts could not rule
out the possibility that the Phenol was scalded upon loading on board the BOW FLORA thus
causing the discoloration of the Phenol.  Typically, during a transshipment of phenol, a first-foot
sample of phenol is taken by surveyors and "the first foot is important, because sometimes cargo
can get scalded as it[']s first loaded onto a ship."  (East, 125:7-10.)  In addition, "[i]n the case of
phenol" "that's one of the reasons you take a first foot [sample]."  (East, 125:11-12.)

Mr. East was unable to rule out the possibility that Sample B – i.e., the first foot sample
of phenol loaded on the BOW FLORA that was retained and tested in Korea – was scalded upon
loading onto the BOW FLORA.  (East, 125:7-12; 126:22-127:1.)  He testified that:

Q. . . . Second, [the first foot] went off spec while being loaded on
the Bow Flora because the heating coils or something happened

- 5 -

that caused the phenol to be heated too much and caused some discoloration, possibility, correct?

A.  That's right.  (East, 126:22-127:1.)

To rebut this possibility, Cedar will attempt to rely upon the testimony of BOW FLORA First Mate, Gry Berg-Nilsen.  Cedar's reliance is misplaced.

First, during Ms. Berg-Nilsen's deposition – taken nearly 8 years after the voyage in question – she admitted that she did not have a specific, independent recollection of what occurred on the BOW FLORA and had to rely on her practice and on the documents shown to her during her testimony.  (Berg-Nilsen 38:21-39:8.)  On this point, there were no documents from which Ms. Berg-Nilsen could rely because the temperature of the heating coils is never recorded in any document.  (Berg-Nilsen, 50:10-19.)  Moreover, according to Ms. Berg-Nilsen, it is "impossible to read the temperature on the one foot."  (Berg-Nilsen, 56:15-21.)

Again, without any record and no specific recollection from Ms. Berg-Nilsen, the possibility of the first-foot of Phenol being scaled on board the BOW FLORA – as Mr. East candidly admitted was a possibility – cannot be ruled out.

## C.     The BOW FLORA's Damage to the Phenol Prevented it From Being Blended Back On Specification By Ertisa.

Assuming that the Phenol was damaged while on board the GREEN PIONEER (as instructed by the Court), the GREEN PIONEER delivered the phenol to the BOW FLORA in a condition that would have arrived in Rotterdam with a Hazen score of 30-50, *i.e.*, the Hazen unit result from the Korea Joint Analysis.  If the BOW FLORA had not overheated the Phenol and damaged the Phenol to the tune of a Hazen unit score of greater than 500, then the Phenol could have been blended back to specification and Cedar would not have had any monetary damages. As a result, any monetary damages suffered by Cedar are attributable to the BOW FLORA, i.e.,

after the risk of loss passed to Cedar.  It is the fact that the Phenol was rendered un-blendable –
as caused by the BOW FLORA – that has caused Cedar damages in this case.

      At trial, Ertisa's representative Mr. Irisarri testified that off spec phenol can be "blended"
with colorless phenol to bring the phenol back into specification.  (Irisarri, 433:20-25.)  This
process is common in the industry.  (*Id.*)  In fact, it is well-known in the petrochemical industry
that "as long as the Hazen units haven't gone through the roof," phenol is "usually blendable and
can be got back into specification."  (Ex. U.)  Indeed, when the Phenol in question arrived in
Rotterdam, Ertisa attempted to blend the phenol back into specification, but was unsuccessful.
(Irisarri, 423:24-424:4.)

      More importantly, Mr. Irisarri testified that Phenol with a Hazen unit score of 30-50 can
be blended to bring the phenol back on specification and that he has done it before.  (Irisarri,
424:18-425:2.)[2]  Mr. Irisarri tested as follows:

> Q:  For instance, if the color specification for Ertisa was 10 max
> Hazen units.  Let's just assume that to be true for purposes of these
> questions.  Ok?  If the phenol in question arrived at disport at a
> Hazen unit score of approximately 30 to 50, would that be a cargo
> that Ertisa would be able to blend to then bring down and make it
> on specification at 10?
>
> A.  Yes.
>
> Q.  And you have done that before, right?
>
> A.  Yes.  (Irisarri, 424:18-425:2.)

      If the BOW FLORA had not overheated the Phenol and damaged it to the point where it
could not have been brought back on spec, then Cedar would have no damages attributable to
Dongbu.  ***But for*** the BOW FLORA's actions, the Phenol simply could have been blended back

---

[2] Contrast this incredible testimony of Cedar's CEO Mr. Harfouche, who testified that even if the color of the phenol
is "eleven, it's not negotiable any more."  (Harfouche, 365:16-366:2.)

to being on spec.  Indeed, it was only after the phenol could not be brought on spec that Ertisa

asserted a claim against Cedar.  (Irisarri, 425:5-7.)

### D.   Cedar's "Seeding" Theory Is Not Supported and Does Not Explain Why the Phenol Arrived in Rotterdam with a Color of Greater Than 500 Hazen Units.

The heating damage which changed the Phenol's Hazen unit score from 30-50 to greater

than 500 cannot be explained by anything attributable to Dongbu or the GREEN PIONEER.  The

only attempt made by Cedar is its "seeding" theory.  Again, Cedar's "seeding" theory is that,

first, the Phenol is injured by either heat or a contaminant.  (Minton, 317:14-25.)  After this

original injury, Cedar's experts theorize that the color change is then "irreversible," "will get

progressively worse over time," and is accelerated by heat.  (Minton, 342:6-17.)

Importantly, Cedar's "seeding" theory, as applied to this case, is that "the cargo was

damaged on the Green Pioneer or before, and then by being carried ***at normal temperatures on***

***the Bow Flora***, the damage that had been done led to a progressive increased discoloration."

(Minton, 324:9-12 (emphasis added).)  As demonstrated above, the phenol was ***not carried at***

***normal temperatures on the Bow Flora***.  (*See supra.* at 3-5.)  The BOW FLORA flat out

violated Cedar's heating instructions.  Thus, Cedar's "seeding" cannot be applied in this case.

Moreover, Cedar's "seeding" theory has no merit.  It simply does not fit with the facts of

this case or the test results of the various samples tested.  In short, if Cedar's theory of "seeding"

was correct, then one would expect that any sample tested later in time after another sample

taken contemporaneously would have a higher Hazen unit score, *i.e.*, get "progressively worse."

Indeed, Cedar's "seeding" theory hinges on this assumption.  (Minton, 355:18-21 ("Q.  And it's

fair to state, sir, that your seeding theory is that the color is irreversible and it gets progressively

worse, correct?  A.  Correct.").)  This, however, did not happen with any group of samples

tested.

Cedar's "seeding" theory is first disproven by analyzing Samples 5 and C.  Sample 5 and Sample C were both taken from the GREEN PIONEER by SGS and, as Cedar's experts admitted, would have been drawn from the tank one right after another.  (Ex. 80, East, 256:8-12, 257:19-25; Minton, 322:22-323:3.)  Sample 5 was tested on July 29, 2005.  (Ex. 55.)  Sample C was tested on August 8, 2005.  (Ex. 64.)  If Cedar's seeding theory was correct, Sample C's Hazen unit score would have been "progressively worse" than Sample 5.  It was not.  (Minton, 356:14-17.)  Sample C had a *lower* Hazen unit score than did Sample 5.  (Ex. 80.)

Similarly, the "seeding" theory does not explain the difference in the BOW FLORA's first foot samples.  The first foot sample tested in Rotterdam (Sample 2) had a worse Hazen score (60-70) than Sample B that was tested ten days later in Korea (20-30).  (Ex. 80.)  Under the "seeding" theory, Sample B should have had a higher Hazen score than Sample 2.

Cedar's experts face the same insurmountable problem with the samples taken from the BOW FLORA after it was fully loaded.  Sample 6 and Sample A were both taken by SGS from the fully loaded BOW FLORA and, as Cedar's experts admitted, would have been drawn from the tank one right after another.  (Ex. 80, East, 256:8-12.)  Sample 6 was tested on July 29, 2005. (Ex. 55.)  Sample A was tested on August 8, 2005.  (Ex. 64.)  As a result, if Cedar's seeding theory was correct, Sample A's Hazen unit score would have been "progressively worse" than Sample 6.  That did not happen.  Sample A had a *lower* Hazen unit score than did Sample 6. (Ex. 80.)

Because Cedar's "seeding" theory is unsupported by the evidence in this case, the only explanation supported by the record for why the Phenol tested at greater than 500 Hazen units is that it was overheated on board the BOW FLORA.[3]

###### E. The BOW FLORA's Actions Constitute A Superseding Cause Relieving Dongbu of Any Liability

The BOW FLORA's acts constitute a superseding cause which relieves Dongbu of any liability. Although typically thought of as a tort concept, a superseding cause is also applicable in a breach of contract action. *See Exxon Company, U.S.A. v. Sofec, Inc.*, 517 U.S. 830 (1996). "A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." Restatement (Second) Torts § 440. "The following considerations are of importance in determining whether an intervening force is a superseding cause of harm to another:

> (a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;
>
> (b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;
>
> (c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;
>
> (d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;

---

[3] Indeed, Cedar's experts acknowledged that the BOW FLORA could have caused the damage to the Phenol. Mr. East stated that some of the "degradation in color could have been due to overheating on the Bow Flora." (213:25-214:1; see also Ex. 67 at 5-6.) Mr. Minton also stated that "[i]t's possible there was some further heat damage on the Bow Flora." (Minton, 305:1-9.)

- 10 -

(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subject the third person to liability to him;

(f) the degree of culpability of a wrongful act of third person which sets the intervening force in motion."  Restatement (Second) Torts § 442.

Applying these factors to the case at bar demonstrates that the BOW FLORA's failure to follow the heating instructions of Cedar constitutes a superseding cause.  First, if any injury was caused by the GREEN PIONEER, it was limited to the Phenol going off specification to 30-50 Hazen units.[4]  This injury is negligible since phenol with a Hazen unit score of 30-50 can be blended back into specification.  As a result, the BOW FLORA's damage to the Phenol to an *unblendable* state is an injury different in kind than would have otherwise resulted from the GREEN PIONEER.

Second, it was unforeseeable and extraordinary that the BOW FLORA would violate the heating instructions in the repeated and wanton matter than it did.  Third, Dongbu had no control over the BOW FLORA and the acts of the BOW FLORA were independent of Dongbu's.  Fourth, the BOW FLORA's act of overheating the Phenol is the act of a third party to Dongbu and Cedar.  Fifth, the BOW FLORA acted wrongly towards Cedar when it overheated the Phenol in contravention of Cedar's explicit heating instructions.  Finally, the BOW FLORA was entrusted to follow the heating instructions but appears to have just about completely ignored them.  Accordingly, *all* of the factors demonstrate that the BOW FLORA's overheating of the Phenol constitutes a superseding cause that relieves Dongbu of liability.

Indeed, this superseding cause concept applies in a contract case.  In *Exxon Company, U.S.A. v. Sofec, Inc.*, 517 U.S. 830 (1996), the Supreme Court affirmed the lower court's finding

---

[4] It should be noted that it is Dongbu's position that the GREEN PIONEER delivered on specification Phenol and the aberrant result of Sample C was caused by the matted material found in Sample C – and not any other sample.

that an individual's negligence was "the superseding and sole proximate cause" of the plaintiff's injury, which cut off the defendant's liability for contractual breach of warranty.  This case arose from an incident in which Exxon's tanker broke away from its mooring, which was manufactured by the defendant, Sofec.  *Id*. at 832.  After the tanker broke away from its mooring, the tanker's captain negligently ran the ship aground, resulting in its "constructive total loss."  *Id*. at 834.  Exxon asserted that defendant Sofec was best situated to prevent the loss of the tanker and that Sofec breached various contractual warranties.  On appeal, the Court agreed that the Captain's negligence was "the sole proximate cause of Exxon's injury [which] suffices to cut off [defendant Sofec's] liability for that injury on a contractual breach of warranty theory . . . ."  *Id*. at 840.

The Court stated that "[a]lthough the principles of legal causation sometimes receive labels in contract analysis different from the 'proximate causation' label most frequently employed in tort analysis, these principles nevertheless exist to restrict liability in contract as well.  Indeed, the requirement of foreseeability may be more stringent in the context of contract liability than it is in the context of tort liability."  *Id*. at 839-40.

Similarly, the BOW FLORA's negligence in improperly heating the phenol was the superseding and proximate cause of plaintiff's damages here.  Like the defendant Sofec, whose product defect resulted in the tanker's unmooring, which then led to the captain taking actions that ran the tanker aground, Dongbu may have delivered phenol with a slightly higher Hazen score than required under the contract, but the BOW FLORA's negligence is what ultimately rendered the Phenol unusable and *unblendable* and caused Cedar's "total constructive loss."  As a result, Dongbu should be relieved from any liability.

- 12 -

## II.   CEDAR'S BREACH OF CONTRACT CLAIM FAILS AS A MATTER OF LAW.

As discussed below, Cedar's claim for breach of contract pursuant to Articles 35 and 36 of the CISG fails as a matter of law because (i) the CISG does not override the parties' express contractual agreement; (ii) pursuant to Article 6 of the CISG, as evidenced by its Contract Dongbu and Cedar agreed to "derogate from and/or vary the terms" of Articles 35 and 36 of the CISG through the Inspection Clause, and (iii) Dongbu met all of its obligations under the express terms of the Contract when it delivered conforming goods to Cedar in Ulsan, Anchorage Korea.

### A.   The CISG Does Not Override The Parties' Express Contractual Agreements

The CISG was ratified by the United States on December 11, 1986 and became effective on January 1, 1988. *See* 15 U.S.C. App. at 332 (1998). The CISG "applies to contracts of sale of goods between parties whose places of business are in different States when the States are contracting parties. CISG Art. 1 § 1(a). The CISG governs this dispute because the United States, where Cedar has its place of business, and Korea, where Dongbu has its place of business are both States Party to the Convention. *Id*.

The CISG does not usurp or undermine the parties' own contracts. In that regard, Article 6 of the CISG provides that "[t]he parties may exclude the application of this Convention or, subject to article 12, *derogate from or vary the effect of any of its provisions*." (Italics supplied.) As explained in the Commentary to Article 6 of the CISG, "The non-mandatory character of the Convention is explicitly stated in article [6]. The parties may exclude its application entirely by choosing a law other than this Convention to govern their contract. They may also exclude its

applications in part or derogate from or vary the effect of any of its provisions by adopting

provisions in their contract providing solutions different from those in the Convention."[5]

Indeed, United States courts have recognized the effect of Article 6.  As explained in

*Ajax Tool Works, Inc. v. Can-Eng Mfg*., No. 01 C 5983, 2003 U.S. Dist. LEXIS 1306, at *9

(N.D. Ill. Jan. 29, 2003):

> Although the CISG applies to the parties' contract, contrary to [plaintiff's]
> argument, the terms and conditions and all limitations contained in the contract
> are not completely superseded by the provisions of the CISG….The CISG does
> not preempt a private contract between parties; instead, it provides a statutory
> authority from which contract provisions are interpreted, fills gaps in contract
> language, and governs issues not addressed by the contract.  In fact, Article 6
> states that parties may, by contract, "derogate from or vary the effect of any of
> [the CISG's] provisions."  CISG Art. 6.  Accordingly, under the CISG, the terms
> of the parties' agreement controls.

*See also*, *Am. Mint LLC, v. GOSoftware, Inc*., No. 1:05-CV-650, 2006 U.S. Dist. LEXIS 1569, at

*19 (M.D. Pa. Jan. 5, 2006) (citing *Ajax*, and noting that pursuant to Article 6, parties were free

to agree to liquidate damages in the event of breach of contract.).

Accordingly since the parties' contract will always control, commentators have referred

to the CISG as a "gap-filling law", "supplying rules when the parties have not addressed issues

specifically in the contract."  14-74 *Corbin on Contracts* § 74.12 (2007).

**B.     The Parties' Contract, Not Articles 35 and 36
of the CISG, Controls This Dispute**

In accordance with Article 6 of the CISG, the parties chose to "derogate from" and/or

"vary the effect" of Articles 9, 35 and 36 of the CISG by including two critical provisions in the

Contract – the Merger Clause[6] and the Inspection Clause.[7]  Through these two contractual

---

[5] This Commentary is from the Text of Secretariat Commentary on Article 5 of the 1978 Draft of the Convention, which was the draft counterpart of CISG Article 6.

[6] The Merger Clause in the Contract states:  "Following sets forth the entire agreement of the parties."  (Ex. 10.)

clauses, the parties explicitly agreed that the Contract was their entire agreement and Cedar

cannot look outside of the contract to extrinsic evidence (in accord with Article 8 of the CISG) to

modify the parties' agreement.  At the end of the day, Cedar cannot escape the parties'

Inspection Clause which dictates that the surveyor's test results in May of 2005 – showing that

the Phenol was delivered *on specification* under any set of specification – are "*final and*

*binding*."

> 1.   *Article 8 of the CISG – Extrinsic Evidence*

Cedar will surely point to Article 8 of the CISG to argue that the Court is commanded to

examine extrinsic evidence to inform the interpretation of the Contract.  Cedar's reliance is of no

moment in this case.  Simply put, Cedar failed to offer any extrinsic evidence at trial that could

be used to inform the parties' intent with regard to the Merger Clause or the Inspection Clause.

Importantly, Cedar failed to offer any evidence that the Merger Clause means anything other

than what it says, i.e., that the Contract is the parties' "entire agreement."  (Ex. 10.)

However, to the extent that there is any ambiguity in the Merger Clause, the contract is

Cedar's form contract (Harfouche, 368:25-369:1) and any ambiguity in the terms of the Contract

should be construed against Cedar as the drafter.  *Westchester Resco Co v. New England*

*Reinsurance Corp*, 818 F.2d 2, 3 (2d Cir. 1987) ("Where an ambiguity exists in a standard-form

contract supplied by one of the parties, the well-established contra proferentem principle requires

that the ambiguity be construed against that party").

---

[7] The Inspection Clause in the Contract states:  "Inspection:  By mutually acceptable independent surveyor whose findings as to quantity/quality as per shore tank figures at load port are final and binding on both parties."  (Ex. 10.)

2.       *Article 9 of the CISG –Trade Usage*

First, Article 9(1) states that "[t]he parties are bound by any usage to which they have agreed and by any practices which they have established between themselves."  Here, this Contract was Dongbu's first and only deal with Cedar and they had no pre-existing relationship. (Chu ¶ 3.)  Thus, this Contract – and importantly, the Inspection Clause – set up the usage and practices between the parties.  As discussed in further detail herein, the Inspection Clause is "final and binding" and that usage should be upheld.

Second, Article 9(2) states that the parties "*unless otherwise agreed*" are considered to have made industry practice applicable to their contract.  As an initial matter, Dongbu submits that there was no competent testimony submitted by Cedar with regard to industry practice. Neither Mr. Minton nor Mr. East was offered as an industry expert in the petrochemical trade. And, Mr. Harfouche and Mr. Irisarri only provided testimony concerning their individual practices – not industry wide practices.  As a result, Article 9(2) can have no applicability here.

More importantly, here, between the Merger Clause and the Inspection clause, the parties "otherwise agreed" to displace any reliance upon industry practice in interpreting this contract. Here, Cedar submits that the members of the petrochemical industry invariably draw samples at all points that a chemical is transferred from one vessel to another and, if necessary, *all* industry parties rely upon retained samples should a controversy arise.

However, the Inspection Clause is clearly in conflict with Cedar's telling of the industry practice since the Inspection Clause makes the inspection at "loadport . . . final and binding."  If Cedar's version of industry practice is determined to be binding, the Court would be *overriding* the express terms of the parties' contract.

Cedar's final response will be that the Inspection Clause only applies to the test results from the "shore tanks." Cedar's reading of the Inspection Clause is untenable.[8] Reading the Inspection Clause in context with the entire contract, it is clear that the "inspection" referred to is the one at the "loadport" for the particular shipment at issue. In the case of Cedar-Dongbu contract, the "loadport" is the Ulsan, Anchorage, *i.e.*, where the Phenol is loaded from Dongbu to Cedar and not the testing of the "shore tank."

This makes sense in light of the fact that this is Cedar's form contract. For instance, Cedar used the same exact inspection clause in its agreement with Ertisa for the same Phenol. (*Compare* Ex. 10 *with* Ex. 8.) If Cedar's reading of the clause is correct, then Ertisa would also be bound by the shore tank tests with which it had no involvement whatsoever. This would make no sense. The better reading of this clause is that the inspection conducted at the "loadport" – Ulsan for Dongbu and Rotterdam for Ertisa – are the results that are "*final and binding.*"

As a result, a proper reading of the Contract demonstrates that the parties intended the testing conducted by the surveyors in Ulsan at the time of transshipment to be final and binding. Dongbu delivered the Phenol *on specification* at that point and, thus, is not liable for any alleged damages suffered by Cedar. If Cedar wanted to make the Rotterdam tests or the Korea joint analysis tests "final and binding" it could have easily included that in the Contract. The Court should decline to interpret the contract in contravention of the "strong presumption against reading into contracts provisions that easily could have been included but were not." *Fix v. Quantum Indus. Ptnrs. LDC*, 374 F.3d 549, 553 (7th Cir. 2004); *see also IBM Credit Fin. Co.*

---

[8] Respectfully, Dongbu asserts that Judge Swain's discussion of this point in her Summary Judgment Order (Dkt. 118, at 7-9) is not a definitive determination of the issue. However, Dongbu believes that Judge Swain is incorrect on this point and the Court should now re-evaluate this issue based on the evidence adduced at trial.

*Corp. v. Mazda Motor Mfg. (USA) Corp.*, 170 Misc. 2d 15, 22, 647 N.Y.S.2d 322, 327 (Sup. N.Y. Co. 1996), *aff'd*, 245 A.D. 2d 78, 665 N.Y.S.2d 645 (1st Dep't 1997) ("Contingencies which could readily be anticipated but which were never mentioned can fairly be ignored as not within the contemplation of the parties.").

Moreover, under this proper reading of the contract, Dongbu is in compliance with Article 35 of the CISG which requires that goods be delivered in accord with the terms of the contract. The goods passed the inspection in May 2005 and, thereafter, Dongbu had no further responsibility under the Contract.

       3.     *Article 36 of the CISG – Latent Defect*

Cedar takes the position that Article 36(1) of the CISG means that a seller of goods is always liable for any latent defect that becomes apparent after initial inspection. Article 36(1) of the CISG states that "[t]he seller is liable in accordance with the contract and this Convention for any lack of conformity which exists at the time when the risk passes to the buyer, even though the lack of conformity becomes apparent only after that time." Cedar's position is untenable. If Cedar was correct, then Article 36(2) of the CISG would be rendered superfluous. *See Hernandez v. Barrios-Paoli*, 93 N.Y.2d 781, 787 n.2 (1999) (noting that "settled principles of statutory construction" prohibit reading a statute in manner that would render a provision meaningless).

Article 36(2) covers post-inspection injury to a cargo but only subject to some agreement that the cargo will remain fit for a period of time. Article 36(2) states that "[t]he seller is also liable for any lack of conformity which occurs after the time indicated in the preceding paragraph and which is due to a breach of any of his obligations, including *a breach of any guarantee* that for a period of time the goods will remain fit for their ordinary purpose or for

- 18 -

some particular purpose or will retain specified qualities or characteristics." (Emphasis supplied.)

Cedar's reading of the statute is flawed. If, for instance, a contract for the sale of goods included a 30 day guarantee that the cargo will remain on specification but an alleged defect shows up after 45 days, Article 36(2) would relieve the seller of liability. However, under Cedar's reading, the buyer could always rely on Article 36(1) and override the parties' contract and render Article 36(2) meaningless. In essence, if Cedar's theory is correct, Article 36(1) essentially provides that a party must deliver on specification goods *ad infinitum* as a matter of law irrespective of any other agreement.

The better reading of the statute is that a seller only sells goods that will remain on spec or fit for a particular purpose if the seller provides an explicit guarantee. This would give meaning to Article 36(2). At the same time, Article 36(1) would continue to cover, as it does here, issues with the initial inspection of the cargo. The implication in these two statutes is that Cedar's "fit for their ordinary purpose" argument only applies when there is some actual contractual agreement or obligation to do so.

Thus, in this matter, Dongbu is not liable under Article 36 if some defect in the product showed up two months later unless Dongbu explicitly agreed to take on that liability. The evidence is clear that Dongbu did not take on that liability. The Contract does not mention it and Dongbu's contemporaneous communications show that Dongbu explicitly believed that the tests at transshipment in May 2005 governed. (Ex. 59.) In short, Dongbu is not liable.

## III.   IF INTEREST IS AWARDED, THE FEDERAL RATE SHOULD APPLY

Cedar claims that it is entitled to interest under Article 78 of the CISG. Cedar also claims that the N.Y. State rate of 9% applies in this case. These claims are inapposite and Cedar's claim for interest under the N.Y. State rate is wrong. Cedar has admitted that the CISG governs this

matter.  (Cedar's Proposed Conclusions of Law ¶ 6.)  CISG cases, such as this one, require that the Federal Interest Rate apply.

The matter of recoverable interest is governed by Article 78 of the CISG which states that:  "If a party fails to pay the price or any other sum that is in arrears, the other party is entitled to interest on it, without prejudice to any claim for damages recoverable under article 74."

In *Delchi Carrier, SpA v. Rotorex*, the Court determined (in a matter governed by the CISG) that:  "Delchi is entitled to prejudgment interest pursuant to UNCCISG Article 78. Because Article 78 does not specify the rate of interest to be applied, the court in its discretion awards Delchi prejudgment interest at the United States Treasury Bill rate as set forth in 28 U.S.C. § 1961(a)."  *Delchi Carrier, SpA v. Rotorex Corp.*, No. 88-CV-1078, 1994 U.S. Dist. LEXIS 12820 (N.D.N.Y. Sept. 9, 1994).  The same should apply in this case and, thus, any pre-judgment interest is governed by 28 U.S.C. § 1961.

## CONCLUSION

For all of the foregoing reasons, Dongbu respectfully requests that this Court enter judgment in favor of Dongbu.

Dated: New York, New York
     October 9, 2013

McDERMOTT WILL & EMERY LLP


By:   */s/ Robert A. Weiner*
    Robert A. Weiner
    Michael R. Huttenlocher
    340 Madison Ave.
    New York, New York  10173-1922
    (212) 547-5400

    *Attorneys for Defendant*
    *Dongbu Hannong Chemical Co., Ltd.*

DM_US 45500571-5.068134.0012