S:\FILES\4651_BOW_FLORA\FINAL_BRIEF.DOC

KENNEDY LILLIS SCHMIDT & ENGLISH
John T. Lillis Jr.
Nathan T. Williams
75 Maiden Lane – Suite 402
New York, N.Y. 10038-4816
Telephone: 212-430-0800
Telecopier: 212-430-0810
Attorneys for Plaintiff
CEDAR PETROCHEMICALS, INC.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| CEDAR PETROCHEMICALS, INC. | ) |
| Plaintiff, | ) |
| - v. - | ) |
| DONGBU HANNONG CHEMICAL CO., LTD. | ) |
| Defendant. | ) |

06 Civ. 3972 (AJN)

# CEDAR'S POST-TRIAL
# MEMORANDUM OF LAW

*Of Counsel*

John T. Lillis Jr.
Nathan T. Williams

S:\Files\4651_BOW_FLORA\4651_Final_Brief_TOC.doc

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ iii

**Question 1:**   **Assuming the Court Holds that the Phenol Was Damaged**
**before Dongbu Delivered It to the BOW FLORA, Is Dongbu**
**Liable for Breach of Contract?** ...................................................... 1

**Answer:**   **Yes.** .................................................................................................. 1

A.   *The Parties Agreed that, if Cedar Proved the Phenol Was Damaged*
*before Dongbu Delivered It to the BOW FLORA, Dongbu*
***Would Be*** *Liable for Breach of Contract* ............................................ 1

B.   *Under the CISG, Dongbu Was Obligated to Provide Phenol*
*that Conformed with the Contract (Pure Phenol with Color*
*Subsisting Below 10 Hazen), which Was Fit for Its Ordinarily*
*Purpose and Cedar's Intended Resale to Ertisa* .................................. 2

**Question 2:**   **Does the Parties' Contract Provide Dongbu with a Basis**
**for Avoiding Its Liability for Breach of Contract** ........................ 6

**Answer:**   **No.** ................................................................................................... 6

A.   *The Contract's "Entire Agreement" Language Does Not Exclude*
*Evidence of the Parties' Intent and Trade Usage* ............................... 6

B.   *The Contract's First Inspection Clause Does Not Absolve*
*Dongbu's Liability Because It Is Limited to the Phenol's Quality*
*in the **Shoretanks** Not the **Vessels'** Tanks* ...................................... 10

C.   *Under the CISG, Dongbu Is Liable for the Cargo's Defective*
*Condition That Existed Pre-Rail Despite the Fact It Only*
*Became Apparent at Disport* ............................................................. 11

D.   *Despite the Fact the Parties' Joint Inspection In Ulsan in May*
*2005 Did Not Disclose the Phenol's Defect Condition, Cedar*
*Sufficiently Examined the Cargo and Provided Satisfactory*
*Notice of its Non-Conformity So That Cedar Did Not Lose Its*
*Right to Rely on That Non-Conformity* .............................................. 12

i

## TABLE OF CONTENTS
## (Continued)

Page

**Question 3:** **Is Dongbu Entitled to a Reduction of Its Liability Because the Phenol's Damage Was Exacerbated Aboard the BOW FLORA** ........................................................................... 15

**Answer:** **No.** ........................................................................................ 15

**Question 4:** **If Dongbu is Liable for Cedar's Damages, What is the Prejudgment Interest Rate that Should be Applied and From What Date Should Interest Be Calculated?** ..................................... 15

**Answer:** **9% p.a.; 20 May 2005** ............................................................. 15

CONCLUSION .......................................................................................... 16

TABLE OF AUTHORITIES

Cases                                                                                                    Pages

*BP Oil International, Ltd. v. Empresa Estatal Petroleos de Ecuador*,
332 F.3d 333 (5th Cir. 2003) ................................................................................12, 13

*Brooklyn Life Insurance Co. v. Dutcher*,
95 U.S. 269, 24 L.Ed. 410 (1877)..............................................................................9, 11

*Chicago Prime Packers, Inc. v. Northam Food Trading Co.*,
320 F.Supp.2d 702 (N.D. Ill. 2004) ...............................................................................16

*Delchi Carrier v. Rotorex Corp.*,
1994 WL 495787 (N.D.N.Y. Sept. 9, 1994) ...................................................................16

*Delchi Carrier v. Rotorex Corp.*,
71 F.3d 1024 (2nd Cir. 1995)...........................................................................................16

*ECEM European Chemical Marketing B.V. v. Purolite Co.*,
451 Fed.Appx. 73 (3rd Cir. 2011).....................................................................................16

*Guang Dong Light Headgear Factory Co. v ACI Int'l, Inc.*,
2007 WL 1341699 (D.Kan. April 28, 2008) ...................................................................16

*MCC-Marble Ceramic Ctr. v. Ceramica Nuova D'Agostino, S.p.A.*,
144 F.3d 1384 (11th Cir. 1998) .........................................................................................8

*Norfolk S. Ry. Co. v. Power Source Supply Inc.*,
WL 2884102 2008 (W.D.Pa. July 25, 2008)...................................................................16

*San Lucio, S.r.l. v. Import & Storage Servs., LLC*,
2009 WL 1010981 (D.N.J. April 15, 2009) .....................................................................16

*St. Paul Guardian Ins. Co. v. Neuromed Med. Sys. & Support, GmbH*,
2002 U.S. Dist. LEXIS 5096 (S.D.N.Y. 2002)................................................................12

*Treibacher Industrie, A.G. v. Allegheny Technologies, Inc.*,
464 F.3d 1235 (11th Cir. 2006), available at
http://cisgw3.law.pace.edu/cisg/text/050427-decision.pdf...........................................16

*Zhejiang Shaoxing Yongli Printing & Dyeing Co., Ltd.
v. Microflock Textile Group Corp.*,
2008 WL 2098062, 2 (S.D. Fla. 2008) ..............................................................................2

TABLE OF AUTHORITIES
(Continued)

Pages

Treaties

U.N. Convention on Contracts for the International
Sale of Goods, 11 April 1980, S. Treaty Doc. No. 98-9 (1983),
1489 U.N.T.S. 3, 15 U.S.C.App. (1998) ("CISG") ...................................................... *passim*

Other Authorities

American Heritage Dictionary, New College Edition, 2d Ed. (1985), p. 1005 .......................5

P.M. Roth, 27 *American Journal of Comparative Law* (1979), pp. 291-310, available at
http://www.cisg.law.pace.edu/cisg/biblio/roth.html#2 ...........................................................4

Sylvain Bollee, *The Theory of Risks in the 1980 Vienna Sale of Goods Convention*,
p. 278 (1999), available at http://www.cisg.law.pace.edu/cisg/biblio/bollee.html.................12

Ralph H. Folsom, et al., *International Business Transactions in a Nutshell*,
p. 52 (5th Ed. 1996) ...............................................................................................................12

Joseph Lookofsky, *The 1980 United Nations Convention on Contracts
for the International Sale of Goods* published in *International Encyclopaedia
of Laws - Contracts*, Suppl. 29 (December 2000) *available at*
http://www.cisg.law.pace.edu/cisg/biblio/lookofsky.html.......................................................11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CEDAR PETROCHEMICALS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | 06 Civ. 3972 (AJN) |
| | ) | |
| | ) | POST-TRIAL |
| - v. - | ) | MEMORANDUM OF LAW |
| | ) | |
| DONGBU HANNONG CHEMICAL CO., LTD. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff, Cedar Petrochemicals, Inc. ("Cedar"), by its attorneys, Kennedy Lillis

Schmidt & English, submits this Post-trial Memorandum of Law as directed by the Court.

**Question I:** ***Assuming the Court Holds that the Phenol Was Damaged before Dongbu Delivered It to the BOW FLORA, Is Dongbu Liable for Breach of Contract?***

**Answer:** **Yes.**

A. *The Parties Agreed that, if Cedar Proved the Phenol Was Damaged before Dongbu Delivered It to the BOW FLORA, Dongbu **Would Be** Liable for Breach of Contract*

In their Joint Pretrial Statement, Docket No. 150, the Parties stipulated that this Court

had three legal issues to resolve, the third of which relates to Question 1. In formulating that legal

question presented, the Parties agreed as follows:

Did Cedar prove, by a preponderance of the evidence, that the injury to the Phenol occurred before the Phenol passed the rail of the BOW FLORA? ***If yes, then Cedar has established Dongbu's liability.*** (Dongbu reserves all its rights regarding damages). If not, Cedar's claims against Dongbu are dismissed.

Based on this rendition of the legal issue, Cedar and Dongbu ***agreed*** that Dongbu

would be liable for breach of contract if Cedar proved the Phenol was damaged before Dongbu de-

livered it to the BOW FLORA. Therefore, assuming the Court determines that the Phenol was dam-

aged before Dongbu delivered it to the BOW FLORA, Cedar respectfully submits that Dongbu is liable for breach of contract.

           B.     *Under the CISG, Dongbu Was Obligated to Provide Phenol that Conformed with the Contract (Pure Phenol with Color Subsisting Below 10 Hazen), which Was Fit for Its Ordinarily Purpose and Cedar's Intended Resale to Ertisa*

In its 28 September 2011 Decision on the Parties' cross motions for summary judgment, Docket No. 118 ("2011 Decision"), this Court held that U.N. Convention on Contracts for the International Sale of Goods, 11 April 1980, S. Treaty Doc. No. 98-9 (1983), 1489 U.N.T.S. 3, 15 U.S.C.App. (1998) ("CISG") governs this dispute.[1]  2011 Decision, p. 6.

When evaluating a dispute governed by the CISG, CISG Art. 8[2] mandates that the parties' subjective intent (as informed by "all relevant circumstances of the case") be considered, and CISG Art. 9[3] mandates that usage in trade be considered.  For these reasons, Cedar has provided the

---

[1] The CISG governs because of the Parties' contractual decision – namely, to not derogate from the CISG application as is their right:  "[The CISG] applies to international sales contracts between parties from different contracting states unless the parties agree to exclude [its] application."  *Zhejiang Shaoxing Yongli Printing & Dyeing Co., Ltd. v. Microflock Textile Group Corp.*, 2008 WL 2098062, 2 (S.D. Fla. 2008); CISG Art. 6.  As will be discussed, *infra*, this has implications for the Court's prejudgment-interest analysis.

[2] CISG Art. 8(1) & (2) provides: "[S]tatements made by and other conduct of a party are to be interpreted according to his intent where the other party knew or could not have been unaware what that intent was" or "[i]f the preceding paragraph is not applicable" . . . "according to the understanding that a reasonable person of the same kind as the other party would have had in the same circumstances."  In so interpreting parties' intent or a reasonable person's understanding, CISG Art. 8(3) requires that "due consideration . . . be given to all relevant circumstances of the case including the negotiations, any practices which the parties have established between themselves, usages and any subsequent conduct of the parties."

[3] CISG Art. 9(2) provides: "The parties are considered, unless otherwise agreed, to have impliedly made applicable to their contract or its formation a usage of which the parties knew or ought to have known and which in international trade is widely known to, and regularly observed by, parties to contracts of the type involved in the particular trade concerned."

Court with evidence respecting the Parties' express and implicit intent[4] and trade usage in the petrochemical industry, including the internationally recognized inspection regime that industry uses to monitor the quality of chemical parcels over the course of their carriage.[5]

When that evidence is considered as required, it contextualizes Dongbu's obligations under the Parties' Contract. In context, Dongbu was obligated to deliver[6] (1) "Pure Phenol"

---

[4] A petrochemical trader purchases a quantity of petrochemicals, at a specified quality, at a designated price, from a seller in one region of the globe and ships it to another region for resale on the same quality terms but at a higher price to exploit price differences across the global market. Ex. 87 ¶8; Trial Transcript ("TT") 372:10-373:2 (Harfouche). In making its purchase, the buyer intends to receive homogeneous cargo free from latent defect that will remain sound (within the quality specifications) over the course of transit so it may consummate the resale on the same quality specifications on which it executed the original purchase. Id. ¶9. This intent is well known to sellers of petrochemicals who, as traders, are often themselves purchasers in other transactions. Id. ¶10. Because transoceanic shipment is implicit in such transactions, in addition to issues of supply and demand, the parties determine the selling price based on an internationally recognized shipping term, such as CFR (Cost & Freight), CIF (Cost, Insurance, Freight), or FOB (Free on Board). Id. ¶11. The shipping term incorporated in the parties' contract defines and orders the parties' respective obligations (e.g. arranging transport, procuring insurance, delivering conforming goods, paying purchase price, accepting delivery) and allocates risk of damage to the cargo between the buyer and seller over the course of its carriage. Id.

[5] The petroleum and petrochemical industry employ an internationally recognized inspection regime to monitor product quality of over the course of its carriage. Ex. 85 ¶14; TT 227:15-229:18 (East). At loadport, the parties – via an independent surveyor – draw and test a sample of the product in store at a shoretank storage facility to ensure it meets the agreed quality "specification." Ex. 85 ¶15; TT 227:15-229:18 (East). The independent surveyor retains an additional shoretank sample and/or ships one aboard the vessel to disport for additional testing if quality issues later arise. Ex. 85 ¶16. Provided tests on the shoretank sample confirm the product in store appears "on-specification," the parties begin loading the agreed quantity aboard a contractually specified vessel. Id. at ¶17. Often, the loading process is interrupted so the independent surveyor can test a "first foot" sample, which is drawn after the receiving tanks have been filled approximately 12 inches full. Id. at ¶18; TT 318:16-321:17 (Minton). If that sample confirms the product appears to remain on-specification, then loading resumes to completion. Ex. 85 ¶19. As with the shoretank samples, the independent surveyor retains an additional first-foot sample and/or ships one aboard the vessel to disport for additional testing if quality issues later arise. Id. at ¶20. After loading is completed, the surveyor draws and tests a post-load sample from the vessel to again ensure that the product appears on-specification. Id. at ¶21; TT 231:1-236:3 (East). The surveyor again draws an additional post-load sample, which it retains and/or ships aboard the vessel to disport for additional testing if quality issues later arise. Id. at ¶22. Meanwhile, to protect the vessel's interests, the crew usually draws and retains its own first-foot and post-load samples in case quality issues later arise. Id. at ¶23. At disport, the parties – again via an independent surveyor(s) – draw and test a pre-discharge sample from the vessel tank(s) to confirm that the product has remained on-specification during transit. Ex. 85 ¶24; TT 238:13-239:22 (East). If the pre-discharge sample shows that the quality has deteriorated, the independent inspector will first draw and test a fresh set of samples (to confirm those initially determined were correct). Ex. 85 ¶25. If these confirm the deterioration, all interested parties (including the vessel and its underwriters and the parties and their underwriters) will be notified and will jointly arrange for all available samples drawn over the course of the cargo's transport to be tested. Id. This testing is conducted to determine, if possible, why and at what stage of the voyage the cargo was injured so the interested parties may determine fault. Id.; TT 238:13-239:22 (East).

3

(Contract, Ex. 5, Quality Clause) (2) of a quality conforming to Eritsa's Specifications (Contract, Ex. 5, Quality Clause as modified to substitute Ertisa Specifications for Kumho's (see modification discussion, *infra*, pp. 8-9); CISG Art. 35(2)(c)), (3) fit for its ordinarily use that would remain so for a reasonable time[7] (CISG Art. 35(2)(a)), and (4) fit for Cedar's resale to Ertisa, which was made known to Dongbu when concluding the Contract (see modification discussion, *infra*, pp. 8-9), that would remain so for a reasonable time (CISG Art. 35(2)(b)).[8]

---

(Footnote continued:)

[6] Under CISG Art. 67 and the Contract's FOB term, Dongbu effected delivery when the Cargo passed the rail of the BOW FLORA at the Ulsan Anchorage. Until that point, Dongbu retained all risk of damage to the Cargo. CISG Art. 36. "'Risk' as a legal concept refers to *accidental injury* to the goods. . . . The central question in the consideration of risk is time. . . . Despite the loss or damage, the buyer must pay [the purchase price] if the risk *at the time of injury* [to the goods] was on him; *not so if it was still on the seller*." P.M. Roth, 27 *American Journal of Comparative Law* (1979), pp. 291-310, available at http://www.cisg.law.pace.edu/cisg/biblio/roth.html#2. In this way, the rail of the BOW FLORA demarks a bright line: If the Phenol was injured before it crossed the BOW FLORA's rail, Dongbu is responsible and must bear this loss – irrespective of the time of discovery of the injury. If it was injured after, Cedar is and must. See 2011 Decision, pp. 6-8 ("If Cedar succeeds in showing that the phenol was damaged prior to delivery to the Bow Flora, the FOB term will not shield Dongbu from liability." *Id.* at 8.).

[7] A CISG "seller must furnish goods which are fit for all the purposes for which goods of the same description are ordinarily used. The standard of quality which is implied from the contract must be ascertained in the light of the normal expectations of persons buying goods of this contract description. . . . In particular, the obligation to furnish goods which are fit for all the purposes for which goods of the contract description are ordinarily used also covers a buyer *who has purchased the goods for resale rather than use*. For goods to be fit for ordinary purposes, they must be *honestly resalable in the ordinary course of business*." Secretariat Commentary on 1978 Draft of the CISG, addressing CISG Art. 35 (formerly Art. 33), available at http://www.cisg.law.pace.edu/cisg/text/secomm/ secomm-35.html (emphasis added). That is, "CISG goods are not considered fit for ordinary or particular purposes unless they *are fit and remain fit* (for such purposes) for a 'reasonable' time, i.e., the period during which such goods normally/usually remain fit, assuming normal use." *Id.* (emphasis in bold added). It cannot be seriously argued that Dongbu provided Phenol that was "honestly resalable in the ordinary course of business" because it did not "**remain fit** for a 'reasonable' time," which – considering the fact that the parties were fully aware that the Cargo would be shipped half way around the world – would surely encompass the duration of transit so that the product could be used for one if its appropriate applications after arrival at disport. Here, the Phenol did not even survive the normal incidents of its intended carriage.

In this way, CISG Art. 35(2)(a) & (b) protect a CISG buyer from bearing a loss due to a CISG seller's provision of latently defective goods: "The buyer's protection against latent defects covers failure to comply with the requirement of Art. 35(2) that the goods be fit for their ordinary purpose or for 'any particular purpose *expressly or impliedly* made known to the seller at the time of the conclusion of the contract.'" *Id.* (Emphasis added).

[8] See Footnote 7.

4

Cedar submits that Dongbu failed to provide Phenol as required by the Contract and the CISG because (1) the particulate matter in Sample C shows that the Phenol was not "pure"[9] because it would have been pulled from the bulk carried aboard the GREEN PIONEER (as it was SGS's practice to only use clean sampling bottles); (2) while initial tests on loading samples suggested the Phenol was on-specification, tests results from pre-BOW FLORA Retained Samples (3, 5, and C) show the Phenol was injured before Dongbu's delivery; (3) the vast majority of the industrial applications of phenol require that its color subsist at or below 10 Hazen and the Phenol outturned at Rotterdam at +500 Hazen thereby preventing it from being put to its ordinary use; and (4) the Phenol was not fit for its intended purpose – resale to Eritsa made know to Dongbu at the conclusion of the contract – because, under Cedar's contact with Ertisa, Cedar was obligated to supply stable phenol with a color subsisting at or below 10 Hazen.

Because, when the Parties' transaction is considered in its proper context, it is clear that Dongbu had to provide pure, sound, and stable Phenol that would survive the normal incidents of its intended post-transshipment carriage to Rotterdam so that it could be used for a shoreside application, Dongbu will argue, as it did in its summary-judgment motion and during summation, that the Contract's "entire agreement" language and the first of its two Inspection Clauses contractually excuse Dongbu from liability for providing Phenol apparently sound on the date of delivery but ultimately determined to be impure, unsound, and unstable thereafter.  That is, Dongbu

---

[9] "Pure" means: "(1) Having a homogeneous or uniform composition; not mixed; (2) Free from adulterants or impurities; full strength; (3) Free from dirt, defilement, or pollution; clean; (4) Free from foreign elements; (5) Containing nothing inappropriate or extraneous."  American Heritage Dictionary, New College Edition, 2d Ed. (1985), p. 1005.

will argue that the Parties contractually agreed that Dongbu would *not* be liable for any lack of conformity that became apparent after the risk of loss passed to Cedar to try to convince the Court that it only had to deliver Phenol that met Ertisa's specification **on the date of delivery**, 20 May 2005, by not after.  Dongbu's arguments fail.

**Question 2:**   ***Does the Parties' Contract Provide Dongbu with a Basis for Avoiding Its Liability for Breach of Contract***

**Answer:**       **No.**

A.     *The Contract's "Entire Agreement" Language Does Not Exclude Evidence of the Parties' Intent or Trade Usage*

In an attempt to convince the Court to ignore the intent of parties to a petrochemical trade, usage in that trade (including the trade's quality control inspection regime), and Cedar's specific intent to resell the Phenol to Ertisa, Dongbu will claim that a phrase in the Contract, which provides "[f]ollowing sets forth the entire agreement of the parties," is a binding merger clause, which prohibits the Court from considering extrinsic evidence of intent and usage.  Dongbu has already advanced – and the Court already expressly rejected – this argument as it applies to trade usage.  However, the Court left open the possibility that, if the Parties *actually intended* the "entire agreement" language to function as a merger clause, it would operate to "bar[] evidence of an ***earlier*** oral contract that contradicts or varies the terms of a subsequent or contemporaneous written contract" – ***but not*** evidence of a later contract modification *or* extrinsic evidence for purposes of contract interpretation:[10]

---

[10] "Under the CISG, a Merger Clause *does not generally have the effect of excluding extrinsic evidence **for purposes of contract interpretation***."  CISG Advisory Counsel, Opinion No. 3, at 4.5 & 4.6: *Parole Evidence Rule, Plain Meaning Rule, Contractual Merger Clause and the CISG*, 23 October 2004 (Emphasis added).  "Extrinsic evidence should not be excluded, unless the parties *actually intended* the Merger Clause to have this effect.  The question is to
(Footnote continues . . . )

Dongbu's last ground for asserting that the agreement derogated from the CISG is the contract's "entire agreement" language. According to Dongbu, this merger clause precludes Cedar from relying on extrinsic evidence regarding the ordinary usage of phenol or Cedar's intent to re-sell the shipment to Erista. The problems with this argument are manifold. *First, the CISG does not merely lack a parol-evidence rule, it commands courts to consider extrinsic evidence that illuminates the parties' intent.* CISG Advisory Council opinions and the one U.S. court to explicitly consider this issue have held that *"'extrinsic evidence . . . should not be excluded, unless the parties actually intend the Merger Clause to have this effect'"* and that *"'Art. 8 requires an examination of all relevant facts and circumstances when deciding whether the Merger Clause represents the parties' intent.'"* [T]here is clearly a genuine dispute as to whether the parties intended the merger clause to exclude all extrinsic evidence. *Second, even if the merger clause were to effectively re-animate the parol-evidence rule, such a rule would only "bar[] evidence of an earlier oral contract that contradicts or varies the terms of a subsequent or contemporaneous written contract."* Here, there is a genuine dispute as to whether the parties' negotiations concerning the re-sale to Erista occurred before or after the contract was memorialized. Finally, even if the merger clause displaced Art. 8's dictate that courts consider extrinsic evidence regarding the parties' negotiations, such clauses do not apply to CISG Art. 9, which allows parties to introduce evidence of common international trade practices. *Thus, even if Dongbu showed that the parties intended the merger clause to exclude Art. 8 and that Cedar informed Dongbu of its intent to re-sell the phenol prior to the contract's memorialization, Cedar could still introduce evidence of petrochemical trade practices to bolster the inference that Dongbu knew or should have known that the phenol would be unfit for ordinary usage if it degraded prior to reaching its final destination.*

---

(Footnote continued:)

be resolved by reference to . . . Art. 8 [which] requires an examination of *all relevant facts and circumstances* when deciding whether the Merger Clause represents the parties' intent." *Id.* at 4.5. A Merger Clause will only operate to exclude extrinsic evidence *for purposes of contract interpretation* when the such a clause has specific wording, which when considered with all relevant factors, makes clear that mutual intent clear. *Id.* at 4.6 (Emphasis added). Here, even if the "entire agreement" language is deemed a binding merger clause, because it does not specifically exclude evidence of the parties' intent or usage in the trade for the purposes of contract interpretation, under the CISG, the Court is required to consider such extrinsic evidence so as to give effect to the Parties' actual agreement. *MCC-Marble Ceramic Ctr. v. Ceramica Nuova D'Agostino, S.p.A.*, 144 F.3d 1384 (11th Cir. 1998).

2011 Decision, p. 8-10 (Citations omitted) (Emphasis added).

At trial, neither Dongbu nor Cedar testified that they actually intended the "entire agreement" language to function as a merger clause (designed to exclude parol evidence or extrinsic evidence for the purposes of contract interpretation). And when the Parties' contract formation and modification history is considered, it is clear that the Parties agreed to modify their Contract *after* the written Contract was exchanged and countersigned such that neither Cedar nor Dongbu intended the "entire agreement" language to function as a binding merger clause – because the written Contract did not, in fact, constitute the Parties' "entire agreement."

In April 2005, Cedar began to negotiate this phenol trade with Kumho P&B Chemical Co. ("Kumho"). Exhibit 89 (Declaration of Cho Yong) ¶5. In early May 2005, Kumho introduced Dongbu to Cedar's local agent and proposed that Dongbu and Cedar be parties to a proposed agreement under which Cedar would agree to purchase and Dongbu would agree to sell 2,000 mt +/- 5% of liquid Phenol conforming to Kumho's Standard Guaranteed Sales Specifications delivered FOB Ulsan Anchorage in exchange for $950/mt. Undisputed Facts ¶¶8-10 at 4, P.T.S. Docket No. 150. Cedar, via its local agent, and Dongbu agreed and, thus, formed an oral contract (which is permissible under the CISG, *MCC-Marble Ceramic Center, Inc., v. Ceramica Nuova d'Agostino, S.p.A.*, 144 F.3d 1384, 1387 (11th Cir. 1998)). Exhibit 1 (Declaration of Dao-Lin Chu) ¶4; Exhibit 87 ¶15; Exhibit 89 ¶7; Exhibit 90 (Declaration of Charlene Silva) ¶10; Undisputed Facts ¶10 at 4, P.T.S. Docket No. 150. Trial Transcript ("TT") 368:17-370:3 (Harfouche). On 17 May 2005, Cedar and Dongbu memorialized their agreement by executing the written Contract. Exhibit 89 ¶9; Exhibit 90 ¶11; Undisputed Facts ¶19 at 5, P.T.S. Docket No. 150. On the same day, Cedar applied for a letter of credit. Undisputed Facts ¶27 at 6, P.T.S. Docket No. 150. That application incorporated Kumho's Standard Guaranteed Sales Specifications, which called for the

8

Phenol to have a color that would remain at or below 5 Hazen. Undisputed Facts ¶28 at 5, P.T.S. Docket No. 150; Exhibits 6, 90 ¶13. On 18 May 2005, Dongbu accepted Cedar's letter-of-credit application. Exhibits 6-8, 89 ¶12-13. On 19 May 2005, Cedar decided to resell the Phenol to Ertisa and modified its 8 April 2005 contract to partially reflect that change. Exhibits 10, 16-19, 89 ¶14, 90 ¶15; TT 414:13-415:14 (Irisarri). Later that day, Cedar explained to Kumho that it intended to resell the Phenol to Ertisa and provided Kumho with Ertisa's specifications, which called for the Phenol to have a color that would remain at or below 10 Hazen. Exhibits 12, 89 ¶17. After it provided Ertisa's specifications, on 19 May 2005, Cedar procured a Documentary Letter of Credit from Korea Exchange Bank to cover the agreed purchase price, which incorporated Ertisa's Specification in lieu of Kumho's. Undisputed Facts ¶¶28-30 at 5, P.T.S. Docket No. 150; Exhibits 16-18, 90 ¶21-22. Dongbu accepted the Letter of Credit modification and issued its Commercial Invoice with Ertisa's Specification in lieu of Kumho's. Undisputed Facts ¶25 at 5, P.T.S. Docket No. 150; Exhibits 16-18, 90 ¶¶21-22. These changes confirm the Parties agreed to modify their written Contract so that Cedar could effectuate a "back-to-back" trade with Ertisa per Ertisa's specifications. Ex. 87 ¶8; TT 372:10-373:2 (Harfouche).

Because "there is no surer way to find out what the parties meant than to see what they have done," the fact that the Parties freely modified their written Contract (as they may under CISG Art. 29) – and thereby rendered the written Contract *less than* their "entire agreement" – proves they did not intend that language to operate as a merger clause. *Brooklyn Life Insurance Co. v. Dutcher*, 95 U.S. 269, 24 L.Ed. 410 (1877). Further, even if the "entire agreement" language is deemed a merger clause that reanimates the parol-evidence rule, that rule does not bar the Court from considering evidence of a post-writing contract modification; rather, it only bars consideration of an "earlier [e.g. pre-writing] oral contract that contradicts or varies the terms of a subsequent or contemporaneous written contract." 2011 Decision, p. 9.

Therefore, because the CISG "commands courts to consider extrinsic evidence that illuminates the parties' intent," 2011 Decision, p. 8, the Court must consider the intent of parties to a petrochemical trade, usage in that trade (including its quality control inspection regime), and Cedar's specific intent to resell the Phenol to Ertisa to determine if Dongbu breached the Parties' Contract by delivering to Cedar impure, unsound, and unstable Phenol.

B.   *The Contract's First Inspection Clause Does Not Absolve Dongbu's Liability Because It Is Limited to the Phenol's Quality in the **Shoretanks** Not the **Vessels'** Tanks*

Alternately, Dongbu will claim that it is contractually absolved from liability based on the following Shoretank Inspection Clause:

Inspection:   By mutually acceptable independent surveyor whose findings as to quality/quantity as per **shoretank** figures at loadport are final and binding on both parties.

By agreeing Dongbu would affect delivery at the Ulsan Anchorage, the Parties agreed Dongbu would transship the Phenol from the Yosu Shoretanks via GREEN PIONEER to the BOW FLORA for oncarriage to Rotterdam. Undisputed Facts ¶33 at 7, P.T.S. Docket No. 150; Exhibit 90 ¶¶23-24. That is, the parties recognized that the Phenol would originate from the Shoretanks, be transferred to the GREEN PIONEER Vessel Tanks, and "delivered" to the BOW FLORA Vessel Tanks. *Id*. This Clause relates strictly to the Phenol's quality in the ***Shoretanks***. GSI surveyed the Phenol's quality in the Shoretanks on 21 May 2005 and determined it to be LT 5 Hazen in both. Undisputed Facts ¶¶34-36 at 7, P.T.S. Docket No. 150; Exhibits 80, 90 ¶27. The Shoretank Inspection Clause makes GSI's determination final and binding on the Parties. Despite the obvious limitation of that Clause, Dongbu argues that, pursuant to it, GSI's and SGS Korea's quality findings on samples pulled from the ***Vessel Tanks*** of the GREEN PIONEER and BOW FLORA over 21-24 May 2005 are final and binding. Dongbu's attempt to substitute "Vessel Tanks" for "Shoretank" clearly violates the plain

10

meaning of the Shoretank Inspection Clause, and Dongbu's argument must be, accordingly, be rejected (as it *already was* in the 2011 Decision[11]).

        C.     *Under the CISG, Dongbu Is Liable for the Cargo's Defective Condition That Existed Pre-Rail Despite the Fact It Only Became Apparent at Disport*

        Contrary to Dongbu's claim that the Parties contractually agreed Dongbu would *not* be liable for any lack of conformity that became apparent after the risk of loss passed to Cedar, by virtue of their incorporation of the CISG, the Parties agreed that Dongbu *would remain liable* for any lack of conformity that became apparent after risk passed to Cedar.  CISG Art. 36(1) provides, "[t]he seller is liable in accordance with the contract and this Convention for any lack of conformity which exists at the time when the risk passes to the buyer, even though the lack of conformity becomes apparent only after that time."

        Although the 'risk' (of accidental loss or destruction) usually passes to the buyer when the seller hands the goods over to a carrier (for transmission to the buyer), Art. 36(1) makes it clear that the seller *remains liable* for any non-conformity existing at that particular point in time, i.e., even if the non-conformity in question first becomes *discoverable* by the buyer at a later point in time.

---

[11] "Dongbu also vaguely intimates that the inspection clause extinguishes any liability under Art. 36, but it offers no explanation as to how.  The inspection clause only mentions the tests conducted on the phenol in the shore tank, the first of many tests conducted over the course of delivery.  Dongbu nonetheless appears to construe this clause to mean that it fulfilled its contractual obligations concerning the phenol's quality when the independent surveyors drew samples from the shore tanks and certified that it was on-specification.  This construction would render the 'F.O.B.' term and the elaborate, mutually agreed-upon inspection regime a nullity.  If, hypothetically, the surveyors had tested the phenol moments after its loading onto the Green Pioneer and found it wildly off-specification, Dongbu would be free of liability.  Risk of injury would effectively pass to Cedar upon extracting the phenol from the shore tanks in Yosu.  Were that the case, there would be little use in conducting periodic tests of the phenol after the shore tank figures were ascertained.  "There is no surer way to find out what parties meant, than to see what they have done," *Brooklyn Life Ins. Co. v. Dutcher,* 95 U.S. (5 Otto) 269, 273, 24 L.Ed. 410 (1877), and the parties' conduct here clearly demonstrates that they did not intend the inspection term to operate as Dongbu suggests."  2011 Decision, p. 8.

Joseph Lookofsky, *The 1980 U.N. Convention on Contracts for the International Sale of Goods* published in *International Encyclopaedia of Laws - Contracts*, Suppl. 29 (December 2000) *available at* http://www.cisg.law.pace.edu/cisg/biblio/lookofsky.html.

> Any defect that "exists at the time risk of loss passes is actionable, even if discovered later.  Thus, the buyer is still able to recover for any non-conformity which becomes apparent long after delivery, but the buyer may have to prove that *the defect was present at delivery . . . .*  The buyer *need not prove what caused the goods to be defective,* only that they are, in fact, defective."

Ralph H. Folsom, et al., *International Business Transactions in a Nutshell*, p. 52 (5th Ed. 1996).

> "[T]he fact that the defects show themselves later is *irrelevant to the assumption of risk. . . .*  What becomes apparent in this situation is *a defect which already affected the goods to a full extent at the time of the passing of risk*, although its discovery requires *further examination*, or the *development of a condition* which existed in an *embryonic form at that time*."

Sylvain Bollee, *The Theory of Risks in the 1980 Vienna Sale of Goods Convention*, p. 278 (1999), available at http://www.cisg.law.pace.edu/cisg/biblio/bollee.html.

Although Cedar cannot prove the exact cause of the Cargo's deterioration, it does not have to, and test results on Retained Samples 3, 5, and C show that a defect existed in the Phenol in embryonic form, not detectable at the time of the May 2005 Ulsan inspections, which developed under the normal conditions of carriage it encountered aboard the BOW FLORA eventually resulting in the damage discovered in Rotterdam.

> D.    *Despite the Fact that Contemporaneous Testing on Samples in Ulsan in May 2005 Did Not Disclose the Phenol's Defective Condition, Cedar Properly Examined the Cargo and Notified Dongbu of the Phenol's Non-Conformity as Required by the Contract and CISG*

Dongbu may also claim that, under CISG Arts. 38 and 39, Cedar lost the right to raise the issue of the Phenol's lack of conformity because the contemporaneous testing of Phenol samples

in May 2005 suggested that it was sound upon delivery.  This argument too must be rejected.[12]  CISG

Art. 38 requires buyers to "examine the goods, or cause them to be examined, within as short a pe-

---

[12] To the extent Dongbu relies on *St. Paul Guardian Ins. Co. v. Neuromed Med. Sys. & Support, GmbH*, 2002 U.S. Dist. LEXIS 5096 (S.D.N.Y. 2002) and *BP Oil International, Ltd. v. Empresa Estatal Petroleos de Ecuador*, 332 F.3d 333 (5th Cir. 2003) to support its argument, *St. Paul* is inapposite because the litigants agreed that no defect existed in the goods upon delivery, and *BP Oil* supports Cedar's case.

In *BP Oil*, BP Oil sued PetroEcuador for breach of a CFR contract for the purchase and sale of gasoline. *Id.* at 335-36.  Under the parties' contract, BP Oil was obligated to deliver a quantity of gasoline with a specified gum content.  *Id.*  The parties agreed that the gum content would be determined at loadport.  *Id.*.  The loadport inspection suggested that the gum content comported with the contract specification.  However, upon arrival, the gasoline's gum content was off-specification.  *Id.*  Therefore, PetroEcuador declined to pay the purchase price.  *Id.*  BP Oil moved for summary judgment motion and argued that the contemporaneous tests on loadport samples showed the gasoline was on-specification.  The Court, relying on CISG Art. 36(1), denied BP Oil's summary-judgment motion because a question of fact remained respecting the possible existence of a latent defect:  "Therefore, there is a fact issue as to whether BP provided defective gasoline by failing to add sufficient gum inhibitor."  *Id.* at 338.

Confusingly, *in dicta* on p. 338, the court raised CISG Arts. 39 and 40:

> Having appointed [an inspector] to test the gasoline, PetroEcuador "ought to have discovered" the defect before the cargo left Texas.  CISG art. 39(1).  Permitting PetroEcuador now to distance itself from [the inspector's] test would negate the parties' selection of CFR delivery and would undermine the key role that reliance plays in international sales agreements.  Nevertheless, BP could have breached the agreement if it provided goods that it "knew or could not have been unaware" were defective . . . . CISG art. 40.

The Court's comments on CISG Arts. 39 and 40 were premature.  Only when "the buyer fails to [examine the goods, or cause them to be examined, within as short a period as is practicable in the circumstances] and there is a lack of conformity . . . *that an examination would have revealed*, [does] the notice period in Art. 39 commence[] from the time the buyer 'ought to have discovered it.'"  CISG Advisory Council Opinion No. 2, *Examination of the Goods and Notice of Non-Conformity Art.s 38 and 39*, *available at*, http://www.cisg.law.pace.edu/cisg/CISG-AC-op2.html; *see also*, Sanna Kuoppala, *Examination of the Goods under the CISG and the Finnish Sale of Goods Act* (2000), *available at*, http://www.cisg.law.pace.edu/cisg/biblio/kuoppala.html.  That is, the only instance where the question of whether a buyer "ought to have discovered" defective goods applies where there has been an "*examination [that] would have revealed*" goods' defective condition.  Because questions of fact remained as to whether the inspector's "examination would have revealed" the gasoline's defect, the Court rightly denied BP Oil's summary judgment motion.  However, until those questions were resolved, the Court was not in a position to state, as it did, that "[h]aving appointed [an inspector] to test the gasoline, PetroEcuador 'ought to have discovered' the defect before the cargo left Texas."  Because this comment was premature, the Court's corollary comment on CISG Art. 40, that "BP could have breached the agreement if it provided goods that it 'knew or could not have been unaware' were defective'" was also premature.  If a buyer fails to provide adequate notice of non-conformity under CISG Art. 39, it losses its right to rely on the non-conformity under CISG Art. 40.  A buyer's failure is excused where it can prove that the seller "knew or could not have been unaware" of the non-conformity.  CISG Art. 40.  Thus, to reach Art. 40, a court initially has to examine whether a buyer failed to provide adequate notice as required by Art. 39.  Because the *BP Oil* court was not in a position to determine whether PetroEcuador failed to provide adequate notice under CISG Art.

(Footnote continues . . . )

riod as is practicable in the circumstances." CISG Art. 39(1) states: "The buyer loses the right to rely on a lack of conformity of the goods if he does not give notice to the seller specifying the nature of the lack of conformity within a reasonable time after he has discovered it or ought to have discovered it."[13] Here, the Parties agreed Cedar was entitled to also inspect the Phenol at Rotterdam:

> [I]nspection may be made by Buyer or Buyer's customer within one month after Buyer acquires physical possession of the goods or clearance by customs of the goods, whichever is later.  Notification of defect or nonconformity mailed by Buyer's customer within such time period and forwarded by Buyer to Seller within one week after receipt thereof shall be deemed timely and valid notification.

Contract, Ex. 8,  Purchase Order Standard Terms and Conditions ¶ 7.  Under this Clause, the Parties agreed that Cedar could inspect the Phenol within one month from the date (i) Cedar acquired physical possession of it at disport or (ii) it cleared customs, whichever was later.  Further, the Parties agreed that any notice of non-conformity provided to Cedar by its customer within that time and forwarded by Cedar to Dongbu within a week would constitute timely notice.  Cedar inspected the Phenol immediately upon its arrival at Rotterdam and provided Dongbu notice of the Phenol's non-conformity on 20 July 2005.  Undisputed Facts ¶65 at 11, P.T.S. Docket No. 150.  Exhibits 57-63, 87 ¶35, 89 ¶24.  Dongbu acknowledged Cedar's notice on 21 July 2005.  Undisputed Facts ¶65 at 11, P.T.S. Docket No. 150.  Exhibits 57-63, 89 ¶24.  Therefore, under the *relevant* Inspection

---

(Footnote continued:)

39 (having not concluded whether the inspector's "examination would have revealed" the gasoline's latent defect), it was equally not in a position to determine whether that failure, if any, was excused under CISG Art. 40.

Here, the Court need not reach Art. 39 and 40 because (1) a reasonable inspection occurred, (2) despite that inspection, the defect remained hidden, (3) once Cedar learned of the non-conformity after its disport inspection, it notified Donbu straightaway.

[13] CISG Art.s 38 and 39 plainly delimit the liability of a CISG seller's liability for tendering latently defective goods.  Therefore, it cannot be said that CISG Art. 36 makes such a sell liable for defective goods *ad infinitum* as Dongbu suggested during summation.

14

Clause,[14] Cedar provided sufficient notice such that it cannot be said that it lost its right to rely in the Phenol's non-conformity under CISG Art. 39.

This second Inspection Clause also makes clear that Dongbu was perfectly aware Cedar intended to resell the Phenol to a customer, which seriously undermines any suggestion by Dongbu that it was unaware of Cedar's intent to resell the Phenol to Ertisa.

In sum, no contractual provision insulates Dongbu from its liability for providing Phenol ultimately determined to be impure, unsound, and unstable.

|  |  |
|---|---|
| **Question 3:** | **Is Dongbu Entitled to a Reduction of Its Liability Because the Phenol Was Further Damaged Aboard the BOW FLORA?** |
| **Answer:** | **No.** |

_____

[14] Even if the Contract did not include this second inspection clause, Cedar sufficiently examined the Cargo and provided adequate notice of non-conformity under the CISG. "[W]here a buyer can prove that *a satisfactory examination would not reasonably have revealed the lack of conformity*[,] . . . Art. 38 [is] not relevant to Art. 39." Camilla Baasch Andersen, *Reasonable Time in Art. 31 of the CISG – Is Art. 39 (1) Truly a Uniform Provision?* (1999), available at http://www.cisg.law.pace.edu/cisg/biblio/andersen.html. That is, "[t]here is . . . no Art. 39 obligation upon the buyer to discover 'latent' defects, (defined for present purposes as) defects which are so well-hidden that they are *not discoverable by ordinary means* (the 'reasonable' inspection always required by Art. 38). Therefore, if a buyer conducts a reasonable inspection, but first discovers a 'latent' defect at some later point in time – perhaps even *several months after delivery* – he is then required to provide the seller with the necessary Art. 39 notice *within a reasonable time after that*, i.e., after the discovery of the latent non-conformity is actually made." Joseph Lookofsky, *The 1980 United Nations Convention of Contracts for the International Sale of Goods, Art. 39, Notice of Defects* (2000), available at http://www.cisg.law.pace.edu/cisg/biblio/loo39.html. Where a latent defective condition – not discoverable by an ordinarily inspection – remains hidden, "[t]he period for examining for latent defects commences when signs of the lack of conformity become evident." Therefore, Cedar was obligated to reexamine the Cargo once it was discovered off-specification at disport. Cedar did so by having SGS Netherlands pull and test a series of samples all of which confirmed the Cargo's defective condition. As for providing notice of that defective condition to Dongbu, "[a] lack of conformity, which is not recognisable upon a *proper examination*, must be notified by the buyer *within a reasonable period after he actually establishes it* or should have done so." Sanna Kuoppala, Examination of Goods Under the CISG and the Finnish Sale of Goods Act (2000) available at http://www.cisg.law.pace.edu/cisg/biblio/kuoppala.html (emphasis added). Cedar established the lack of conformity on 20 July 2005 and provided Dongbu notice thereof the same day.

First, Cedar rejects any contention that the Phenol was damaged aboard the BOW FLORA. Cedar has presented the only scientist capable of opining on suitability of the carriage conditions the Phenol encountered aboard that Vessel. Based on his review of the evidence, which included Cedar's Heating Instructions, see Ex. 69, Appx. 1.1 (Documents Received from Marsh/Ertisa ¶9), John Minton testified that the Phenol Heating Log from the BOW FLORA, Ex. 81, "show[s] that the Phenol was properly maintained at approximately 54°C-56°C over the course of its carriage aboard the M/T BOW FLORA." Dongbu has presented no evidence to refute that informed, expert conclusion and, in fact, purposefully avoided asking Mr. Minton about the carriage conditions the Phenol encountered aboard the BOW FLORA.

Rather, in summation, Dongbu claimed that its liability had to be reduced because, it alleges, the Phenol suffered further injury aboard the BOW FLORA because the Phenol Heating Log, Ex. 81, showed three instances where the Phenol's temperature fluctuated more than 1°C in 24 hours. To justify this assertion, on which Dongbu bears the burden of proof (both as to the allegation of additional damage and the apportionment thereof[15]), Dongbu relies on a single piece of evidence, Cedar's Heating Instructions, Ex. 23, which provide in part:

---

[15] CISG Art. 79 provides, "A party is not liable for a failure to perform any of his obligations *if he proves* that the failure was due to an impediment beyond his control and that he could not reasonably be expected to have taken the impediment into account at the time of the conclusion of the contract or to have avoided or overcome it or its consequences." *Id.* (Emphasis added). CISG Commentators have generally concluded that CISG Art. 79 allocates the burden of proof between the parties such that "[a]ny party which wants to derive beneficial legal consequences from a legal provision has to prove the existence of the factual prerequisites of that provision . . . [and] [a]ny party claiming an exception has to prove the existence of the factual prerequisites of that exception . . . ." Franco Ferrari, *Burden of Proof under the CISG* (2001) available at http://cisgw3.law.pace.edu/cisg/biblio/ferrari5.html#25.

    4.     In the event vessel wishes to increase temperature of cargo, such increase is not to exceed 1 degree C per 24 hours.

However, Dongbu misreads this provision by ignoring the conditional introductory clause. Only when the BOW FLORA sought to increase the Phenol's temperature was it prohibited from increasing the temperature more than 1°C. That is, the BOW FLORA crew was instructed not to increase the ***heating elements*** responsible for regulating the Phenol's temperature more than 1°C in 24 hours. This makes perfect sense in light of Minton's and East's testimony. Both experts explained the importance of regulating the skin temperature vessel heating coils to prevent scalding and Cedar's Heating Instructions separately counseled that the skin temperature of the heating elements should never exceed 60°C because "[t]he critical point for contingent discoloration of the material due too high temperature is about 60 degree C." The Phenol Heating Log, Ex. 81, shows that the Phenol never came even close to this impermissibly high temperature. Therefore, Dongbu cannot carry its burden to prove that the Phenol's was further damaged aboard the BOW FLORA, and Dongbu is entitled to no reduction in its liability.

The same is true if Dongbu claims that Cedar failed to properly mitigate its damages as required by CISG Art. 77. Fernando Irisarri testified that, after the Phenol was discovered damaged at Rotterdam, Ertisa ran tests to determine whether the product could be blended and, ultimately, concluded it could not be. As such, Ertisa forced Cedar to repurchase it, and Cedar sold the product in India for a reasonable return. It can hardly be said, then, that the loss was not properly mitigated. Because it was, Dongbu is entitled to no reduction in its liability.

| | |
|---|---|
| **Question 4:** | **If Dongbu is Liable for Cedar's Damages, What is the Prejudgment Interest Rate that Should be Applied and From What Date Should Interest Be Calculated?** |
| **Answer:** | **9% p.a.; 20 May 2005** |

The parties have stipulated – and the Court has held – that it "has diversity jurisdiction of this action pursuant to 28 U.S.C. § 1332." P.T.S Docket 150, p. 1; 2011 Decision, p. 1. The Second Circuit has held that, "[i]n a diversity case, state law governs the award of prejudgment interest." *Schipani v. McLeod*, 541 F.3d 158, 164 -165 (C.A.2 (N.Y.) 2008). Under New York law, in breach-of-contract suits, courts award prejudgment interest – as a right – at the statutory rate of 9% p.a., pursuant to CPLR 5001[a] and 5004, and prejudgment interest is computed from the earliest ascertainable date on which there was a cause of action, pursuant to CPLR 5001[b]. *Baer v.Anesthesia Assoc. of Mount Kisco, LLP,* 57 A.D.3d 817, 819, 870 N.Y.S.2d 92 (2008). Therefore, Cedar submits that, on the foregoing basis, it is entitled to prejudgment interest at the rate of 9% p.a. from the earliest ascertainable date of Dongbu's breach, 20 May 2005, the date Dongbu tendered non-conforming Phenol to the BOW FLORA.

Cedar submits the same outcome results if the Court carefully considers the weight of CISG-related precedent considering the issue of prejudgment interest. In *Delchi Carrier v. Rotorex Corp.*, 1994 WL 495787, 7 (N.D.N.Y. 1994), the Northern District of New York correctly held that a claimant is entitled to prejudgment interest on its damages pursuant to CISG Art. 78. However, without analysis or explanation, the Northern District stated that it was entitled "in its discretion" to set the rate of prejudgment interest and did so at the T-Bill rate set forth in 28 U.S.C. §1961(a), despite the fact that the court had diversity jurisdiction. The case was appealed, but the Second Circuit only noted that prejudgment interest had been awarded; it did not analyze whether the rate invoked was appropriate. *Delchi Carrier v. Rotorex Corp.*, 71 F.3d 1024 (2nd Cir. 1995).

Since then, courts have more carefully considered the prejudgment interest issue when parties have chosen to make the CISG applicable to their contracts. In *Chicago Prime Packers, Inc. v. Northam Food Trading Co.*, 320 F.Supp.2d 702 (N.D. Ill. 2004) aff'd by *Chicago Prime*

18

*Packers, Inc. v. Northam Food Trading Co.*, 408 F.3d 894 (7th Cir. 2005), the Northern District of Illinois held, citing Erie R. Co. v. Tompkins, 304 U.S. 64 (1938),  that "[i]t is well-settled that '[a] federal court sitting in diversity jurisdiction must apply the substantive law of the state in which it sits" to ultimately apply Illinois statutory interest rate. *Id.* at 715-16.  In doing so, the court noted, "[u]sing the forum's interest rate is a common choice in CISG cases, notwithstanding its tension with the CISG's goal of promoting international uniformity." *Id.* (citing Tom McNamara, *U.N. Sale of Goods Convention: Finally Coming of Age?,* 32–FEB Colo. Law. 11, 19 (2003) ("In the absence of direction, courts have often awarded interest according to the applicable law of the forum jurisdiction." *Id.*)).  In *Treibacher Industrie, A.G. v. Allegheny Technologies, Inc.*, Case No. CV-01-HS-2872-NE,  available at http://cisgw3.law.pace.edu/cisg/text/050427-decision.pdf, *aff'd* by 464 F.3d 1235 (11th Cir. 2006), the Northern District of Alabama adopted *Chicago Prime* rationale to award prejudgment interest at the Alabama statutory interest rate. *Id.* at 28-29.

This trend toward recognizing that state statutory prejudgment-interest rates had to be applied in CISG cases where courts had diversity jurisdiction was temporarily stunted by the District of Kansas's decision in *Guang Dong Light Headgear Factory Co. v ACI Int'l, Inc.*, 2007 WL 1341699 (D.Kan. 2008).  There, the Court considered a claimant's application for "post confirmation-[arbitration] award, prejudgment interest."  Seemingly taking a page from *Delchi*, the court held that the rate to be applied "rest[ed] firmly within [its] sound discretion" but noted that "when a federal statute is silent on a rate of interest, ***courts often look to state law***." *Id.* at 4 (citing *Kalmar Indus. USA, LLC v. Int'l Brotherhood of Teamsters*, 452 F.Supp.2d 1154, 1167 (D.Kan.2006) (finding the state interest rate to be equitable under the facts and circumstances of the case).  Despite this, the Court instead looked to Southern District precedent interpreting the U.N. Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York, 1958) to determine that the appropriate rate for "post confirmation-[arbitration] award, prejudgment interest" was the T-Bill rate.

Despite the unique facts underpinning *Guang Dong*, in *Norfolk S. Ry. Co. v. Power Source Supply Inc.*, WL 2884102 2008 (W.D.Pa. July 25, 2008), the Western District of Pennsylvania held that, despite the fact its had diversity jurisdiction, it would treat the dispute presented "as a federal question, which it indisputably is, and apply its 'broad discretion' to set a rate of prejudgment interest . . . ." In its discretion, the Court award prejudgment interest at the rate of 6% p.a. and note that that rate "coincidentally" was the default rate of interest under Pennsylvania law, which the court considered appropriate because "[u]sing the forum's interest rate is a common choice in CISG cases...." *Id.* at 7 (citing *Chicago Prime Packers,* 320 F.Supp.2d at 716 and McNamara, supra, 32-FEB Colo. Law. at 19).

The trend began to its track in *San Lucio, S.r.l. v. Import & Storage Servs., LLC*, 2009 WL 1010981 (D.N.J. April 15, 2009), where the Northern District of New Jersey explained the proper rule:

> Although the CISG does not provide for a specific rate of interest, Article 7(2) states that questions unresolved by the CISG are to be settled "in conformity with the general principles on which it is based," or, in the absence of such principles, "in conformity with the law applicable by virtue of the rules of private international law." Because there are no "general principles" of the CISG that might shed light on the interest rate to be used, the CISG having deliberately declined to select a specific rate, private international law must be used.
>
> Courts that have previously turned to private law to consider the issue of prejudgment interest rates have focused their analyses on the source of the court's subject matter jurisdiction. When a court has diversity jurisdiction, it is appropriate for the court to perform an *Erie* doctrine analysis and determine which jurisdiction's law should apply . . . based on whether the law in question is substantive or procedural. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

*Id.* at 3. However, because the court did not have diversity jurisdiction in that case, it held that it was required to consider the matter a federal question and award prejudgment interest at the T-Bill rate.

Most recently, in *ECEM European Chemical Marketing B.V. v. Purolite Co.*, 2010 WL 4069188 (E.D.Pa. 2010), a case presenting diversity jurisdiction, the Eastern District of Pennsylvania held that "general principles on which the [CISG] is based" warranted the court in awarding prejudgment interest at the Pennsylvania statutory rate of 6% p.a. *Id.* at 6. On appeal, the Third Circuit affirmed holding that the trial court's award of prejudgment interest at the Pennsylvania statutory rate of 6% p.a. was permissible either under state law or if the court presumed the trial court had broad discretion insofar as the case presented a federal question. *ECEM European Chemical Marketing B.V. v. Purolite Co.*, 451 Fed.Appx. 73 (3rd Cir. 2011).

Cedar respectfully submits that, as "[a] federal court sitting in diversity jurisdiction, [this Court] must apply the substantive law of the state in which it sits," namely New York law. *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). In *O'Rouke v. Eastern Air Line, Inc.*, 730 F.2d 842 (2d Cir. 1984), overruled on other grounds by *Salve Regina College v. Russell*, 499 U.S. 225, 230, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991)the court held that the calculation of pre-judgment interest is considered a substantive issue. Therefore, Cedar submits it is entitled to prejudgment interest as specified in New York law. In the alternative, should the Court determine that the rate of prejudgment interest is within its sound discretion, Cedar asks that the Court recognize the overwhelming trend discussed above, where court with diversity jurisdiction apply the statutory prejudgment interest rate of the forum state – the forum Cedar and Dongbu expressly nominated in their Contract. Ex. 8, Purchase Order Standard Terms and Conditions ¶ 1.

<u>CONCLUSION</u>

By delivering Phenol with an embryonic defect to the BOW FLORA, Dongbu breached the Parties' Contract and is liable for Cedar's damages.

21

Dated:  New York, New York
        October 9, 2010

KENNEDY LILLIS SCHMIDT & ENGLISH
Attorneys for Plaintiff
CEDAR PETROCHEMICALS, INC.

By: John T. Lillis Jr.

John T. Lillis (JL0056)
75 Maiden Lane – Suite 402
New York, New York  10038-4816
Telephone:  212-430-0800

22