Da3QcedF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CEDAR PETROCHEMICALS, INC.

                    Plaintiff,

          v.                              06 CV 3972 (AJN)

DONGBU HANNONG CHEMICAL CO.,
LTD.,

                    Defendant.

------------------------------x
                                        New York, N.Y.
                                        October 3, 2013
                                        10:45 a.m.

Before:

                    HON. ALISON J. NATHAN

                                        District Judge

                         APPEARANCES

KENNEDY, LILLIS, SCHMIDT & ENGLISH
     Attorneys for Plaintiff Cedard Petrochemicals, Inc.
JOHN T. LILLIS
THOMAS FEDELI
NATHAN WILLIAMS

McDERMOTT, WILL & EMERY LLP
     Attorneys for Defendant Dongbu Hannong CHemical Co. Ltd.
ROBERT A. WEINER
MICHAEL R. HUTTENLOCHER

Da3QcedF

1           (In open court)

2           THE COURT:  Please be seated.  We are here for

3     summations.  We have allocated somewhere between 45 minutes and

4     an hour a side.  We didn't talk about order or rebuttal.

5           Mr. Lillis, you will go first or you're going to

6     switch?

7           MR. LILLIS:  Yes.  I have the burden of proof; I go

8     last, your Honor.

9           THE COURT:  Well, that should be rebuttal.  So, you

10    could either go first and be rebuttal or you can go last.

11          MR. LILLIS:  I'll go last.

12          THE COURT:  That's fine with me.

13          Mr. Weiner?

14          MR. WEINER:  If you want us to go first, we're happy

15    to go first, but Mr. Huttenlocher is going to start our

16    argument.

17          THE COURT:  And you don't want to do it on rebuttal?

18          MR. WEINER:  Maybe I misunderstood, your Honor.  I

19    thought you were talking about order of argument.

20          THE COURT:  So, either the plaintiff will go first and

21    then the defendant with opportunity for rebuttal by the

22    plaintiff or it will simply be defendant and the plaintiff.

23          MR. WEINER:  I actually have no preference.  I will

24    leave this to Mr. Lillis, whatever you would like.

25          MR. LILLIS:  I would prefer to close, your Honor.

Da3QcedF

1            THE COURT:  That doesn't answer the question.

2            MR. LILLIS:  I'm sorry, Judge.  I'm trying to answer

3     the question.

4            THE COURT:  You will get the last word.  The question

5     is whether you get the last word as rebuttal or simply

6     following --

7            MR. LILLIS:  I would just prefer to follow Mr. Weiner.

8            MR. WEINER:  That means we're up first.

9            THE COURT:  Well, I'm thinking what I think would be

10    most useful.  I actually do think hearing from the defendant

11    first would be most useful.

12           So, as you wish, Mr. Lillis.

13           Mr. Weiner, you will go first.

14           MR. WEINER:  As I said yesterday, your Honor, we were

15    splitting our argument with the acquiescence of Mr. Lillis.

16    Mr. Huttenlocher will start.  He's going to argue two issues.

17    One is the CISG and damages, and I will argue the actual

18    elements regarding the expert testimony.

19           THE COURT:  Thank you.

20           Mr. Huttenlocher.

21           MR. HUTTENLOCHER:  Thank you, your Honor.

22           As you know, my name is Mike Huttenlocher.  I'm here

23    with Mr. Robert Weiner.  We represent Dongbu Chemical.

24           Just to start, I want to thank the Court for its time

25    and attention during the proceedings this week.  My partner,

Da3QcedF

1    Mr. Weiner, and I have divided, as he mentioned, the closing

2    here into three principal sections:

3           First, I'll address the issues concerning the contract

4    and the terms and the CISG and the interaction between those

5    two.

6           Second, Mr. Weiner is going to address, as he

7    mentioned, the factual liability issues that were discussed

8    throughout the trial with particular attention on the expert

9    testimony that was offered by Mr. Martin East and Mr. John

10   Minton.

11          Then, finally, you will hear from me again briefly to

12   discuss some of the issues with regard to damages.

13          First, let's turn to the contract.  As we all know,

14   the case here centers on a May 17, 2005 contract executed

15   between Cedar Petrochemicals on the one hand and Dongbu Hannong

16   Chemical on the other.  Dongbu in that role was the seller of

17   approximately 2,000 metric tons of phenol that was to be

18   delivered FOB in Ulsan Anchorage.  In the parties' contract,

19   there is agreement on all of the major points that one would

20   expect:  Price, quality, quantity, payment terms.

21          There are also two other important elements of that

22   particular contract.  The first is the inspection clause that

23   was in that contract.  Let me just read the words of the clause

24   so we can keep them in mind throughout the summation.

25          "Inspection by a mutually acceptable, independent

Da3QcedF

surveyor whose findings as to quantity, quality as per shore
tank figures at load port are final and binding on both
parties."  Then it discusses the fees to be split among them.

          The parties, importantly, also have a clause in the
contract that is a merger clause.  The parties agree that that
contract would be the parties' entire agreement.

          So the principal legal question that your Honor needs
to address here is what is the effect of that merger clause.
That was a question that your Honor raised right at the outset
of the trial -- what interplay does that have here?  Let's
first try to split the issues from which the merger clause will
have a legal effect and which it doesn't.

          First and foremost -- and all parties agree here --
that the color specification is not something that is
implicated by this merger clause in the contract.  As the Court
knows, the contract was signed on May 17, 2005, and all of the
evidence that has been presented with regard to an amendment to
that contract with regard to the color specifications occurred
after that date.  As Judge Swain had mentioned in her summary
judgment opinion, that extrinsic evidence is defined as
evidence that is contemporaneous with or prior to the written
agreement that could be used at some later point to try and
change the terms.

          So, the original term on that color specification was
6 maximum hazen units as per the Kumho specifications.  The

Da3QcedF

1   parties then amended that to be 10 max under the Ertisa

2   specifications, and that agreement was memorialized.  The

3   agreement was memorialized in a few documents.  It was

4   memorialized in a letter of credit that Cedar had applied for

5   and then paid Dongbu for the phenol.  It was also amended by

6   another writing in the Dongbu commercial invoice that was

7   issued from Dongbu to Cedar that had the 10 max specification.

8   Again, that's not an issue that's put in play here by this

9   question of extrinsic evidence for the merger clause, and all

10  parties agree on that, as has been detailed in the joint

11  pretrial order.

12          But there are, as I mentioned, some issues that are

13  implicated by the merger clause.  So, let's first take each

14  article of the CISG that Cedar contends has an effect on this

15  contract and try to go from there.

16          The first is Article 8 of the CISG covering extrinsic

17  evidence.  As I just mentioned, your Honor, there has been no

18  evidence offered as to extrinsic evidence of any oral agreement

19  prior to, or contemporaneously with, the contract.  So, there

20  is really not a question as to extrinsic evidence on

21  essentially any point with respect to the contract.  There

22  simply was no precontract evidence that was offered that would

23  be extrinsic to the deal.

24          So, importantly, there is no extrinsic evidence that

25  was offered concerning the intent of the parties with respect

Da3QcedF

1    to that merger clause.  The merger clause means what it says

2    and it says what it means; that the parties' entire agreement

3    is encapsulated through that particular contract.

4          Without extrinsic evidence to rely upon to change or

5    derogate from those terms of the contract, Cedar relies first

6    on Article 9 of the CISG.  Article 9 of the CISG contemplates

7    the parties' usage or usage in the trade

8          THE COURT:  Before you go to that, just to make sure

9    I'm solid on the point before you leave it.  Therefore, under

10   the terms of the contract, what was required at the time of

11   delivery to Cedar was a specification of 10?

12         MR. HUTTENLOCHER:  That's correct, your Honor.

13         THE COURT:  Under your view then, does it matter if

14   the phenol was injured before it passed the rail of the Bow

15   Flora so long as the specification at the time it passed the

16   rail and after it passed the rail was 10?

17         MR. HUTTENLOCHER:  It shouldn't matter there, your

18   Honor.  The reason why it wouldn't matter is that the parties

19   have a explicit inspection clause here that says that the ones

20   that were controlling were as of the time of loading, loading

21   from the Green Pioneer to the Bow Flora.  That, as I mentioned

22   at the outset, that inspection clause was final and binding on

23   the parties.  Those are the words that the parties used.

24         So, to bring in any evidence either under the Article

25   9 of the trade usage regarding petrochemical testing at large,

Da3QcedF

1   and we would also submit to your Honor that there hasn't been

2   sufficient credible evidence presented by any competent witness

3   to provide that trade usage evidence.

4        But the extrinsic evidence point is point 8, I think

5   is slightly different than with -- so, to answer your question

6   a little more directly -- I think I did, but just to make sure

7   that I'm clear -- is that the inspection at the time of the

8   transfer from the Green Pioneer to the Bow Flora is what

9   mattered.  When it passed the rail and was in the Bow Flora

10  tanks, it tested on specification.  It tested on specification

11  at 4.  That should be the set of inspection results that are

12  final and binding on the parties just as they agreed in the

13  contract.

14       THE COURT:  So, from your view, even if I conclude --

15  and I'm taking you off your point a little bit, but answer this

16  and then return to your outline because it's helpful.

17       Even if I conclude that the phenol was injured in some

18  way between the shore tanks and the rail of the Bow Flora, you

19  still assert that you're not liable?

20       MR. HUTTENLOCHER:  That would be our contention, your

21  Honor, yes.

22       THE COURT:  OK.  Please do return to your outline

23  because it's helpful.

24       MR. HUTTENLOCHER:  Your Honor, I think in our colloquy

25  there, I covered Article 9 of the CISG.  So, unless your Honor

1   has any questions with respect to that, I'll move on to the

2   next point.

3          I think it piggybacks as well off of what we were just

4   discussing with what happens with this concept of if it was

5   injured prior to being on the Bow Flora and then some defect

6   should show up at some later point.  That really is spoken to

7   in Article 36 of the CISG.  In reading Article 36, again, you

8   have to read both Article 36(1) and Article 36(2) together.

9          So, Article 36(1) is that the seller is liable in

10  accordance with the contract in this convention for any lack of

11  conformity which exists at the time when the risk passes to the

12  buyer even though the lack of conformity becomes apparent only

13  after that time.

14         Now, Cedar has asserted that Article 36(1) would mean

15  that if the cargo was injured prior to passing the Bow Flora,

16  that essentially if there is any defect that shows up at any

17  point in time further down the road, that it would be Dongbu's

18  responsibility and Dongbu's liability there.  Though if we read

19  36(1) and 36(2) in conjunction, 36(1) can't mean that.  And

20  here is why I say that.  Let me read 36(2).

21         36(2) is:  "The seller is also liable for any lack of

22  conformity which occurs after the time indicated in the

23  preceding paragraph and which is due to a breach of any of his

24  obligations, including a breach of any guarantee that for a

25  period of time the goods will remain fit for their ordinary

Da3QcedF

1    purpose or for some particular purpose or will retain specified

2    qualities or characteristics."

3         Now, when Cedar looks at 36(2), it focuses on the

4    second half of that language.  It focuses on the "ordinary fit

5    purpose."  However, in comparing Article 36(1) and Article

6    36(2), in trying to harmonize those two, I asked myself this

7    question:  That if there was, for instance, a 30-day guarantee

8    in a contract -- and 36(2) explicitly speaks to breach of any

9    guarantee or an obligation under the contract -- that the cargo

10   will remain on specification or will have that same

11   characteristics essentially ad infinitum.  That Article 36(2)

12   applies to a breach of an express obligation in the contract.

13        So the question in trying to harmonize the two, if,

14   for instance, there was a 30-day guarantee on the contract,

15   36(2) would apply.  And -- but the defect, for instance, didn't

16   show up until 90 days later, well, then you would always fall

17   back on 36(1) to mean that any defect that should happen to

18   show up later down the road that the seller would always be

19   liable for.

20        But if you take that reading, it essentially renders

21   36(2) superfluous.  Why would you need 36(2) if no matter when

22   the defect shows up, that the liability traces back to the

23   beginning?  Your Honor, we would submit that you can't read

24   those two provisions of the CISG in harmony like that, but

25   they've got to mean something different.

Da3QcedF

1          So what's different that it means?  We would submit

2     that 36(1), rather, means that if there's a defect that

3     couldn't show up at the time of the actual contracting --

4     excuse me -- that the determination as to specification at the

5     time of the transfer of title from the seller to the buyer, if

6     there's a defect there that's covered, then that's under 36(1).

7          But if there is some sort of forward obligation that's

8     covered, that the party has an explicit obligation to make sure

9     that that specification carries on through for a particular

10    period of time subject to an agreement between the parties,

11    then that's when 36(2) applies.  But the CISG doesn't impose

12    liability for a product just ad infinitum.

13         The other part about Article 36 is that there is a

14    conflict here.  If you take Cedar's reading that 36(1) means if

15    the latent defect shows up at any point down in the road, then

16    Dongbu is liable if it can show that the injury happened

17    pretransfer.  That conflicts directly with the inspection

18    clause that the parties had in their entire agreement in which

19    the figures from the transhipment were, as the parties said,

20    final and binding.  36(1) does not provide Cedar with multiple

21    apples or multiple bites at the inspection apple as things

22    proceed, but, rather, the parties agreed to that explicitly.

23         THE COURT:  Why couldn't that be a way of having a

24    limit to the ad infinitum theory?  That is to say, well, we

25    would be concerned here that injury before that doesn't become

Da3QcedF

1    detectable till later but suggests some sort of continuing

2    liability ad infinitum.  So we'll put an inspection process in

3    place that gives us a stopping point.

4              MR. HUTTENLOCHER:  Your Honor, if that's what the

5    parties agreement and the words that they use in the contract

6    was, I would agree with you, but it's simply not.  It's that

7    the inspection figures at the time of the transhipment are

8    final and binding.  If they wanted to have a further

9    description, it's not that would displace otherwise provisions

10   of the CISG then they could have done that, but they just

11   didn't.

12             THE COURT:  So, in other words, in your looking at

13   Exhibit 80, in your reading of the inspection clause, I need

14   look no further than after loading 4.  Is that right?

15             MR. HUTTENLOCHER:  You just have to look at the top

16   line.

17             THE COURT:  Top line, call it for lack of a better

18   term, the contemporaneous one.

19             MR. HUTTENLOCHER:  For the contemporaneous testing at

20   this time of the original transhipment.  That's what we would

21   submit your Honor would only have to look at.  We would further

22   describe and Mr. Weiner will further describe.

23             THE COURT:  I will let you further describe.

24             MR. HUTTENLOCHER:  So I'll leave it at that.

25             Your Honor, just one final point with respect to these

Da3QcedF

 1    inspection provisions here.  We would also submit that -- just

 2    to make a couple small factual points about the subsequent

 3    analysis that was done in Korea -- is that just to keep in mind

 4    for your Honor is that prior to attending the joint analysis

 5    that was conducted in Korea in August, Dongbu submitted a

 6    letter expressing the exact same position that I've expressed

 7    to you this morning:  That the transhipment figures are the

 8    ones that control.  It tested on specification; and that there

 9    was no further inquiry; and that Dongbu is sorry that there was

10    a problem, but it's not their responsibility.

11            There has been an intimation in the papers from Cedar,

12    if not an outright claim, that by attending the joint analysis

13    that somehow there is a waiver.  However, in that instance, a

14    waiver needs to be an actual intentional waiver of a known

15    right.  Here, by Dongbu attending those -- it had already

16    preserved its position on the record with the particular letter

17    and was not intending to, and there is no evidence that they

18    were intending to, waive that right by attending the Korean

19    analysis.

20            So that's where we leave the point with respect to the

21    contractual issues.  If it's all right, I'll turn it over to

22    Mr. Weiner.

23            THE COURT:  Thank you.

24            MR. WEINER:  Good morning, your Honor.

25            THE COURT:  Good morning, Mr. Weiner.

Da3QcedF

```
1          MR. WEINER:  My portion of the argument is really
2     going to direct itself to the burden of proof that must be met
3     here.  We had argued before Judge Swain that this was
4     essentially a failure of proof case; that the plaintiff could
5     not base upon the record established by preponderance of the
6     evidence that the phenol was injured before it was loaded in
7     the Bow Flora.
8          THE COURT:  Right.
9          MR. WEINER:  I believe that at this trial we have
10    demonstrated that they have not met their burden.
11         In its simplest terms, this is a case where Martin
12    East, who is both an expert and a fact witness, was a
13    supervisor there with minimal experience in phenol who rushed
14    to judgment.  What made it worse, he knew that he had rushed to
15    judgment in August of 2005 when he submitted his report and
16    made it very clear that he wasn't sure what the results were.
17    He needed more documents and tests should have been done, and
18    none of that was completed.
19         So let's look at the evidence as we know it came in
20    through the trial.
21         Minton, Treharne & Davies was retained on July 21,
22    2005 to investigate the fact that the phenol was over 500 on
23    the hazen scale.  East was designated as the surveyor
24    responsible to oversee the investigation.  East acknowledged he
25    had no training in phenol for chemistry.  He had handled only
```

Da3QcedF

1    one phenol claim in eleven years with MTD.  He was certainly

2    self-acknowledged he's not an expert.  He doesn't even know

3    what the forensic standard is that constitutes chemical

4    investigations.  He also stated that he was well aware that MTD

5    employed chemists, scientists, analysis people, and that none

6    of them were contacted by him in connection with his

7    investigation.

8          We also know that Mr. East was supposed to be

9    supervised by Mr. Minton, who may have some of that expertise,

10   but we know also that Mr. Minton was on vacation the entire

11   time that Mr. East was conducting his investigation and doing

12   his report; and by Mr. Minton's own words at his deposition, he

13   had not supervised Mr. East, and Mr. East was not supervised at

14   all.

15         But Mr. East did acknowledge certain things about

16   phenol that he knew before he did his investigation.  He knew,

17   for example, that phenol, the color change in phenol is "a very

18   poorly understood subject even with a great deal of research."

19   He knew that the recommended temperature for storing and

20   transferring phenol is 50 to 55 degrees Celsius.  He also knew

21   that transporting phenol at temperatures exceeding 55 degrees

22   coloration of the phenol can occur.  He also knew that in

23   general, the lower the temperature in the 50 to 55-degree

24   range, the better.

25         Mr. East acknowledged -- and this is a critical

Da3QcedF

1    point -- that the literature states that when phenol is stored

2    in ambient conditions; that is, without being heated, it

3    remains colorless for a number of weeks and a color change can

4    thereafter occur.  As Mr. East acknowledged, that color change

5    could easily be 10 to 35 on the hazen scale after the material

6    is stored in ambient conditions for "several weeks" or a number

7    of weeks.

8         Finally, Mr. East acknowledged that when phenol is

9    transported, it should be maintained in a controlled and

10   unchanged temperature.  In my reading of the document, it's a

11   constant temperature, even though Mr. East took issue with

12   that.

13        Mr. East also stated that he was aware of the Ertisa

14   heating instructions, which is Exhibit TT.  He was aware,

15   according to Ertisa, that the skin temperature of the heating

16   coils should not exceed 60 degrees Celsius at any time.  He was

17   aware that the heating instructions established that the master

18   must keep the temperature between 50 degrees and 55 degrees

19   Celsius; and he was aware -- and this is critically important

20   to this case, -- that in the event the vessel wishes to

21   increase the temperature of the cargo, such increase is not to

22   exceed one degree Celsius within a 24-hour period.  As Mr. East

23   acknowledged during cross-examination, he was well aware that

24   phenol is inherently unstable, and that increasing the

25   temperature more than one degree Celsius in a 24-hour period

Da3QcedF

1    could cause discoloration.  He knew all of this before he did

2    his investigation.

3            We also established that within MTD's library, there

4    are a number of articles talking about phenol.  In fact,

5    Mr. Minton provided us with several of them.  According to

6    those articles, adding water or other contaminants to phenol

7    caused an immediate and noticeable color change.  Something

8    that happens instantly; and at least one of those articles said

9    it can't even measure how quickly it occurs.  I had read those

10   into the record when I was cross-examining Mr. Minton.

11           Shortly after he had begun his investigation, Mr. East

12   became well aware that there were two sampling companies that

13   were involved here:  SGS, which was Cedar's choice of

14   inspector, and GSI, which was Dongbu.  Mr. East further

15   acknowledged that he was aware that there were four basic

16   categories for these samples.  There were shore tank samples.

17   There were Green Pioneer composite samples.  There was Bow

18   Flora first foot samples.  And the reason for that was to test

19   for possible scalding as the phenol is then put onto the Bow

20   Flora.  And then there is the Bow Flora full tank running

21   samples.  As Mr. East explained, a running sample is meant that

22   you take phenol from the bottom to the top so you have a basic

23   good idea of what's in the full tank.

24           Mr. East finally acknowledged that he was aware that

25   both SGS and GSI maintained copies or maintained separate

Da3QcedF

samples in Korea.  One set was loaded on the Bow Flora, and one
set was maintained in Korea.  So there were essentially three
samples taken by each company for each category.  One was
analyzed on May 24, one kept in Korea, and one placed on the
Bow Flora.

Mr. East also acknowledged that the samples were
maintained in an unheated and un-air-conditioned sample locker,
although he did not know much beyond that because he never
asked anyone about it, but, he said under normal conditions,
samples are kept in these sample lockers, and, therefore, that
turns them into solids because they're being now stored in
ambient conditions.  We have to keep in mind that this voyage
was eight to nine weeks on the Indian Ocean during the summer.
And no one at this trial was able to provide any insight as to
whether these samples were on the same shelves, different
shelves.  We just don't know.  Mr. East did acknowledge and
never asked anyone about it.

So, the first thing is the Rotterdam results.  As
Mr. East stated, the purpose of the Rotterdam joint analysis
was to determine whether there was, in fact, a color change.
But Mr. East -- in fact, just to quote it as he stated.  The
purpose of the Rotterdam testing was "to establish whether or
not there had been a color change."  Interestingly, Mr. East
had already come to a conclusion, at least a preliminary
conclusion, based upon his reading of the -- not even the

Da3QcedF

Rotterdam test results, just the fact that the phenol was off
color.  And in his July 27, 2005 email to Robert Sparrow, he
concludes it's likely that the cause of the phenol numbers was
"an instability in the material through its manufacturer" -- In
other words, an inherent defect.  And that was his mindset
going in.

He gets the Rotterdam results, and one of the things
that's remarkable about the Rotterdam results is there are no
consistency and you have Exhibit 80.  I don't have it in front
of me but your Honor can see it.  I think I have a copy of it.
So we know the Rotterdam results that are the results are all
over the lot.  For example, with respect to the after-loading,
which is the full tank, it's below 35 to 40 with a high of 100
to 150.  Mr. East could provide no guidance as to how that
could be.  With respect to the SGS sample, that was actually
the highest.  The crew sample was the lowest.

Similarly, there are other discrepancies in the Green
Pioneer composite sample.  There was a significant difference.
Again, Mr. East could not explain how that came to be.
Nevertheless, he concluded based upon those results in Exhibit
N, he writes an email saying that the phenol is color unstable
due to its inherent properties.  So he already reached that
conclusion.  He just reinforced his conclusion irrespective of
these Rotterdam results.  He sends an email to Mr. Sparrow in
which he states that.  Ertisa was not satisfied.  They felt, as

Da3QcedF

1    stated in Exhibit Q, that the Rotterdam results were

2    inconclusive.  And that was confirmed yesterday during the

3    deposition of the Ertisa representative.

4         So, a decision was made that there would be a Korea

5    test, and the Korea test would be for the purpose of

6    determining where the -- I'll quote it.  East testified that:

7    "The analysis in Korea was actually the investigation to where

8    that discoloration occurred."

9         What's interesting about that test is at the time it

10   was done, Mr. East was aware that only four samples were being

11   tested.  Yet, paragraph 26 of his declaration, he states that

12   "In the circumstances as were present here, what the surveyor

13   should do is jointly arrange for all available samples drawn

14   over the course of the cargo's transport."  And we know that

15   was not done.

16        Now, Mr. East suggests that the reason that was not

17   done, it was really up to the parties to somehow bring their

18   samples to the testing; and he acknowledged he has no idea what

19   the parties were told.  But we do know some things.  We know

20   that on July 21, 2005, Dongbu, as Mr. Huttenlocher had already

21   stated, had written a letter stating we have no further

22   responsibility in this matter.  But that letter also states,

23   however, we will do our best if we can help you.

24        So, the fact that they attended, in my mind, as

25   Mr. Huttenlocher stated, is not an indication that they were

Da3QcedF

```
1    going to bring their samples.  But Mr. East further testified

2    when he was being examined by Mr. Lillis that it was customary

3    for the local representatives to bring samples to the joint

4    sampling.

5              In fact, your Honor, there's an Exhibit that we did

6    not highlight during the course of the trial, but if you look

7    at Exhibit 65, that's the report of Peter Duguid.  It's dated

8    August 29, 2005.  No one from GSI was present at the joint

9    sampling.  There is no evidence that anyone asked GSI to appear

10   at the joint sampling or to bring samples to the joint

11   sampling.  But Mr. East was well aware that those samples

12   existed.

13             In any event, the joint sampling is done on the four

14   samples.

15             THE COURT:  If you can try to stay clear of the mike

16   on there, Mr. Weiner.

17             MR. WEINER:  Yes, I will.

18             THE COURT:  It's just hard to hear you when you do

19   that.

20             MR. WEINER:  Yes.  These are the results of the Korea

21   test which was to determine where this discoloration occurred.

22   Mr. East and Mr. Minton acknowledged that sample D, which is a

23   shore tank, which is a 3 to 5, demonstrated no inherent defect.

24   Therefore, that eliminated as a potential, the fact that the

25   phenol was inherently -- there was something wrong with the
```

Da3QcedF

1   phenol from the manufacturing process.

2          What we do have is the most important what we would

3   assert is sample A which is on spec.  When I asked Mr. East

4   about that, how do you explain sample A?  Why wasn't that

5   dispositive.  That was what the spec. was.  His response was --

6   I'm sure your Honor remembers it -- "It's an oddity.  It's an

7   oddity.  Maybe it was something to do with the way the sample

8   was taken," which is an absurd position in view of the fact

9   that Mr. East made it very clear in determining blame or fault,

10  you look at the samples.  He could offer no explanation.

11         Mr. Minton was asked the same question, and at his

12  deposition, Mr. Minton said the same thing.  "I can't explain

13  it."

14         In his declaration, Mr. Minton says, well, maybe there

15  was some process where it hadn't yet spread, you know, that it

16  was really there but just didn't show up in the sample.  When I

17  asked him, well, what tests did you do to try and determine

18  whether that theory has any viability, he hadn't done any

19  tests.  Something he came up with off the top of his head.

20         And, quite frankly, that theory is actually belied by

21  the literature, the scientific journals that he had provided to

22  us which showed that when a contaminant is put in the phenol,

23  there's almost instances color change.  So, your Honor, I start

24  with we have a two samples from A and D both on spec.  That's

25  what counts here under the contract.  We passed two times.  But

Da3QcedF

1    we do have samples B and C to talk about.

2              THE COURT:  Before you leave the first two, I suppose

3    one of the things that East and Minton would say is, "Well, one

4    thing you can see between the shore tank and the Bow Flora full

5    tank is that the color got worse."

6              MR. WEINER:  Well, but it didn't.  If you look at --

7              THE COURT:  10 is higher than 3 to 5.

8              MR. WEINER:  Yes, the color got worse.  Absolutely, it

9    got worse because Mr. East acknowledged that it's stored in

10   ambient conditions.  It had been stored in Korea for three

11   months, from May till August when it was tested.

12             THE COURT:  But the shore tank sample of 3 to 5 was

13   stored -- tell me if this is right.  A question:  Was the

14   sample used at the joint analysis taken from the shore tank,

15   was that stored in the same conditions as the joint analysis

16   testing from the Bow Flora full tank?

17             MR. WEINER:  We don't know.  No evidence of that one

18   way or the other.  But Mr. East did say that it doesn't always

19   change color with ambient conditions.  We just don't know.  We

20   don't know if it was in the same place, same shelf.  No way to

21   determine.  But we do know -- and 4 to 10 your Honor is not a

22   particularly significant change of color.  As Mr. East said,

23   it's still colorless, and that's in fact the color that was

24   accepted here.  So we know 10 is 10.  How it got there, I would

25   suggest to you is because it was stored in ambient condition

Da3QcedF

1    and there was a slight color change.

2              THE COURT:  But is it not a data point that that

3    increases there?

4              MR. WEINER:  I think that's something you would expect

5    to have happen.  You expect to have some color change because

6    it's in ambient conditions.  That's the norm.

7              THE COURT:  But he's got an expert saying that it's a

8    data point.  Do you have anything to rebut that it's a data

9    point?

10             MR. WEINER:  No.  It's a data point, but the point is

11   it's a data point that happens to be on spec.  It's not off

12   spec.  It's not 500.  It's not a hundred.  It's not 50.  It's

13   on spec.

14             THE COURT:  That's why it's a data point.

15             MR. WEINER:  Yes, it's a data point, and I agree with

16   you, and I'm happy to take that data point because it is on

17   spec.  It certainly doesn't show the other kind of changes that

18   are on Exhibit 80.  It gets better.  It doesn't get worse.

19             Exhibit 80 reflects for the full tank, according to

20   the three samples, anywhere from 100 to 150 which is the SGS

21   sample, the 60 to 70 which is the GSI, and the 35 to 40 which

22   is the crew.  You would have expected -- and, remember, under

23   the seeding theory, the seeding theory is that it progressively

24   gets worse.  This didn't progressively get worse.  This got

25   marginally different due to the storage in ambient conditions.

Da3QcedF

1          There is no indication of some kind of significant

2     contaminant or other cause that made this get worse.  You would

3     have expected, quite frankly, if there was the seeding theory

4     at play, that the 10 would have been at higher than 35 to 40

5     and possibly as high as 150.  It don't get better.  It could

6     only get worse.  That's the seeding theory.  It's progressive.

7     It continues to get worse, and gets really bad when you heat

8     it.  So, this, if anything, belies the heating theory, as does

9     the other portions of Exhibit 80.

10          But if I may continue?

11          THE COURT:  Please.

12          MR. WEINER:  So we have two other samples.  We have

13     sample B.  Let's start with sample that's 20 to 30.  There are

14     two possible explanations there.  Sample B could be something

15     that occurred on the Bow Flora on May 24.  Remember, this is

16     the first foot.

17          THE COURT:  I'm sorry, could you give me the 80 back?

18          MR. HUTTENLOCHER:  Certainly, your Honor.

19          THE COURT:  80 is the most useful to me.  Lift it up,

20     please.  Thank you.

21          MR. WEINER:  So 80 is the first foot.

22          THE COURT:  80 is the first foot.  What does that

23     mean?

24          MR. LILLIS:  What are you talking about?

25          MR. WEINER:  I misspoke.  B.  Thank you.  I misspoke.

Da3QcedF

1   First foot, your Honor, as you recall --

2              THE COURT:  I know what the first foot is.

3              MR. WEINER:  Sample B is the first foot, which does

4   not appear on, as I see it, on Exhibit 80.  Now, the first

5   foot --

6              THE COURT:  I'm sorry?

7              MR. WEINER:  I'm looking at Exhibit 80.  I have it on

8   my Exhibit, but I don't believe it's on -- I take it back.

9   It's there.  It's over there under the Bow Flora.

10             So there is another example of where the test in Korea

11  has a lower result than the sample that was kept on the Bow

12  Flora.  Again, inconsistent with the seeding theory.  The

13  seeding theory should have been that sample B should have been

14  at least 60 to 70, probably more than that, but it's not.

15             Now, there are other issues with sample B that we

16  should talk about.  This is the day, May 24, 2005, when the

17  phenol was delivered on to the Bow Flora, and this is the first

18  foot, that, as Mr. East said, you measure to see if there was a

19  scalding.

20             Now, this 20 to 30 number could be due to:  (1)

21  possibly overheating during the first foot process when it was

22  loaded.  It could be due to the fact that the sample was stored

23  in ambient conditions; but we don't know.  We also don't know

24  what the heating records were for May 24.  If you recall, your

25  Honor, the heating records that were provided to us start with

Da3QcedF

```
 1    May 25.  So we would have to speculate as to what happened
 2    regarding sample B.  Was it caused by overheating?  Was it
 3    caused by ambient conditions?  Was it caused by something bad
 4    in the phenol?  We just don't know.
 5              THE COURT:  If it were caused by overheating, wouldn't
 6    you expect the May 20 test of the Bow Flora first foot to be
 7    higher than 4?
 8              MR. WEINER:  No, because I don't know when the
 9    overheating might have occurred.  I don't know when they took
10    it in terms of context.  I don't know -- the answer is, I don't
11    know.  I don't know how I would respond to that, your Honor.
12    Let me think about that.
13              So, we don't know if that heat was put on and kept on
14    all day that caused -- I just don't know how to answer other
15    than to say no one knows.  It's possible.  That's the problem
16    with this case.  You're being asked to speculate as to what
17    might have happened without ample proof.  All we do know is
18    that when we get to sample B, it's less it's 20 to 30, again,
19    within that range of color change.
20              THE COURT:  Let me get to a sort of summary question,
21    which is to that point.  It seems to me that there is a signal
22    and noise problem.  I mean, the data, I don't think can, in a
23    uniform way, explain all -- all of the data seems to point in
24    some different directions, and you focus in on one thing and
25    something else becomes hard to explain.
```

Da3QcedF

```
 1              MR. WEINER:  Correct.
 2              THE COURT:  That sort of is your proof problem
 3    argument; that, well, if this data is confusing, and it doesn't
 4    quite point one way or the other, it's their job to show that
 5    it's more likely than not that it's one thing.
 6              Part of what your task is to show is how any
 7    particular data point that their experts are relying on has
 8    some difficulties and problems with it.
 9              But one of the things that their experts do is to say,
10    yes, I can't say exactly where it happened, and I can't say
11    exactly when it happened, and, no, I can't really explain A,
12    but one thing I can tell you is that if you look at all of the
13    data points up on that big chart, it tells a story, at least,
14    that whatever is going on here started to happen before the
15    rail of the Bow Flora.  And then your rendition of that I think
16    so far has been -- well, go ahead.
17              MR. WEINER:  There are several your Honor.  First of
18    all, the data points in Korea are consistent with something
19    being stored in an ambient condition.
20              THE COURT:  You mean August 8, right?
21              MR. WEINER:  Yes.  OK, that's consistent with the
22    acknowledge --
23              THE COURT:  Just as a terminological matter, May 20
24    was in Korea too.
25              MR. WEINER:  That's correct, your Honor.
```

Da3QcedF

1          So, the data points in Korea are consistent with the

2    ambient discoloration just caused from normal being stored as a

3    solid.  That's number one.

4          Number two, the real problem here is there was a --

5          THE COURT:  I just want to make sure I have my head

6    around that point.  What was that first point?

7          MR. WEINER:  First point is we know from the

8    scientific textbook that when you store phenol for a number of

9    weeks in ambient conditions, it will turn color just because

10   it's in a solid condition.  We know that.  There will be a

11   color change.  Mr. East acknowledged that.  It's in the books.

12   It's in the record.

13         THE COURT:  So given that, wouldn't you expect D to be

14   higher than it is?

15         MR. WEINER:  No, it got higher -- it got higher than

16   it was back in -- D.  I'm sorry.  The answer is I don't know

17   how that was stored.  They say that not every one turns color.

18   I don't know why.  I would have expected it to turn color.  I

19   don't know why.

20         THE COURT:  But it was stored as a solid, right?

21         MR. WEINER:  Yes.  I agree.  I don't know.  I'm not a

22   scientist.  All I know is that --

23         THE COURT:  You could have brought one in.

24         MR. WEINER:  Well, I don't think if I would have here

25   that it's going to change anything.  No one understands this --

Da3QcedF

1     let's go back to what Mr. Minton said.

2              Nobody understands how or why phenol turns color.  It

3     is a science that is very unclear.  We know it turns color.  We

4     know it's unstable.  We don't know when it will and when it

5     won't.  And I will get to the Bow Flora in a minute, your

6     Honor.  But I do want to point out other thing.

7              THE COURT:  Just a second, because there is a little

8     bit of this tendency that sort of you focus in on one point and

9     then you switch to another.  But what you started with was the

10    first point, we know from the scientific textbook that when you

11    store phenol for a number of weeks in ambient conditions, it

12    will turn color just because it's in solid condition.  Do we

13    know that?

14             MR. WEINER:  Yes, that's what the book says.

15             THE COURT:  There will be a color change.  When I ask

16    that given that what we know scientifically to be true,

17    wouldn't you expect D to be higher?

18             MR. WEINER:  Yes, I would have.

19             THE COURT:  OK.

20             MR. WEINER:  I would have.  Why it wasn't, I don't

21    know, but I would have.

22             THE COURT:  So, then let's see what data point we can

23    extract from that.  That would suggest if D is an accurate

24    sample, that simply storing in a solid form in ambient

25    temperatures would not, at least always, lead to an increase in

Da3QcedF

1    hazen units.

2           MR. WEINER:  That's correct.  I would say that's

3    correct.  And I don't know how you can tell one from the other.

4           Now, there are other things you could have done though

5    that would have helped you out or would have helped them out.

6    Both Mr. East and Mr. Minton acknowledged that back in August

7    of 2005, there were tests that could have been done, simulation

8    tests, among other things, chemical analysis of the samples to

9    see if they contained any contaminants.  So they would have had

10   a greater picture of what was going on here and been in a

11   position to determine what the cause was.

12          Mr. East in his report recommends doing those tests

13   and Minton confirms those tests are valid.  They could have

14   taken the samples they had.  They could have heated them to see

15   whether the heating caused greater degradation than there was.

16   They didn't do that.  That was easily done.  They could have

17   simply taken the samples, put them into an oven, as Mr. Minton

18   explained, and you heat it for the period of time at 55 degrees

19   for the period of time of the voyage and see what happened.

20   They could have done that.  You could have looked at the

21   samples to see whether the samples had contaminants.  But

22   equally important, you could have gotten the SGS samples which

23   were still in Korea and tested those too to see what those

24   numbers showed.

25          None of that was done, your Honor.  Not only was none

Da3QcedF

1    of it done, by the time my client was actually told there was a

2    lawsuit, those samples are gone because they're only kept for

3    90 days.

4           THE COURT:  Those are valid points, and I suppose the

5    experts' response to that is, yes, I would have liked that.  It

6    would have helped me know what was the cause, and it would have

7    helped me pinpoint the when was the cause, but the failure to

8    have that data, they say, doesn't undermine, again, any sort of

9    big picture examination of all of the data points, which is

10   difficult to discern exactly what happened, but one thing they

11   say can be discerned is that it happened before the Bow Flora.

12          MR. WEINER:  I understand.  And I just want to finish

13   up with Sample C, and then I'm going to turn to that.

14          THE COURT:  OK.

15          MR. WEINER:  Sample C, we have the sample which is 30

16   to 50.  That is the only sample in this case which has small

17   matted material described as a rag-like material by Mr. East.

18   Mr. East acknowledges that there were three possibilities

19   regarding that.  One is the rag-like material was in the

20   container at the time it was tested.  Nowhere else.  By the

21   way, he did acknowledge that no other container contained any

22   rag-like material, just this one.  Or it could have gotten into

23   the container during the testing process itself.  Or it could

24   have been in the phenol itself.  So we have three

25   possibilities, none of which were ever explored.

Da3QcedF

```
 1          One of the things they could have done is found the
 2     composite for the Green Pioneer that the GSI had taken and
 3     tested that to see if that had any particles, but they didn't
 4     do that.  The fact of the matter is we don't know, and Mr. East
 5     doesn't know, whether the matted material itself caused a color
 6     or degradation.
 7          Let's go back to what your Honor was just asking me.
 8     They said, well, we conclude -- we may not know where, may not
 9     know why, may not know how.  The only thing we do know it's
10     before it got on to the Bow Flora.  And the only theory they
11     have said that supports that position is the seeding theory.
12     That's the one they told you about it's the essential one in
13     their case.  That's what Mr. Lillis said in his letter the
14     other day to your Honor.
15          THE COURT:  You are right that it is going to be a
16     necessary step, but first I think they say we can see between D
17     and C -- well, one, I guess we know at the end of the day in
18     Rotterdam, you have off spec. stuff, right?
19          MR. WEINER:  Yes.
20          THE COURT:  That's a data point.
21          MR. WEINER:  No dispute.
22          THE COURT:  Wildly off spec., apparently.
23          MR. WEINER:  Wildly off spec.
24          THE COURT:  We know that we have, at least looking at
25     the August 8 test, we've got an off spec. result at C.
```

Da3QcedF

 1          MR. WEINER:  Correct.

 2          THE COURT:  And we have an increase between the D and

 3   C.  And then although the Rotterdam data is sending some noise,

 4   it all shows off spec, including two tests that are 3 and 5,

 5   which are both starting to show an increase in hazen unit.

 6   Now, that doesn't have anything to do with the seeding theory

 7   yet, right?  That's just data.

 8          MR. WEINER:  Well, the data is looking at the results

 9   in August because it got better.  It didn't get worse.  It goes

10   from 30 to 50, which are the small particles, which could be

11   due to whatever the source is, we don't know.  Then goes down

12   to 20 to 30, and then goes down to 10.  It didn't get worse.

13   It got better.

14          THE COURT:  But that does not refute in and of

15   itself-- in other words, they don't need the seeding theory,

16   right?  I think they do need the seeding theory to explain some

17   things, but they don't need the seeding theory to explain that

18   test C is off spec. and it happened before the Bow Flora.

19          MR. WEINER:  Yes, and I said that.  I said one of two

20   things could have happened there, your Honor.

21          THE COURT:  They don't need the seeding theory exactly

22   to say that all of the tests -- there might be some

23   inconsistent -- it might be a line that the graph might not go

24   up at an even rate, but it might go up at points until it gets

25   to 500 in Rotterdam, to show that all of the tests between -- I

1   lost my track there.  Go ahead.

2           MR. WEINER:  The fact is that they do need the seeding

3   theory, your Honor, because they need to find some way to put

4   all these pieces together.  As your Honor said, you could start

5   looking here or there or wherever.  It's like Rubik's cube, and

6   drive yourself crazy looking for the logical explanation, and

7   there are certain things you can't run away from.  One of the

8   things you can't run away from them was a 10.  So they come up

9   with a seeding theory, and the fact of the matter is the

10  seeding theory is belied by the very chart that they pointed

11  you to.

12          THE COURT:  Sorry, just a second.  It seems to me that

13  both of you at some level have -- that there is an assumption

14  on both sides that not all samples are accurate, right?

15          MR. WEINER:  I'm not taking that position.  I will

16  take each sample amount as it is.

17          THE COURT:  The Rotterdam samples?

18          MR. WEINER:  I'm not saying they're not accurate.  I

19  said there are explanations for them.  I'm not challenging

20  their numbers.

21          THE COURT:  Well, it turns into an epitemological

22  debate, but I don't mean that it was tested wrong, that

23  something went wrong with -- that is to say, the sample

24  numbers, you don't believe that all of the sample numbers

25  accurately reflect the state of the cargo at the time that the

Da3QcedF

1   sample was extracted.

2           MR. WEINER:  No.  What I believe -- and I was about to

3   get to it -- is that whatever happened here happened on the Bow

4   Flora.  I understand their experts have concluded that it

5   didn't happen on the Bow Flora.  We don't know, and they can't

6   explain why you have different numbers for the samples that

7   were kept on the Bow Flora.  We just don't know.

8           But, more importantly, let's talk about the heating

9   records that they so anxiously wanted to get into this case.

10          THE COURT:  I can't hear you when you're shuffling.

11          MR. WEINER:  I know.  I just want to get there.

12          We looked at those heating records, and this is what

13  we found from looking at those heating records.  We know that

14  while it is desirable to keep the phenol in the lower part of

15  the 50 to 55-degree range, the phenol was only below 54.2 for

16  four of the 113 time measurements.  It was kept at a very high

17  range.

18          We know that even though the phenol was supposed to be

19  kept at a constant temperature, the temperature varied between

20  55.5 degrees Celsius and 55.9 degrees Celsius which is almost a

21  degree above the maximum temperature.

22          We know that even though the heating temperature was

23  not to exceed 55 degrees Celsius, the temperature exceeded

24  55-degree Celsius on 27 occasions and was as high as 55.9, as I

25  stated a moment ago.

Da3QcedF

1          We also know that in the period between June 28, 2005

2    and July 2, 2005, which is a five-day period, the heating

3    temperature went from 55.9 degrees down to 53.5 degrees, which

4    is a 2.4-degree change in a very short period when the phenol

5    is supposed to be stored at a constant temperature.

6          Finally, we know that between June 25, 2005 and

7    July 3, 2005, the temperature changed more than one degree in a

8    12-hour period rather than a 24-hour period on three separate

9    occasions.  1.3 degree change on June 25, 2005; 1.1 degree

10   change on June 28, 2005; and a 1.4-degree change between the

11   evening of July 2 to the morning of July 3, 2005.

12         I would suggest to your Honor that those numbers are

13   far more important in terms of explaining why this cargo was

14   off spec.  I would also remind your Honor that when you

15   asked -- I'm not sure if it was you or me but when we asked

16   Mr. --

17         THE COURT:  You'd probably be better if you suggested

18   it was me.  I'm just kidding.

19         MR. WEINER:  When we asked Mr. East whether those

20   temperature changes could affect the color of the phenol, could

21   cause the color to go off spec., he said yes.  Phenol is an

22   unstable chemical, which he acknowledged.  And those kinds of

23   bouncing around and deviation from the heating instructions

24   that were given by Ertisa in our view demonstrates that the

25   cause of the problem was the Bow Flora.

Da3QcedF

 1          All of this other stuff about the samples, for all the

 2     reasons that we have been talking about, we just don't know

 3     enough.  We can't draw any conclusions.  We don't know how they

 4     were stored on the Bow Flora.  We don't know how they were

 5     stored in Korea.  We have the results.  I'm not challenging the

 6     results.  They are what they are.  I can point in this record

 7     to a specific series of events that would have caused what

 8     Mr. Minton called numbers he had never seen; shockingly high

 9     numbers.

10          THE COURT:  Two points about that, if you could

11     address:  (1) That doesn't in any way deal with sample 3, 5 and

12     C; and (2) one of the things their expert said is that, yes,

13     the stuff might have gotten overheated and that might

14     explain -- this is my gloss on it or let me suggest a possible

15     gloss on it -- that it wouldn't have had the effect it did.

16     The heating wouldn't have had the effect it did had there not

17     already been a problem with the phenol.

18          MR. WEINER:  So let's talk about that.  I think

19     Mr. Minton said he reached his conclusions on 3, 5 and C, and I

20     said to him -- that's how he came to his seeding theory.  First

21     of all, C is better in terms of score than 3 and 5, and it

22     shouldn't have been.

23          Secondly, C is the one canister that had the matted

24     material.  So we didn't even know if C is a fair representation

25     of what the Green Pioneer loaded hazen color was.  It had a

Da3QcedF

contaminant in it that was never tested, never determined it came from the Green Pioneer.  It could have been in the canister itself.  So just to rely on C, as I said earlier, you can't just rely on C.

What they should have done because there was a parallel GSI canister that everyone knew was there.  The 40 to 50 is a GSI container.  They should have gone and gotten that container and tested the phenol in that, and then you would have a true picture.  One, you could see whether there was a contaminant or not; but, putting that aside, you would have had a true number.

The number 30 to 50 is a bogus number here.  It's a number you can't rely on because it has this other element that is in no other container and no one knows whether that rag-like material affected the color change.  And I would suggest it probably did because phenol is so unstable.  So you can't just narrowly focus on those three numbers, your Honor.  You just can't get there.

And there are things they could have done.  That's what really is the troubling part of this.  Things they could have done that they didn't do.

Just going back for a moment to their experts in terms of what I would call bias.  These are guys who reached a conclusion that was wrong and then defended the wrong conclusion and began to find theories to try and position the

Da3QcedF

results to fit their theories rather than look at all the
results and come up with a viable theory.  These are not true
experts in the normal sense of the word -- people that come in
after the fact they look at these things and come to an
independent position.

        These guys, first of all, East had a position he was
representing an insurance company that wouldn't pay for the
test that should have been done; and Minton came in to
basically protect East.  So, your Honor, I don't believe that
just relying on, as Mr. Minton does, Exhibits 3, 5 and C get
you there.

        In any event, it doesn't address all the heating
records.  No one from their side ever explained what I just
went through with you in terms of what happened on the Bow
Flora.  They turned a blind eye to that.  They never even
sought those heating records.  It wasn't until we made a point
in this case said, "Don't you think you ought to be looking
into the Bow Flora heating records?"  They didn't think it was
relevant.  It didn't have any bearing.  They had come to a
conclusion.  This is an effort to justify that conclusion, your
Honor.  It's not based upon any scientific analysis or any kind
of real expertise.

        THE COURT:  Mr. Weiner, you are almost out of time.

        MR. WEINER:  And I'm done.  I don't have anything else
to say, your Honor.

Da3QcedF

1        THE COURT:  You omitted from the introductory outline

2   damages.

3        MR. WEINER:  Do I have two minutes to address damages?

4        THE COURT:  I'll add two minutes to both sides.

5        MR. WEINER:  Thank you.

6        MR. HUTTENLOCHER:  Thank you, your Honor.  I will keep

7   in mind the two minutes and try to move quickly without

8   speaking too quickly.

9        THE COURT:  Thank you.

10        MR. HUTTENLOCHER:  There are essentially three pieces

11   that I just want to address shortly on damages.  The first with

12   respect to one of the things that Mr. East had said during the

13   questioning, whether it was during cross or during your Honor's

14   questioning was that he acknowledged that some of the

15   degradation of the phenol color could have been caused by

16   overheating while on the Bow Flora.

17        So, to the extent that there is any damage by

18   overheating, and the heating records, as Mr. Weiner has

19   described, there are violations of the heating instructions and

20   that could have caused additional or some sort of additional

21   degradation on the Bow Flora, which, if it's injured past the

22   rail of the Bow Flora, then that jury is on Cedar and is

23   Cedar's responsibility.

24        One of the things that could have mitigated those

25   damages, but Cedar has offered no evidence on that, is a common

Da3QcedF

1    industry practice that Mr. Irisarri spoke about yesterday, and

2    that is the concept of blending.  So, even if we look at sample

3    C, and we've got that result of 30 to 50, and if that was the

4    color, putting aside the fact that it could have been caused by

5    the matted material that's in sample C, is that the Bow Flora

6    then overheated that phenol further damaging it.  And

7    Mr. Irisarri directly testified that if a cargo of 30 to 50 had

8    arrived in Rotterdam, it could have been blended.  This wasn't

9    just a hypothetical exercise that he was engaging in.  He said

10   he's done it before.  But there is no evidence with damages

11   that Cedar has in that regard.

12         THE COURT:  So, the basis of that theory is, let's

13   assume something happened.  Let's take their expert's position

14   that something happened before the Bow Flora, but their experts

15   have said it could have also been overheated.  So we can't

16   possibly separate out the damage done and the extent of the

17   damage done by the potential overheating from what they

18   speculate was the injury that occurred before.

19         MR. HUTTENLOCHER:  It very well may be very difficult

20   to do that, and Cedar hasn't offered any proof on its damages

21   with respect to that, and we would say that that is improper

22   evidence of mitigation in that regard.

23         THE COURT:  Improper evidence of mitigation?

24         MR. HUTTENLOCHER:  Yes.  There was some other -- if

25   there was --

Da3QcedF

1          THE COURT:  It's not really a mitigation point because
2    they didn't know about it because it was too late to mitigate
3    in that way.
4          MR. HUTTENLOCHER:  That's a fair point, your Honor.
5    There would be some -- and Mr. East acknowledged that it could
6    have been, and it's not only just acknowledgment of a theory,
7    but that the heating records themselves did show there was
8    overheating while it was on the Bow Flora, and there was
9    violations of the heating instructions with the fluctuations
10   and temperatures by over one degree Celsius in shorter than a
11   24-hour period.
12         THE COURT:  Right.  They show fluctuations.  We don't
13   know what happens when it first came onboard.  They're all
14   under 60, but there are some that peak over 55.
15         MR. HUTTENLOCHER:  That's correct, your Honor.  Let me
16   move on to the other points.
17         So, Cedar's main theory of damages here is the
18   diminution of value claim, which is essentially a cover damages
19   theory.  If your Honor finds liability against Dongbu, then we
20   would submit that that would be the only damages that they
21   would be entitled to.
22         Cedar tries to put some additional damages pieces on
23   top of that.  Let me just address them shortly.
24         First is Ertisa's lost profits.  I just want to point
25   out for your Honor and for the record that Mr. Irisarri, the

 1    only evidence of lost profits was in his declaration paragraph

 2    23 where he stated what he thought Ertisa's lost profits would

 3    have been.  That was stricken from the record.  There is no

 4    other evidence of lost profits for Ertisa that would be able to

 5    support a damages award in that regard.

 6         With respect to the two good will claims, both Cedar's

 7    loss of good will and Ertisa's loss of good will, again, there

 8    is no credible evidence from some sort of appraisal of the loss

 9    of good will from an accountant that could provide some sort of

10    good will, and the figures that Cedar selects are, in essence,

11    plucked from thin air.  There is no basis for the number that

12    they had reached with respect to their two good will numbers.

13         Finally, just to address the interest claim that Cedar

14    has put forth an argument that the 9 percent New York State

15    statutory rate applies.  We would submit that that is

16    incorrect, and that the federal rate should apply, and this

17    exact issue has actually been addressed by a Northern District

18    case in 1994.  It's *Delchi Carrier v. Rotorex Corp.*, 1994 U.S.

19    Dist. LEXIS 12820.

20         It was the same type of issue.  You've got a CISG case

21    that there was prejudgment interest that was awarded by that,

22    and the Court in that case said the entitlement to prejudgment

23    interest falls under Article 74 of the CISG, Article 74 of the

24    CISG, being a multinational treaty to which the United States

25    is a party, then the prejudgment interest rate would be the

1   federal rate and not the state rate.

2            THE COURT:  All right.

3            MR. HUTTENLOCHER:  With that, your Honor, I conclude.

4   Thank you.

5            THE COURT:  Thank you.

6            MR. LILLIS:  Good noon day, your Honor.  We thank

7   everyone for the opportunity this week to have had this case

8   heard on behalf of Cedar and all the support we've had and all

9   the cooperation we've had from counsel, etc.

10           We suggest that the preponderance of the evidence

11  shows that when you look at Exhibit 80 and you look at 3, 5 and

12  C, it shows that there was injury or damage pre-Bow Flora.  The

13  control number is D.  Indeed, if D had been found to be off

14  specification in the shore tank, Dongbu would have been liable

15  as well because it was before risk of loss passed.

16           Instead, what D shows, and Mr. Minton testified to, is

17  the cargo as manufactured by Kumho, and nominated by Dongbu to

18  fill that contract, was manufactured fine.  It was on

19  specification.  So I would suggest, your Honor, that sample D

20  gives us a baseline as a base data point.

21           Mr. Minton, I think correctly, suggested that you have

22  to look at all the evidence.  We can't just cherry-pick one

23  here or we can't just grab one there.  We have to look at all

24  the evidence.  All the evidence shows --

25           THE COURT:  Mr. Lillis, let me ask a couple questions.

Da3QcedF

1              MR. LILLIS:  Go ahead, Judge.

2              THE COURT:  First question:  For you to prevail, do I

3      have to be persuaded of the seeding theory?

4              MR. LILLIS:  I don't think so.

5              THE COURT:  Is there anything in the record that

6      suggests that the contemporaneous samples were not accurate

7      measures of the cargo at the time they were taken; that is to

8      say, the May 20 test?

9              MR. LILLIS:  No, I'm sure they were correct at that

10     time.

11             THE COURT:  So what are the possibilities then of

12     understanding why, if it was tested on May 20, the first foot

13     on the Bow Flora showed a hazen unit of 4 and after loading

14     showed a hazen unit of 4, what are the possible explanations

15     then of how the future off specification could be attributed to

16     what happened before the Bow Flora?

17             MR. LILLIS:  OK, I'm sorry.  I would say partly yes --

18     I wasn't looking at the top line.  You're correct on that.

19             THE COURT:  I worried about that; that you haven't

20     been looking at the top line.  It's an important line, isn't

21     it?

22             MR. LILLIS:  Well, it was a line that my client paid

23     $2 million for the cargo.

24             THE COURT:  Is it a line that your experts have

25     accounted for?

Da3QcedF

```
 1            MR. LILLIS:  Well, they accounted for it in the
 2    seeding.
 3            THE COURT:  OK.  So back to my first question.
 4            MR. LILLIS:  That's fair.  That's fair.  They've
 5    accounted for it in the seeding, is that it was injured pre-Bow
 6    Flora, and they looked at those three samples, the retained
 7    samples 3, 5 and C.
 8            THE COURT:  So, for you to prevail, I have to be
 9    persuaded of your expert's seeding theory.
10            MR. LILLIS:  Yes.
11            THE COURT:  Thank you.
12            MR. LILLIS:  Let me just get a couple other things out
13    of the way for a moment, your Honor.
14            THE COURT:  Can I ask -- maybe this is where you were
15    going.
16            MR. LILLIS:  Please.
17            THE COURT:  Another sort of framing question.  Your
18    brothers for the defendants say that even if I am persuaded by
19    a preponderance of the evidence that the phenol was injured
20    before it passed the rail of the Bow Flora, that they can still
21    prevail because of the express language in the contract
22    requiring as a final measure of specification to be the
23    contemporaneous testing.
24            MR. LILLIS:  Well, it's not the contemporaneous
25    testing.  The final surveys turned out to be all of them.  They
```

Da3QcedF

1    were all of them -- all of the inspectors dealt with that.

2            THE COURT:  So take on, if you would -- persuade me

3    that if I conclude, and in light of the contract language, how

4    is it that -- persuade me that if I conclude that some injury

5    occurred before the Bow Flora, that they have to be liable in

6    light of the contract language, in light of the fact that it

7    tested on spec on May 20.

8            MR. LILLIS:  Can I have my colleague cover that point?

9            THE COURT:  Sure.

10           MR. LILLIS:  Should we do that right now?  OK.

11           MR. WILLIAMS:  Your Honor, the answer to your question

12   is based on an actual reading of the contract language.

13           THE COURT:  Always a good place to start.

14           MR. WILLIAMS:  Always a good place to start.  The

15   contract provides that the inspection will be by mutually --

16           THE COURT:  Slow down for the court reporter when

17   you're reading, but also let me get the language in front of me

18   while you're reading:  It's probably an exhibit.

19           MR. WILLIAMS:  It is Exhibit 5, your Honor.

20           MR. LILLIS:  It's Exhibit 5.

21           MR. WILLIAMS:  The first page, inspection clause,

22   about three-quarters of the way down.

23           "The inspection will be by mutually acceptable

24   independent surveyors whose findings as to quality, quantity as

25   per shore tank figures at load port are final and binding on

Da3QcedF

1    both parties."  This is an agreement that the figures relating

2    to the temperature and ullage and quantity of the shore tank

3    will be final and binding.  Just the load port shore tank.  No

4    other testing.

5            THE COURT:  So tell me what then that means.

6            MR. WILLIAMS:  That means that sample -- the

7    contemporaneous line, the first sample drawn less than five,

8    that is final and binding on the parties.  That is the only

9    sample drawn from the load port shore tank.  That result, and

10   only that result, is final and binding per this clause.

11           This argument was actually addressed.  It was made by

12   Dongbu during our summary judgment motion, and it was resolved

13   by Judge Swain in her opinion, which is Docket No. 118.

14           THE COURT:  I've got it.  You say she resolves it?

15           MR. WILLIAMS:  I think she does, your Honor.

16           THE COURT:  Point me to the language.

17           MR. WILLIAMS:  I will.  It is on page 8 of 12.

18           "Dongbu also vaguely intimates that the inspection

19   clause clearly extinguishes any liability under Article 36, but

20   it offers no explanation as to how.  The inspection clause only

21   mentions the tests conducted on the phenol in the shore tank,

22   the first of many tests conducted over the course of delivery.

23   Dongbu nonetheless appears to construe this clause to mean that

24   it fulfilled its contractual obligation concerning the phenol's

25   quality when the independent surveyors drew samples from the

Da3QcedF

```
 1    shore tanks and certified that it was on specification.  This
 2    construction would render the FOB term and the elaborate,
 3    mutually agreed-upon inspection regime a nullity."
 4             Then later in the paragraph she explains that because
 5    "There is no surer way to find out what the parties meant, than
 6    to see what they have done, and the parties' conduct here
 7    clearly demonstrates that they did not intend the inspection
 8    term to operate as Dongbu suggests."
 9             THE COURT:  So where in the contract do you think --
10    or maybe you don't, but where would it lay out the terms for
11    how to determine on specification?
12             MR. WILLIAMS:  Well, there is a secondary inspection
13    clause in the terms and conditions on the following page, your
14    Honor.
15             THE COURT:  Yes.  Paragraph?
16             MR. WILLIAMS:  Paragraph seven.  The paragraph reads:
17    "The goods need not be inspected by the buyer or its
18    representative upon delivery, but inspection may be made by
19    buyer's customer within one month after buyer acquires physical
20    possession of the goods or clearance by customer of the goods,
21    whichever is later."
22             So, there is a secondary inspection clause.  "This
23    mutually independent surveyor selection clause has no bearing
24    whatsoever on this matter.  It limits any party's ability to
25    challenge the results of the load port shore tank sample, but
```

1     that does not mean that the contemporaneous line of samples

2     drawn has any import on this case whatsoever.  Under the CISG,

3     a seller of cargo has an obligation to deliver goods that are

4     in accordance with the contract fit for their ordinary purpose,

5     fit for any intended purpose made known to the seller at the

6     time of the contracting, and in accordance with any

7     specification provided by the seller."

8            So the question then becomes, I guess, how do you

9     evaluate those things in the context of this case?  Cedar has

10    proposed that this has to be understood within the context of

11    the usage of this trade.  And the subjective intent of Cedar

12    and usage is governed by Article 9 of CISG, and Article 8 of

13    CISG mandates that the court consider the subjective intent of

14    the parties.  Dongbu has replied that we have a merger clause,

15    an alleged merger clause, because this is the entire agreement

16    on the parties.

17           If the entire agreement of the parties language

18    applies, then we spent that you could grant us a judgment as we

19    speak.  The contract face sets Kumho specifications.  Kumho

20    provided Cho Yong, Cedar's agent, its specifications in April

21    of 2005.  Those specifications are Exhibit 3.

22           Kumho's specifications call for a color of 5, not 10.

23    So, if Kumho's specifications govern -- if the alleged merger

24    clause limits the Court's consideration of all the evidence to

25    the four corners of that document and any document incorporated

1    by reference; namely, Kumho's specifications, you could look at

2    Sample D, and the question is over, because it's 10 and it

3    should be 5.

4              THE COURT:  But you would still have to persuade me

5    that it's that testing that matters as opposed to the

6    contemporaneous testing.

7              MR. WILLIAMS:  And I can do that in this way:  Like

8    Judge Swain said, there is no truer Way of determining the

9    parties' intent than by determining what they did.  So let's

10   look at the merger clause first.  We have a merger clause

11   entered into -- I'll back up a second.

12             Cedar starts negotiating with Kumho in April of 2005.

13   Cho Yong explained that.  At some point, Kumho decides to

14   appoint Dongbu as an export agent.  This is in the declaration

15   of Mr. Chu that was put forward by Dongbu.  There is a meeting

16   between Mr. Cho representing Cedar, Mr. Chu representing

17   Dongbu, and some representative of Kumho.  They orally agree on

18   price, quantity, quality, delivery and payment terms at a

19   dinner.

20             A couple of days later, Cedar sends the contracts that

21   we looked at prior, the May 17 contracts that memorializes the

22   oral contract.  That has the full agreement of the parties'

23   language.

24             A couple days later, Cedar decides that they want to

25   resell this product to Ertisa.  They inform Kumho of this

Da3QcedF

1    intent and provide Ertisa's specifications.

2            Now, up until this point Cedar has relied on the

3    specification of phenol in tab 3, which is evidenced by its

4    letter of credit application, which is at Exhibit 6.  That

5    letter of credit application incorporates Kumho's

6    specifications calling for a color of 5.  That letter of credit

7    application is provided to Dongbu, and they accept it in an

8    email on May 18.  So up until that point, the parties agree

9    Kumho specifications calling for a color of 5 applied.

10           In the interim, Cedar decides I want to sell this to

11   Ertisa.  As Mr. Harfouche explained, he wanted to do a

12   back-to-back transaction, so he wanted to buy on Ertisa's

13   specs. so he could sell on Ertisa's specs, the assumption being

14   that product when purchased is going to be delivered in the

15   same condition as when it's delivered ultimately to the

16   subsequent customer.

17           So, Cedar informs Dongbu of this.  They provide Ertisa

18   specifications.  Thereafter, Cedar incorporates Ertisa's

19   specifications into the letter of credit, and Dongbu

20   incorporates them into its commercial invoice.

21           So, we submit that that is a modification of the

22   contract after the fact of the entire agreement language being

23   tendered back and forth between the parties.  We don't

24   understand how Mr. Huttenlocher can have it one way but not the

25   other way.  If the color has changed and the parties agree to a

Da3QcedF

1    modification of the contract, then by definition, the terms of

2    the May 17 agreement can't be the entire agreement of the

3    parties because the entire agreement of the parties includes

4    this modification.

5         So, there was no intent that that clause, the entire

6    agreement language, functioned as a merger clause excluding all

7    other evidence of intent or usage in the trade.  Certainly not

8    intent.

9         As for usage in the trade, again, Judge Swain has

10    already resolved the issue.  She held in the opinion, again

11    Docket No. 118.  "Even if Dongbu showed that the parties

12    intended the merger clause to exclude Article 8 and that Cedar

13    informed Dongbu of its intent to resell the phenol prior to the

14    contract memorialization, Cedar could still introduce evidence

15    of petrochemical trade practices to bolster the inference that

16    Dongbu knew, or should have known, that the phenol would be

17    unfit for ordinary usage if it degraded prior to reaching its

18    final destination."

19         So, Judge Swain has already cited usage and custom and

20    practice in the industry is relevant here.  It contexualizes

21    the entire conversation we've been having.

22         THE COURT:  All right.  I understand the points.  We

23    will go back to Mr. Lillis, because you still do have to show

24    where the injury occurred.

25         MR. WILLIAMS:  If I can just run through one more

Da3QcedF

1    minute.

2           THE COURT:  Sure.

3           MR. WILLIAMS:  The issue then becomes you have to

4    consider usage.  Basically, we submit you have to consider the

5    usage of the trade and the intent of Cedar in determining what

6    happened here.  So the question is:  Did this phenol comport

7    with the contract?  The contract called for pure phenol.  Pure,

8    by definition, means homogenous, free of extraneous material,

9    and we submit that sample C shows that on separate instances

10   this material was not pure, insofar it was not entirely phenol.

11   There was some suspect material, sediment or a particulate

12   matter in sample C.  That alone shows this wasn't pure phenol.

13          THE COURT:  Well, unless there was something wrong

14   with the sample.  By that, I mean that the sample got

15   contaminated in a way that didn't reflect the state of cargo at

16   that time.

17          MR. WILLIAMS:  Well, you have to understand, as John

18   Minton explained, you take an empty bottle -- actually Mr. East

19   and Mr. Minton explained -- you rinse it, and then you descend

20   it -- it descends through the sample and is pulled back up.

21          Whatever came into that bottle was in the belly of the

22   beast.  It was inside the Green Pioneer.  This idea that there

23   was some sort of rag or particulate matter already in the

24   bottle is nonsense.  The parties had stipulated that the SGS

25   surveyor who pulled these samples, sample C, this particular

Da3QcedF

1   sample only uses clean sample bottle.

2           MR. WEINER:  I'm sorry.  That is not what his practice

3   is.

4           MR. WILLIAMS:  Excuse me.

5           THE COURT:  It's not your turn, Mr. Weiner.

6           MR. WEINER:  I'm sorry, your Honor.

7           MR. WILLIAMS:  Paragraph 43, the parties stipulated

8   that SGS Korea's Mr. Yong pulled sample C.  His practice is to

9   use new, clean sampling bottles when sampling petrochemical

10  cargoes.

11          So, we submit that that sample illustrates that this

12  was not pure phenol.

13          As far as the intended use and its ordinary use, I

14  don't think there is any debate about the need for phenol to

15  remain practically colorless, below 10, for its intended

16  purpose.  This arrived at over 500.

17          As for its intended purpose, because Cedar explained

18  to Dongbu, who must have explained to -- or explained to Kumho

19  who must have explained to Dongbu because Dongbu ultimately

20  agrees, they started uses Ertisa specifications.  So they must

21  have known this was going to be a sale that was going to be

22  negotiated to Ertisa; and because it arrived at 500, those

23  didn't comport to Ertisa's specifications.

24          Last, as Mr. Lillis has explained, they ultimately

25  didn't comport with the replacement specifications of color 10.

Da3QcedF

1          THE COURT:  Thank you.

2          Mr. Lillis.

3          MR. LILLIS:  We appreciate this opportunity to be able

4     to have this dialogue with the Court.

5          Exhibit 59 is the letter that Mr. Weiner referred to

6     earlier.  We have heard a lot about Mr. East didn't do this and

7     Mr. East didn't do that.  First of all, what Mr. East didn't do

8     is he didn't go forward with a causation study.  He wanted to

9     do a causation study.  And the underwriter said, "No, we're not

10    going to pay for that.  We don't want to do that."  But he had

11    reported to Mr. Sparrow in August that as far as he was

12    concerned, based upon the Rotterdam results and based upon the

13    Ulsan results, the second line and the bottom line, that as far

14    as he was concerned, it was injured pre-Bow Flora.  Indeed,

15    Ertisa accepted that.  And that was against Ertisa's interest

16    because the underwriters basically declined the case.

17         The same for Cedar.  The underwriter said, "We're not

18    paying it because we were not on the risk at that time."  So,

19    sure, do scientists like to do more tests to find out

20    causation?  Yes.

21         All of this about phenol being -- an off-color on

22    phenol being not well understood.  That's dealing with

23    causation in terms of the fact.  The fact is it was off color.

24    And phenol does not go off color every day.  True.  Millions of

25    tons a year are shipped of phenol around the world and they

1    don't go off color.  Millions of tons a year are shipped around

2    the world with samples in ships' lockers that do not go off

3    color.

4         Mr. Minton testified that if that sample D had been

5    put onboard the Bow Flora, he estimates it would have outturned

6    in Rotterdam at maybe a 5.  And we're back to the seeding,

7    Judge, and you're right, all of those samples starting to

8    the -- with Bow Flora going across were in the ship's locker,

9    and we contend they were already damaged.

10        Coming back to Exhibit 59.  59 is important because

11   Cedar told Dongbu right away that there was a problem, and

12   right away Dongbu came back and declined liability.  However,

13   Dongbu did participate in the Ulsan testing.  That's Exhibit

14   64.

15        Exhibit 64 is interesting because a lot of folks

16   signed that.  Kumho signed it, the manufacturer at page 2.

17   Dongbu signed it.  Minton signed it.  The shipowner for Bow

18   Flora signed it.  There was no, what we would call in our

19   business, there were no exceptions.  There were no notes or

20   footnotes saying "we disagree with this" or "we disagree with

21   that" or "we disagree with the next thing."

22        I think what's more important in terms of rebuttal to

23   some of counsel's suggestions that more testing could have been

24   done, Dongbu also could have done more testing if they wanted

25   to.  I think there was a suggestion today, I'm not sure, that

Da3QcedF

1    GSI, Dongbu's own inspectors and surveyors had other samples.

2    Well, if they were confused or if they wanted to defend

3    themselves or they wanted to clarify all the things that were

4    put on Mr. East, Dongbu could have done that as well.

5         The other thing with Exhibit 64, the Ulsan report, and

6    Mr. Harfouche of Cedar testified that as far as he's concerned,

7    sample A was not on specification because it was off-hue.

8         THE COURT:  Under that theory, sample D is not on

9    specification, right?

10        MR. LILLIS:  It's supposed to be clear.  That's fair,

11   Judge.

12        THE COURT:  Tell me if this is wrong.  Your experts

13   have concluded that there wasn't a problem in the shore tanks.

14        MR. LILLIS:  That's right.  That's right.  I think the

15   trader -- and that's fair, the business person does not want to

16   have off-hue product.  At the time, it wasn't to be off-hue.

17   They don't want cloudy product.  But it was still off color,

18   so, yes, yes.  Minton saw sample D off-hue and still concluded

19   it on specification.  That's correct, Judge.

20        THE COURT:  So should I take your fact witness or your

21   expert witness?  They're inconsistent on this point.

22        MR. SKWRAO:  Yes, they are, Judge.  In most trials,

23   when they go on with -- in most trials that I'm involved with,

24   everything doesn't line up perfectly symmetrically because the

25   evidence is what it is.

Da3QcedF

1          THE COURT:  So, who are you going to throw overboard

2     here?

3          MR. LILLIS:  Well, I think it's, Judge, kind of --

4          THE COURT:  Into the phenol tank.

5          MR. LILLIS:  I think it's kind of clear versus cloudy.

6     I think it's pretty clear that Mr. Minton is more qualified.

7          THE COURT:  OK.

8          MR. LILLIS:  Mr. Minton has had 40 years of

9     experience.  He'd a leading consultant to the London market on

10    these issues for petrochemicals.  If Mr. Minton is OK with

11    sample D, Exhibit 80, then I'm OK with sample D.

12         THE COURT:  Right.

13         MR. LILLIS:  The other interesting thing, we've

14    endured in good spirit, but we've endured a torrent of

15    criticism of the Minton firm for all kinds of things,

16    regrettably, I haven't had the chance to cross-examine anyone

17    from Dongbu and any scientist who would come in and say,

18    "Minton, you're all wet on the science," so ...

19         In terms of this heating, which is Exhibit 81, which

20    is the famous, or the infamous, temperature records on the Bow

21    Flora, I am going to refer the Court to Plaintiff's Exhibit 23.

22    Plaintiff's Exhibit 23 is the heating clauses for Cedar.  Yes,

23    it says the master is to keep the cargo between 50 and 55.

24    And, yes, at one point it got to 55.9.  At other times it

25    jumped around a little bit, but paragraph three --

Da3QcedF

1        THE COURT:  Can I ask you a question that just

2    occurred to me.  I probably should have asked it of the expert.

3    Obviously, the first foot is important.  We test separately for

4    it.

5        MR. LILLIS:  Yes.

6        THE COURT:  At least it's been proffered that we test

7    separately for it because of the possibility of scalding, which

8    makes some intuitive sense, and yet we don't have that

9    temperature.  Isn't that surprising?

10       MR. LILLIS:  No.

11       THE COURT:  Elaborate.

12       MR. LILLIS:  As was explained, we're dealing with a

13   tank that's about the size of this courtroom, Judge.  We are

14   talking about the Bow Flora right now?

15       THE COURT:  Yes.

16       MR. LILLIS:  OK.  I have evidence on that.  I don't

17   have it on the Green Pioneer.  There are coils down in the

18   bottom of the tank on the floor here where water goes through

19   it.  Then once it's loaded, they'll heat up the hot water, and

20   that's how they'll heat the tank.  The chief mate has testified

21   that they did not turn on the heat in the Bow Flora until after

22   all the cargo is loaded.  That is unrebutted testimony.  That's

23   their standard practice.  She was very clear about that.

24   That's in the transcript.  That's Exhibit 93.

25       We have that in our proposed findings of fact, Judge.

Da3QcedF

1          THE COURT:  So her testimony is that in the tank --

2          MR. LILLIS:  In the coils.

3          THE COURT:  So in the --

4          MR. LILLIS:  The pipes.

5          THE COURT:  Right.  I'm sorry.  Let me find my word.

6   What do you call the container on the Bow Flora that holds the

7   phenol?

8          MR. LILLIS:  That is the tank.

9          THE COURT:  The tank, OK.

10         MR. LILLIS:  This is tank 13.

11         THE COURT:  So there is no heating applied to the tank

12  until --

13         MR. LILLIS:  After all the cargo has been loaded into

14  tank 13 center.

15         THE COURT:  And that's testimony in Exhibit 93?

16         MR. LILLIS:  93, chief mate Nilsen.  I asked her

17  explicitly about this, Judge.

18         Now, the way the heating is applied, it's applied

19  through pipes in the bottom, or the floor.  There is no way

20  someone can physically go down and take that manually because

21  this is toxic chemical.  This chemical, phenol, you can only

22  handle it either in refinery or on a ship, in a full suit.

23         THE COURT:  I understand.  I get the point.  Let me

24  ask a question.  What does the evidence show as to why the

25  first foot is tested for color?

Da3QcedF

1              MR. LILLIS:  In the normal practice?

2              THE COURT:  Yes.

3              MR. LILLIS:  The normal practice, the first foot is

4    tested on all petrochemical shipments and all petrol product

5    shipments.

6              THE COURT:  Why?

7              MR. LILLIS:  In order to see if there is potential

8    contamination at that time.

9              THE COURT:  Why wouldn't they just test it before

10   loading and after full loading?

11             MR. LILLIS:  Because if there is a problem in the

12   line, and it shows up right away, you don't damage the whole --

13   you don't damage 2,000 tons.  You only may damage --

14             THE COURT:  Is there any evidence in the record as to

15   why the first foot is tested?  I mean, what you just said makes

16   intuitive sense.  There's been a suggestion -- and I don't know

17   what the evidentiary point is -- but the suggestion has been

18   it's tested because of the scalding possibility.

19             MR. LILLIS:  Well, it's tested across all -- I don't

20   know if I asked the chief mate or the master about it.  It's

21   tested across the board on all petrochemicals to try and see if

22   there is a problem.

23             THE COURT:  I might ask them, but for the moment I

24   will ask you:  Is there evidence in the record to support the

25   notion that the first foot is tested because of the possibility

Da3QcedF

1    of scalding?

2              MR. LILLIS:  I don't know that, Judge.

3              THE COURT:  OK.

4              MR. LILLIS:  I just know in all of our shipments,

5    either on petrochemicals or jet fuel or gasoline, anything that

6    is a refined product, it's always tested on the first foot.  So

7    it's not just phenol.

8              THE COURT:  It sounds, if I'm right, that the

9    testimony of the chief mate that you're pointing to would, as

10   an evidentiary matter, refute the possibility that the phenol

11   was scalded when it got loaded into the tank.  Is that your

12   point?

13             MR. LILLIS:  My point is -- well, you asked me a more

14   generic question.  You're asking me a generic question, and

15   then you're asking me a specific question.  I gave you my

16   general answer.

17             The specific answer, Judge, is the chief mate on the

18   Bow Flora's specific answer on the specific piece of evidence

19   in the record here is Exhibit 93.

20             THE COURT:  Right.

21             MR. LILLIS:  Which I will cite in the proposed

22   findings of fact.

23             THE COURT:  I'm just looking for the testimony.  Go

24   ahead.  What paragraph?

25             MR. LILLIS:  The Exhibit?  I mean, the deposition?

Da3QcedF

1    I'm going to have to look at the transcript, Judge.

2            THE COURT:  Go ahead.  You're telling me that.

3            MR. WEINER:  Your Honor, there is testimony in the

4    record on scalding.

5            MR. LILLIS:  I'm at page 43, Judge.

6            THE COURT:  Just a second.  She says, "The coils are

7    filled with water but heating doesn't start before we're

8    completed."

9            MR. LILLIS:  That's correct.  Page 43/line 10 and 11

10   of Exhibit 93.

11           THE COURT:  Do you think that testimony as an

12   evidentiary point refutes the contention that the phenol could

13   have been scalded upon hitting the tank?

14           MR. LILLIS:  In the Bow Flora?

15           THE COURT:  In the Bow Flora.

16           MR. LILLIS:  Absolutely.  Absolutely.  There is also

17   in the pretrial order the stipulation -- I'm sorry, in Martin

18   East, which is Exhibit 85 --

19           THE COURT:  Yes.

20           MR. LILLIS:  -- at paragraph 18, there is just a

21   general comment on first foot samples.

22           THE COURT:  But as you stand here, you're not aware of

23   evidence that explains why the first foot is tested.  You've

24   offered an intuitive explanation, I grant you that.  But is

25   there anything in the record to support that?

Da3QcedF

1          MR. LILLIS:  I'm not sure.  We may have it in the

2     record, Judge.  I don't have it right this second.

3          THE COURT:  OK.  While you're looking, Mr. Weiner,

4     against my better judgment, just a second, and I will give you

5     full time, Mr. Lillis, but since you're looking...

6          MR. LILLIS:  I got 18 and 19 of East, I think, answers

7     it.

8          THE COURT:  OK.

9          MR. LILLIS:  Of Exhibit 85.

10         THE COURT:  Hang on.  18 and 19.  I'm going to look at

11    that in one second.

12         Mr. Weiner, briefly.

13         MR. WEINER:  125/line 7 to 12.

14         THE COURT:  Says what?

15         MR. WEINER:  It says: "Would you agree with me that

16    the first foot is important because sometimes cargo can get

17    scalded as it is first loaded on to a ship.  Is that right?

18    "A.  That's correct.

19    "Q.  That's one of the reasons you take a first foot, right?

20    "A.  That's one of the reasons you take a first foot, right."

21         MR. WILLIAMS:  I don't have that.

22         MR. WEINER:  He's on cross-examination.

23         THE COURT:  Gentlemen, this is why it's against my

24    better judgment.  Everybody sit down except Mr. Lillis.  Only

25    Mr. Lillis talks.  Go ahead, Mr. Lillis.

Da3QcedF

1              MR. LILLIS:  What do I have, Judge, another five?

2              THE COURT:  I'm sorry.

3              MR. LILLIS:  What do I have, another five minutes

4      maybe?  I know you have a 1:00.

5              THE COURT:  I do.  I will tell you in a second.  You

6      have 10 minutes.

7              MR. WILLIAMS:  Judge, do you mind if I address one

8      point that I think will help assist the Court in understanding

9      whether or not Article 36(1) is applicable in light of

10     Mr. Huttenlocher's argument?

11             Mr. Huttenlocher tried to parse 36(1) from 36(2), and

12     I'm afraid he fails to do so well.  Article 36(1) provides

13     that:  "The seller is liable in accordance with the contract in

14     this convention for any lack of conformity which exists at the

15     time when risk passes to the buyer even though the lack of

16     conformity becomes apparent only at a time thereafter."

17             And Ralph Folsom has explained in his text

18     *International Business Transactions in a Nutshell* that:  "Any

19     defect that exists at the time risk of loss passes is actual

20     even if discovered later; thus, the buyer is still able to

21     recover for any non-conformity which becomes apparent long

22     after delivery, but the buyer may have to prove that the defect

23     was present at delivery.  The buyer need not prove what caused

24     the goods to be defective, only that they are, in fact,

25     defective.

1        Therefore, all this talk about whether not we've

2   proven the actual cause of the loss is unnecessary.  We don't

3   have to show what happened.  We have to show by when it

4   happened.

5        THE COURT:  Your position is you have met your burden

6   if you have established that there was damage to the cargo

7   before the Bow Flora.

8        MR. WILLIAMS:  Right.  And we think that Judge Swain's

9   opinion supports that fact.

10        There is another passage from Sylvain Bollee in his

11   text, *The Theory of Risks in the 1980 Vienna Sale of Goods*

12   *Convention* at page 278.  It's printed in 1999.

13        This is all available on the CISG's website where he

14   explains that:  "What becomes apparent in the situation under

15   Article 36 is a defect which already affected the goods to a

16   full extent at the time of the passing of risk.  Although this

17   discovery requires further examination or the development of a

18   condition which existed in an embrionic form at the time is an

19   actionable breach of contract."

20        Now, Mr. Huttenlocher tried to suggest that 36(1)

21   suggests that goods are -- the seller can be liable for goods

22   ad infinitum.  That is wholly not the case.

23        If you look at Article 38 and 39, Article 38 requires

24   that:  "A buyer examine the goods or cause them to be examined

25   within a short a period as is practical under the

Da3QcedF

 1    circumstances."

 2              39(1) provides that:  "The buyer loses the right to

 3    rely on a lack of conformity of the goods if he does not give

 4    notice to the seller specifying the nature of the lack of

 5    conformity within a reasonable time after he's discovered it or

 6    ought to have discovered it."

 7              As Mr. Lillis explained, as soon as Cedar learned of

 8    the defect of the massively off specification condition, we

 9    notified Dongbu the same day we learned that fact.  So they

10    received notice in a timely manner.  They inspected it.  And a

11    second time as soon as possible under the circumstances.

12              All of this comports with the normal trade practice in

13    this industry.  Goods are loaded aboard a vessel.  They're

14    tested at a point in time to make sure they are on

15    specification at that time.  Samples are retained over the

16    course of delivery to ensure that there is no inherent defect

17    that exists that may later show up upon delivery.  That's

18    precisely what happened here.

19              MR. LILLIS:  Five minutes, Judge?

20              THE COURT:  Let me get a time check.  Yes, five.

21              MR. LILLIS:  Thanks, Judge.

22              Indeed the international scheme in terms of how all of

23    the traders operate, how all the companies operate in these

24    areas, they all have retained samples.  Everyone does retained

25    samples, and, fortunately, 99.99 percent of the time there is

Da3QcedF

 1   no problem.  Cargo is delivered whatever it is -- phenol, jet

 2   fuel, benzene, gasoline.  It is delivered without incident, and

 3   it moves on to customer or manufacturer, and it's used and

 4   that's it.

 5        When you have a situation like this where a cargo

 6   shows up off specification sometime during the supply chain,

 7   that's the reason retained samples are taken.  That is the

 8   reason that there is an SGS, the reason there is a GSI, and

 9   that was testified to by both of the commercial people over the

10   last couple of days.  Indeed, that's how the market operates.

11        My brother, Michael, commented on damages.  He is

12   correct.  Ertisa withdrew its lost profits claim yesterday,

13   paragraph 23.  Ertisa has their claim for diminution of value

14   and expenses.  The total of that is Exhibit 77.  And then their

15   packet in support of that is Exhibit 76.  All of that has been

16   established really without any cross-examination or any

17   effective dispute on that.

18        THE COURT:  May I ask, the other damages point made, I

19   think goes to the suggestion that, again, even if I conclude

20   that something happened prior to the Bow Flora, what have you

21   shown to establish that whatever did occur prior to the Bow

22   Flora is responsible for the extent of the damage to the

23   phenol?

24        MR. LILLIS:  Talking about the argument that there was

25   an aggravation of the damage on the Bow Flora?

Da3QcedF

```
1              THE COURT:  Yes.

2              MR. LILLIS:  Is that the question?

3              THE COURT:  Yes.

4              MR. LILLIS:  Number one, we contend --

5              THE COURT:  Or somewhere after Cedar takes

6    responsibility.

7              MR. LILLIS:  Well, it would have been -- the Bow Flora

8    was the only -- the Bow Flora is the only conveyance, Judge.

9              THE COURT:  I was thinking along the lines between the

10   Bow Flora and the Rotterdam shore tanks, but it's at over 500

11   before that, so ...

12             MR. LILLIS:  When Bow Flora came into Rotterdam, they

13   tested it when it was still in the tanks in the Bow Flora, and

14   it was over 500.  So the question is if Bow Flora aggravated

15   the damage, how do you deal with that?

16             THE COURT:  Right.

17             MR. LILLIS:  I think, number one, they did not

18   aggravate the damage.  Mr. Minton has opined that the handling

19   was within appropriate limits.  The Cedar heating instructions,

20   while they say 55, they also say 60 is when there would be

21   color damage.

22             THE COURT:  But there is certainly testimony that the

23   range should be 50 to 55 as handling instructions, and that a

24   certain level of constancy of temperature should be maintained,

25   and, in particular, there is a document that talks about no
```

1    greater fluctuation than a degree over a 24 hour period.

2           MR. LILLIS:  These are all goals, Judge, and we are

3    also dealing in the real world here.  We are dealing with a

4    tank that is as big as this room.  So this is not a perfect

5    science or a perfect situation.  This is an attempt to try and

6    regulate temperature as best you can.  But with a bulk that is

7    as big as this room with coils that are only in the bottom, you

8    are not going to be approaching perfection.

9           In fact, here, I would suggest, that perfection would

10   get in the way of good.  The practice is this is a modern ship.

11   These were modern officers, well-trained, and these temperature

12   records were comfort -- we're comfortable with these

13   temperature records.  That's the reason we reopened and had the

14   big fight about temperature records and wound up taking the

15   captain and wound up taking the chief officer.

16          The other thing is that we didn't know there was any

17   kind of a problem until we got to Rotterdam and there would be

18   no way to segregate it anyway.

19          So if you injure a cargo prior to delivery and it's

20   going onboard a vessel, those are the foreseeable and direct

21   consequences that flow from there.

22          THE COURT:  Respond to the point, if you put some

23   weight on the August Ulsan test, then we know that it went from

24   10 to over 500.  Obviously, you've offered your seeding theory

25   to explain how this gets worse over time, but that would also

Da3QcedF

suggest, I think, quite the possibility that even if there was

a problem, it somehow exacerbated, given that it's so wildly

off specification at the end, and given that -- well -- given

that and given what we know about the temperature controls.

MR. LILLIS:  I suggest to you, your Honor, that the

temperature controls were within reasonable, practical,

reality.  That is my suggestion.

In terms of -- I mean, John Minton testified if --

let's assume you're doing about 55 degrees Celsius in terms of

heating the cargo.  If it's predamaged, that's going to

accelerate it.

THE COURT:  Right.  But that suggests that that

subsequent event can exacerbate an existing problem.

MR. LILLIS:  It can, but it is also foreseeable.  You

are sitting here, you are loading a cargo which turns out to be

off specification onto a vessel that is going on a voyage.  I

would suggest that the Bow Flora handling was within normal

proper limits.

THE COURT:  Since it's your burden, it seems to me --

we obviously are putting a great deal of weight on the factual

determination whether you have established that something

happened to this cargo before the Bow Flora, but your proof has

to be that the injury at the end of the road in Rotterdam is

attributable to what happened before the Bow Flora.

MR. LILLIS:  And foreseeable consequences flowing

Da3QcedF

1    therefrom.

2              THE COURT:  But you don't know -- but how do I answer

3    what the natural foreseeable consequences are of an injury that

4    your experts can't say what it was or when it was?

5              MR. LILLIS:  Well, the injury, we know, is before Bow

6    Flora.

7              THE COURT:  That is what we are assuming for the

8    moment, yes.

9              MR. LILLIS:  Right.  That's my contention, right.

10             THE COURT:  So let me ask this:  Let's focus on sample

11   C, since obviously that's extraordinarily important for you.

12             MR. LILLIS:  Yes, it is.

13             THE COURT:  I think what we know is that there is a

14   contamination in the phenol, the stuff, which presumably

15   explains -- well, I think from your perspective explains why

16   we've got a -- you tell me, it explains why we have a 30 to 50,

17   because of the matted substance?

18             MR. LILLIS:  No, not necessarily.

19             THE COURT:  But maybe?

20             MR. LILLIS:  The matted substance is there, but not

21   necessarily.

22             THE COURT:  Well let me ask this:  Let's say it's the

23   matted substance that's the contamination -- and I'm not

24   talking about a contamination of the sample.  I'm talking about

25   a contamination of the cargo.  Let's say it's a matted

Da3QcedF

1   substance.

2          MR. LILLIS:  Yes.

3          THE COURT:  Is there any proof that that matted

4   substance could lead, by the time you get to Rotterdam, to a

5   hazen unit of over 500?

6          MR. LILLIS:  No.  No.  I don't have that evidence.

7          THE COURT:  I think your experts testify it's either a

8   contamination or --

9          MR. LILLIS:  Or heat.

10         THE COURT:  -- or temperature.

11         MR. LILLIS:  Correct.

12         THE COURT:  Is there testimony that the temperature

13  that the phenol is exposed to between the load port shore tanks

14  and the Bow Flora could lead to, by the time you get to

15  Rotterdam, a hazen unit of over 500?

16         MR. LILLIS:  Where are you starting, Judge?

17         THE COURT:  Is there any evidence that -- basically,

18  the point I am getting to is, let's say -- just take this as a

19  premise.

20         MR. LILLIS:  We're talking hypothetically, Judge.

21         THE COURT:  That you've established that something

22  happened before the Bow Flora.

23         MR. LILLIS:  Right.

24         THE COURT:  Don't you still need to establish that

25  whatever it is that happened could lead to, could cause, by the

Da3QcedF

1    time it gets to Rotterdam, a measurement of greater than 500

2    hazen?

3             MR. LILLIS:  John Minton testified to that.  He

4    absolutely testified to that.

5             THE COURT:  But he doesn't know what caused it.  So

6    something caused it, is what he told me.

7             MR. LILLIS:  But you don't need to know what caused it

8    in order to know that if it was this injured it could wind up

9    having a greater than 500, because ultimately that is the

10   reality.

11            THE COURT:  All right.  30 seconds to wrap it.

12            MR. LILLIS:  In conclusion, your Honor, as far as

13   Cedar is concerned, Cedar bought cargo.  It turned out to be

14   off spec.  We say the evidence shows that it was pre-Bow Flora.

15            I thought you were going to ask me about loss of good

16   will.  My brother, Michael, is correct that we have no forensic

17   accountants to deal with loss of good will.  I think both of

18   the commercial people testified for your Honor about loss of

19   good will, and that is just an estimate that if the Court --

20            THE COURT:  Am I supposed to put a dollar number on

21   that?

22            MR. LILLIS:  It would be within your discretion.

23            THE COURT:  And what evidence would I look to in the

24   record?

25            MR. LILLIS:  There is no evidence -- there is clearly

Da3QcedF

loss of good will, but there has been no demonstration of a

dollar amount.

THE COURT:  So any dollar amount I attributed would be

speculation?

MR. LILLIS:  It's reputational damage, Judge.

THE COURT:  So, if I say that the reputational damage

here is worth a dollar, is that OK?

MR. LILLIS:  It would be within your sound discretion,

Judge.

THE COURT:  And if I said the reputational damage here

is a million dollars, that's within my sound discretion?

MR. LILLIS:  I would say not.  I would say not.

THE COURT:  So --

MR. LILLIS:  If we're talking about a million two

euros in terms of actual hard damages.

THE COURT:  All right.  I've got the point, and you've

got the point.  I'm going to be late for my meeting.  Just give

me one moment.  I just want to gather my thoughts on what

exactly I'm going to ask you to do for briefing and when

because I have a notion, and I want to jot it out.  Give me a

second.

(Recess)

THE COURT:  At base what I want are final proposed

findings of fact and conclusions of law that are keyed to the

trial record as it now exists.  I want that to really be

Da3QcedF

1    streamlined to what I need.  So I am going to put you on a 25

2    page limit.  I want that by Wednesday.  The thing that I was

3    trying to formulate, and I am, frankly, still not able to quite

4    articulate in my mind exactly what the question is.  We are

5    getting at it, but it is the point of dispute as to the

6    contract and the terms and the interplay with CISG.

7            I am trying to articulate it in a way that really kind

8    of gets to what matters as a decisional point.  I don't know if

9    anyone has a suggestion for the question.  I come to the

10   question in the following way, which I've asked, which is:  If

11   I conclude that the evidence shows damage prior to the Bow

12   Flora, does that mean that Dongbu is liable?  And

13   Mr. Huttenlocher's answer to that is no.  And Mr. Lillis' and

14   Mr. Williams' answer to that is yes.  And I think the

15   difference between you two has to do with various points of

16   contract interpretation and interplay with CISG.

17           MR. LILLIS:  Right.

18           THE COURT:  Would you both agree with that?

19           MR. WEINER:  I agree with that, your Honor, yes.

20           THE COURT:  So let me try this:  My proposal would

21   also be to get like 10 pages of briefing on the question.

22           MR. LILLIS:  That's what I was going to suggest.

23           THE COURT:  So, separate and apart, do your proposed

24   findings of fact and conclusions of law, but give me 10 pages

25   of briefing on the question of just assume that it's been

Da3QcedF

1    established that some damage to the product occurred prior to

2    the Bow Flora, is there an argument that Dongbu is not liable.

3              MR. LILLIS:  And that includes the CISG discussion.

4              THE COURT:  Yes.  I have tried to think of a way to

5    formulate the question that gets at that, but every time I

6    think about a formulation of that question, I can't find how it

7    intersects exactly with how it matters here.  That is, it seems

8    to me, again, premised on the hypothetical which obviously is

9    the main point in dispute; but there is this other argument

10   that is present which may be decisional if I conclude that

11   plaintiff has met its burden on that factual point.

12             If I conclude that plaintiff has not met its burden on

13   that factual point, obviously, none of this matters.

14             So my suggestion -- and I might try to fine-tune it

15   and put out an order rephrasing the question, but as I sit here

16   now, in addition to your 25 pages of proposed findings of fact

17   and conclusions of law, I want a 10 page brief on the question

18   of whether if plaintiff has established damage to the phenol

19   prior to the Bow Flora, can Dongbu escape liability.

20             And I don't mean to interweave in that damages

21   questions.  I just mean to focus on the contract and the

22   interplay with CISG.

23             Mr. Lillis.

24             MR. LILLIS:  I was having the same thought that you

25   were having while you were having it.  I'm sorry, Judge.

Da3QcedF

1          THE COURT:  I know you well enough to believe you even

2     though it's funny.  Go ahead.

3          MR. LILLIS:  It is.  But as I was having that thought,

4     my counsel, Mr. Williams, handed me the pretrial order and

5     referenced me to paragraph three --

6          THE COURT:  Yes.  Yes.  Yes.

7          MR. LILLIS:  -- of the issues agreed to be decided.

8          THE COURT:  Go ahead, read it.

9          MR. LILLIS:  It basically says 3: "Did Cedar prove by

10    a preponderance of the evidence that the injury to the phenol

11    occurred before the phenol passed the rail of the Bow Flora?

12    If yes, then Cedar has established Dongbu's liability (Dongbu

13    reserves all its rights regarding damages).  If not, Cedar's

14    claims against Dongbu are dismissed."

15         THE COURT:  Interesting.  I will take a look at that,

16    but I still want briefing on the question.  You are arguing, in

17    effect, that they have waived the argument.  That is

18    inconsistent with their proposed findings, but I will -- is

19    that the argument?

20         MR. WILLIAMS:  This was a negotiated agreement between

21    counsel, and these are the three legal issues to be decided.

22    The first two are what is the entire agreement language and was

23    there a modification of the contract, and how does that

24    interplay on the Court's interpretation of the alleged merger

25    clause.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Da3QcedF

1          THE COURT:  OK.

2          MR. WILLIAMS:  I would propose we could brief those

3     issues.  I think those issues are discrete and they leave the

4     third issue in tact which is established.  The parties have

5     agreed.

6          THE COURT:  Well, the problem is -- and this is the

7     problem with my ability to get at this question, which is that

8     I think that's the wrong order, at least for me.  Everybody

9     agrees plaintiff has to establish that the damage occurred

10    prior to the Bow Flora.

11         MR. LILLIS:  Yes.

12         THE COURT:  But there are these separate arguments

13    made, which are, I think, embedded in the earlier questions in

14    the stip, what does the contract require and what is the

15    interplay with CISG.  And what they contend is even if conclude

16    that they have established -- you get the point.  I want

17    briefing on that.

18         MR. WEINER:  Just so I'm clear, the word "injury" to

19    me is different from the word "damage."  "Injury" here is a

20    liability issue.  "Damage" obviously is a calculation of harm.

21         THE COURT:  I don't mean damage.  So, to be clear, the

22    question is:  If we assume that plaintiff has established that

23    the phenol was injured prior to the Bow Flora, is Dongbu

24    liable?

25         MR. WEINER:  Yes.  Then there's the next issue which

Da3QcedF

1    is:  Did that cause the damage, the causation issue.

2              THE COURT:  Yes, I do understand that.  Tell me, that

3    is a damages question, a causation question, that I think is

4    separate and apart from the contract terms and the interplay of

5    the contract with CISG.

6              MR. WEINER:  That's correct, but that is not something

7    I think the parties had previously focused on.  We now have the

8    testimony regarding blending and the ability to bring phenol

9    back to spec., and, as your Honor raised in some of your

10   questions, there was a question about what caused the 500,

11   which that's the damage.  So I was wondering if you want that

12   addressed as well.

13             THE COURT:  You're right, it is a separate question,

14   and it has a legal and factual component.  So I will take

15   briefing on it.  Again, it is assuming the same premise.

16             Mr. Williams, I know what you are going to say; that

17   they've waived that too.  I'm not sure that's right, but you

18   can include in the briefing the waiver question and -- let me

19   finish.  So, for purposes of our briefing, we are going to

20   assume -- and this is obviously --

21             MR. LILLIS:  Hypothetical.

22             THE COURT:   -- the determinative question I have to

23   reach.  We are going to assume plaintiff has established that

24   the phenol was injured prior to the Bow Flora.  Question one:

25   Is Dongbu liable?  Question two:  If Dongbu is liable, has

Da3QcedF

1    plaintiff established damages?

2              MR. WILLIAMS:  Your Honor, may we touch on interest on

3    that point?  We obviously have different points of view as to

4    what rate applies.

5              THE COURT:  You can touch on interest, sure.  I think

6    all of those points including interest would be welcome to have

7    actual briefing.

8              On the core question of whether or not the phenol was

9    injured prior to the Bow Flora, there I want proposed findings

10   and conclusions.

11             MR. LILLIS:  Absolutely, your Honor.

12             MR. WILLIAMS:  I don't know how we're going to do this

13   in 10 pages, to be frank.

14             MR. WEINER:  I was going to say the same thing.

15             THE COURT:  OK, 15.

16             MR. LILLIS:  In fairness, Judge, I'm not going to be

17   writing the brief.  However, in fairness, you have put a lot

18   on--

19             THE COURT:  It's grown, I admit that.

20             MR. WILLIAMS:  You've put a lot on Mr. Williams and

21   Mr. Huttenlocher to do this in 15 pages.

22             THE COURT:  You can have 20 pages.

23             MR. LILLIS:  Thank you, your Honor.

24             THE COURT:  But, look --

25             MR. WILLIAMS:  Less is more.

Da3QcedF

1           THE COURT:  -- less is more, I assure you am.

2           As you can see, I try to figure out the core

3    decisional points.  I understand the context.  I don't need any

4    of that in terms of the factual issues.  I know 80 better than

5    Mr. Lillis, for example, so get to the core of what I need to

6    decide.

7           MR. LILLIS:  On 80, I will do proposed findings.

8    That's all.  I am not doing any briefing.  You want conclusions

9    of law on that also?

10          MR. WEINER:  Yes.

11          THE COURT:  There aren't many, but you have to

12   conclude.  You have to apply the findings to a conclusion.

13          MR. LILLIS:  OK.

14          THE COURT:  I agree there's not a lot of law there,

15   but it's for the analysis point.

16          MR. LILLIS:  OK.

17          MR. WEINER:  One other point, your Honor, I had

18   mentioned to you I'm beginning trial Tuesday, which means

19   between now and Monday I'm preparing for that.

20   Mr. Huttenlocher has now the burden of the findings of fact and

21   the brief, and Wednesday seems a little bit tough for him.

22   Could we have to that Friday that I mentioned now that we threw

23   in a 20 page brief?

24          THE COURT:  I'm sorry, I can't.  For my schedule, I

25   need it next week.

Da3QcedF

1          MR. WEINER:  OK.

2          THE COURT:  Given the number of -- you're not solo

3     practitioners.  You have resources.  Mr. Huttenlocher is, I'm

4     sure, up to handling the task.

5          MR. HUTTENLOCHER:  I am, your Honor.

6          THE COURT:  Gentlemen, thank you.  I do very much

7     appreciate your working together to resolve issues at the end

8     here.  There could have been more of that in the years past

9     maybe, but I do appreciate that, and I appreciate your

10    diligence and zealousness in presentation of your sides.

11          I'll come shake hands.  Thank you.  We're adjourned.

12          (Trial adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25